## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF KENTUCKY

| | |
|---|---|
| KENA MOORE, TIMOTHY K. SWEENEY, RUSSEL A. HOHMAN, SUSAN M. SMITH and VERONICA CARGILL, individually and on behalf of all others similarly situated, ) ) ) ) ) ) | CIVIL ACTION NO.:  3:21-cv-232-RGJ |
| Plaintiffs, ) ) | CLASS ACTION COMPLAINT |
| v. ) ) | |
| HUMANA INC., THE BOARD OF DIRECTORS OF HUMANA INC., THE HUMANA RETIREMENT PLANS COMMITTEE and JOHN DOES 1-30. ) ) ) ) ) | |
| Defendants. ) | |

## COMPLAINT

Plaintiffs, Kena Moore, Timothy K. Sweeney, Russell A. Hohman, Susan M. Smith and Veronica Cargill ("Plaintiffs"), by and through their attorneys, on behalf of the Humana Retirement Savings Plan (the "Plan"),[1] themselves and all others similarly situated, state and allege as follows:

### I.     INTRODUCTION

1.     This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the Plan's fiduciaries, which include Humana Inc. ("Humana" or "Company") and the Board of Directors of Humana Inc. and its members during the Class Period[2] ("Board") and the Humana

---

[1] The Plan is a legal entity that can sue and be sued.  ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plan is not a party.  Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plan and its participants.

[2] The Class Period, as will be discussed in more detail below, is defined as April 13, 2015 through the date of judgment.

Retirement Plans Committee and its members during the Class Period ("Committee") for breaches of their fiduciary duties.

2.      To safeguard Plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries.  Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B).  These twin fiduciary duties are "the highest known to the law." *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 426 (6th Cir. 2002), *cert. denied*, 527 U.S. 1168 (2003).

3.      The Department of Labor has explicitly stated that employers are held to a "high standard of care and diligence" and must, among other duties, both "establish a prudent process for selecting investment options and service providers" and "monitor investment options and service providers once selected to see that they continue to be appropriate choices."  *See,* "*A Look at 401(k) Plan Fees*," *supra*, at n.3; *see also Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1823 (2015) (*Tibble I*) (reaffirming the ongoing fiduciary duty to monitor a plan's investment options).

4.      Under 29 U.S.C. § 1104(a)(1), a plan fiduciary must give substantial consideration to the cost of investment options.  "Wasting beneficiaries' money is imprudent.  In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs."  Uniform Prudent Investor Act (the "UPIA"), § 7.

5.      "The Restatement … instructs that 'cost-conscious management is fundamental to prudence in the investment function,' and should be applied 'not only in making investments but also in monitoring and reviewing investments.'"  *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197-98 (9th Cir. 2016) (*en banc*) (quoting Restatement (Third) of Trusts, § 90, cmt. b) ("*Tibble II*").[3]

---

[3] *See also* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, (Aug. 2013), at 2, available at https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited February 16, 2021) ("You should be

6.      Additional fees of only 0.18% or 0.4% can have a large effect on a participant's investment results over time because "[b]eneficiaries subject to higher fees … lose not only money spent on higher fees, but also lost investment opportunity; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time." *Tibble II*, 843 F.3d at 1198 ("It is beyond dispute that the higher the fees charged to a beneficiary, the more the beneficiary's investment shrinks.").

7.       Most participants in 401(k) plans expect that their 401(k) accounts will be their principal source of income after retirement.  Although at all times 401(k) accounts are fully funded, that does not prevent plan participants from losing money on poor investment choices by plan sponsors and fiduciaries, whether due to poor performance, high fees or both.

8.      Prudent and impartial plan sponsors thus should be monitoring both the performance and cost of the investments selected for their 401(k) plans, as well as investigating alternatives in the marketplace to ensure that well-performing, low cost investment options are being made available to plan participants.

9.      At all times during the Class Period (April 13, 2015 through the date of judgment), the Plan had at least 3.4 billion dollars in assets under management.  At the end of 2018 and 2019, the Plan had over 4.2 billion dollars and 5.3 billion dollars, respectively, in assets under management that were/are entrusted to the care of the Plan's fiduciaries.

10.     The Plan's assets under management qualifies it as a large plan in the defined contribution plan marketplace, and among the largest plans in the United States.  As a large plan, the Plan had substantial bargaining power regarding the fees and expenses that were charged against participants' investments.  Defendants, however, did not try to reduce the Plan's expenses

---

aware that your employer also has a specific obligation to consider the fees and expenses paid by your plan.").

or exercise appropriate judgment to scrutinize each investment option that was offered in the Plan to ensure it was prudent.

11.     Plaintiffs allege that during the putative Class Period Defendants, as "fiduciaries" of the Plan, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties they owed to the Plan, to Plaintiffs, and to the other participants of the Plan by, *inter alia*, (1) failing to objectively and adequately review the Plan's investment portfolio with due care to ensure that each investment option was prudent, in terms of cost; and (2) maintaining certain funds in the Plan despite the availability of identical or similar investment options with lower costs and/or better performance histories; and (3) failing to control the Plan's administrative and recordkeeping costs.

12.      Defendants' mismanagement of the Plan, to the detriment of participants and beneficiaries, constitutes a breach of the fiduciary duty of prudence, in violation of 29 U.S.C. § 1104.  Their actions were contrary to actions of a reasonable fiduciary and cost the Plan and its participants millions of dollars.

13.     Based on this conduct, Plaintiffs assert claims against Defendants for breach of the fiduciary duty of prudence (Count One) and failure to monitor fiduciaries (Count Two).

## II.     JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001, *et seq*.

15.     This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and/or have significant contacts with this District, and because ERISA provides for nationwide service of process.

16.     Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District.  Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

### III.    PARTIES

**Plaintiffs**

17.     Plaintiff, Kena Moore ("Moore"), resides in Schertz, Texas. During her employment, Plaintiff Moore participated in the Plan investing in the options offered by the Plan and which are the subject of this lawsuit.

18.     Plaintiff, Timothy K. Sweeney ("Sweeney"), resides in Cincinnati, Ohio. During his employment, Plaintiff Sweeney participated in the Plan investing in the options offered by the Plan and which are the subject of this lawsuit.

19.      Plaintiff, Russell A. Hohman ("Hohman"), resides in Sapulpa, Oklahoma. During his employment, Plaintiff Hohman participated in the Plan investing in the options offered by the Plan and which are the subject of this lawsuit.

20.     Plaintiff, Susan M. Smith ("Smith"), resides in Austin, Texas. During her employment, Plaintiff Smith participated in the Plan investing in the options offered by the Plan and which are the subject of this lawsuit.

21.     Plaintiff, Veronica Cargill ("Cargill"), resides in Louisville, Kentucky. During her employment, Plaintiff Cargill participated in the Plan investing in the options offered by the Plan and which are the subject of this lawsuit.

22.     Each Plaintiff has standing to bring this action on behalf of the Plan because each of them participated in the Plan and were injured by Defendants' unlawful conduct.  Plaintiffs are

entitled to receive benefits in the amount of the difference between the value of their accounts currently, or as of the time their accounts were distributed, and what their accounts are or would have been worth, but for Defendants' breaches of fiduciary duty as described herein.

23.     Plaintiffs did not have knowledge of all material facts (including, among other things, the investment alternatives that are comparable to the investments offered within the Plan, comparisons of the costs and investment performance of Plan investments versus available alternatives within similarly-sized plans, total cost comparisons to similarly-sized plans, information regarding other available identical funds, and information regarding the availability and pricing of collective trusts) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.

**Defendants**

**Company Defendant**

24.     Humana is the Plan sponsor and a named fiduciary with a principal place of business being 500 West Main Street, Louisville, Kentucky.  The December 31, 2019 Form 5500 of the Human Retirement Savings Plan filed with the United States Department of Labor ("2019 Form 5500") at 1.

25.     Humana is a national provider of health insurance. Humana describes itself as "a leading health and well-being company … ." The December 31, 2019 10-k Report of Human Inc. as filed with the United States Securities and Exchange Commission ("2019 Annual Report") at 3.  As of December 31, 2019, Humana "had approximately 46,000 employees … ." 2019 Annual Report at 15.

26.     Humana appointed the Committee to, among other things, ensure that the investments available to Plan participants are appropriate, had no more expense than reasonable

6

and performed well as compared to their peers. The Humana Retirement Savings Plan as Amended and Restated, effective January 1, 2020 ("Plan Doc.") at 60. Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

27.     Accordingly, the Company had a concomitant fiduciary duty to monitor and supervise those appointees.

28.     Accordingly, Humana during the putative Class Period is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because it exercised discretionary authority to appoint and/or monitor the other fiduciaries, which had control over Plan management and/or authority or control over management or disposition of Plan assets.

### Board Defendants

29.     Humana, acting through its Board of Directors, appointed the Committee to, among other things, ensure that the investments available to Plan participants are appropriate, had no more expense than reasonable and performed well as compared to their peers. Plan Doc. at 60. Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

30.     Accordingly, each member of the Board during the putative Class Period (referred to herein as John Does 1-10) is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each exercised discretionary authority to appoint and/or monitor the other fiduciaries, which had control over Plan management and/or authority or control over management or disposition of Plan assets.

31.     The Board and the unnamed members of the Board during the Class Period (referred to herein as John Does 1-10), are collectively referred to herein as the "Board Defendants."

### Committee Defendants

32.     As discussed above, the Committee ensures that the investments available to Plan participants are appropriate, had no more expense than reasonable and performed well as compared to their peers. Plan Doc. at 60. As described in the Investment Policy Statement which governs the conduct of the Committee, the Committee must: "[t]wice a year, or more frequently as the Committee in its sole discretion may determine is otherwise necessary or appropriate, the Committee will evaluate the performance of each Investment Option." IPS at 3. As stated in the IPS, each fund in the Plan must be evaluated based on, among other things, its: "[r]eturn compared to the peer group and its benchmarks; … [f]ees and expenses; [and] [a]dherence to stated investment style … ." *Id.*

33.     The Committee and each of its members were fiduciaries of the Plan during the Class Period, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each exercised discretionary authority over management or disposition of Plan assets.

34.     The Committee and unnamed members of the Committee during the Class Period (referred to herein as John Does 11-20), are collectively referred to herein as the "Committee Defendants."

**Additional John Doe Defendants**

35.     To the extent that there are additional officers, employees and/or contractors of Humana who are/were fiduciaries of the Plan during the Class Period, or were hired as an investment manager for the Plan during the Class Period, the identities of whom are currently unknown to Plaintiffs, Plaintiffs reserve the right, once their identities are ascertained, to seek leave to join them to the instant action.  Thus, without limitation, unknown "John Doe" Defendants 21-30 include, but are not limited to, Humana officers, employees and/or contractors who are/were fiduciaries of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) during the Class Period.

## IV.   CLASS ACTION ALLEGATIONS

36.    Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the following proposed class ("Class"):[4]

> All persons, except Defendants and their immediate family members, who were participants in or beneficiaries of the Plan, at any time between April 13, 2015 through the date of judgment (the "Class Period").

37.    The members of the Class are so numerous that joinder of all members is impractical.  The 2019 Form 5500 lists 49,901 Plan "participants with account balances as of the end of the plan year."  2019 Form 5500 at 2.

38.    Plaintiffs' claims are typical of the claims of the members of the Class.  Like other Class members, Plaintiffs participated in the Plan and have suffered injuries as a result of Defendants' mismanagement of the Plan. Defendants treated Plaintiffs consistently with other Class members and managed the Plan as a single entity. Plaintiffs' claims and the claims of all Class members arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the Class have been similarly affected by Defendants' wrongful conduct.

39.    There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members.  Common legal and factual questions include, but are not limited to:

> A.    Whether Defendants are/were fiduciaries of the Plan;
>
> B.    Whether Defendants breached their fiduciary duty of prudence by engaging in the conduct described herein;

---

[4] Plaintiffs reserve the right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.

C.     Whether the Defendants responsible for appointing other fiduciaries failed to adequately monitor their appointees to ensure the Plan was being managed in compliance with ERISA;

D.     The proper form of equitable and injunctive relief; and

E.     The proper measure of monetary relief.

40.     Plaintiffs will fairly and adequately represent the Class and have retained counsel experienced and competent in the prosecution of ERISA class action litigation.  Plaintiffs have no interests antagonistic to those of other members of the Class.  Plaintiffs are committed to the vigorous prosecution of this action and anticipate no difficulty in the management of this litigation as a class action.

41.     This action may be properly certified under Rule 23(b)(1).  Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants.  Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

42.     In the alternative, certification under Rule 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## V.     THE PLAN

43.     The purpose of the Plan is "to provide a source of retirement income and to encourage and assist qualified Employees in maintaining a regular savings program on a before-tax and/or an after tax basis." Plan Doc. at 1.

44.     The Plan is a "defined contribution" or "individual account" plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the Plan provides for individual accounts for each participant and for benefits based solely upon the amount contributed to those accounts, and any income, expense, gains and losses, and any forfeitures of accounts of the participants which may be allocated to such participant's account. Plan Doc. at 14.  Consequently, retirement benefits provided by the Plan are based solely on the amounts allocated to each individual's account. *Id.*

### Eligibility

45.     In general, regular full-time employees are eligible to participate in the Plan. 2019 Auditor Report at 3. As stated in the Auditor Report: "[t]he Plan is a qualified defined contribution plan established for the benefit of the employees of Humana Inc. and its participating subsidiaries (the 'Company' or 'Humana') who are not employed in Puerto Rico ('eligible employees') … ." 2019 Auditor Report at 6.

### Contributions

46.     There are several types of contributions that can be added to a participant's account, including: an employee salary deferral contribution, an employee Roth 401(k) contribution, an employee after-tax contribution, catch-up contributions for employees aged 50 and over, rollover contributions, discretionary profit sharing contributions and employer matching contributions based on employee pre-tax, Roth 401(k), and employee after-tax contributions. 2019 Auditor Report at 6.

47.     With regard to employee contributions, "[a] Participant, through payroll deductions, may contribute not less than 1% nor more than 35% of the Participant's eligible compensation." *Id*. Humana may elect to make matching contributions to the Plan on behalf of their employees. As detailed in the 2019 Auditor Report: "[t]he Company matches 125% of a Participant's eligible pre-tax, Roth … and catch-up contributions that combined do not exceed 6% of their eligible compensation." 2019 Auditor Report at 7.

48.     Like other companies that sponsor 401(k) plans for their employees, Humana enjoys both direct and indirect benefits by providing matching contributions to Plan participants. Employers are generally permitted to take tax deductions for their contributions to 401(k) plans at the time when the contributions are made. *See generally,* https://www.irs.gov/retirement-plans/plan-sponsor/401k-plan-overview.

49.     Humana and its clients also benefit in other ways from the Plan's matching program.  It is well-known that "[o]ffering retirement plans can help in employers' efforts to attract new employees and reduce turnover." *See,* https://www.paychex.com/articles/employee-benefits/employer-matching-401k-benefits.

50.     Given the size of the Plan, Humana likely enjoyed a significant tax and cost savings from offering a match.

### *Vesting*

51.     Participants are immediately vested in their own contributions made to the Plan. 2019 Auditor Report at 8. Participants are subject to a 2 year vesting schedule before any employer matching contributions are considered earned. *Id*. As stated in the Auditor Report: "[g]enerally, once a Participant has completed two years of service, the Company Matching Account contributions vest immediately and become non-forfeitable." *Id.*

### *The Plan's Investments*

52.     In theory, the Committee responsibilities include selection and monitoring of the funds available for investment in the Plan.  IPS at 2.  The Committee must carry out this fiduciary responsibility for the exclusive benefit of the plan participants and beneficiaries. Plan Doc. at 1. But in practice, as alleged below, that is not what happened.

53.     Several funds were available to Plan participants for investment each year during the putative Class Period. Specifically, a participant may direct all contributions to selected investments as made available and determined by the Committee. 2019 Auditor Report at 6.

54.     The Plan's assets under management for all funds as of December 31, 2019 was $5,354,192,823.  2019 Auditor Report at 4.

### Payment of Plan Expenses

55.     During the Class Period, administrative expenses were paid for using Plan assets. As described in the Plan Doc.: "[a]ll necessary expenses that may arise in connection with the administration of the Plan and Trust, including recordkeeping fees and expenses, Trustee and brokerage fees, and other expenses associated with fund investments, shall be paid by the Trustee from the income of the Trust … ." Plan Doc. at 50.

## VI.     THE PLAN'S FEES DURING THE CLASS PERIOD WERE UNREASONABLE

56.     As described in the "Parties" section above, Defendants were fiduciaries of the Plan.

57.     ERISA "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted).  In addition to a duty to select prudent investments, under ERISA a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble I*, 135 S. Ct. at 1828.

58.     Defendants' breaches of their fiduciary duties, relating to their overall decision-making, resulted in the selection (and maintenance) of several funds in the Plan throughout the Class Period that wasted the assets of the Plan and the assets of participants because of unnecessary costs.

**A.     The Totality of Circumstances Demonstrate that the Plan Fiduciaries Failed to Administer the Plan in a Prudent Manner**

**(1)     Two of the Plan's Primary Mutual Funds Had Investment Management Fees In Excess of Fees for Funds in Similarly-Sized Plans**

59.     Another indication of Defendants' failure to prudently monitor the Plan's funds is that two of the primary mutual funds, which, as of 2019, held more than ***488 million dollars*** in assets were more expensive than comparable funds found in similarly sized plans (plans having more than 1 billion dollars in assets). These funds have remained in the Plan with no change since 2015.

60.     In 2019, these two funds were more expensive than comparable mutual funds found in similarly sized plans.  The expense ratios for these two funds were up to ***200%*** (in the case of Delaware Small Cap Value Class I) and up to ***169%*** (in the case of PIMCO Total Return Fund Class A) above the median expense ratios in the same category: [5]

| ICI Median Chart | | | |
|---|---|---|---|
| **Current Fund** | **2020 Exp Ratio** | **Investment Style** | **ICI Median** |
| Delaware Small Cap Value Class I | 0.90% | Domestic Equity | 0.30% |
| PIMCO Total Return Fund Class A | 1.05% | Domestic Bond | 0.39% |

61.     The high cost of the Plan's funds is even more stark when comparing the Plan's

---

[5] *See*  BrightScope/ICI Defined Contribution Plan Profile: *A Close Look at 401(k) Plans, 2017* at 55 (August 2020) (hereafter, "ICI Study") available at https://www.ici.org/pdf/20_ppr_dcplan_profile_401k.pdf

funds to the average fees of funds in similarly-sized plans:

| ICI Average Chart | | | |
|---|---|---|---|
| Current Fund | 2020 Exp Ratio | Investment Style | ICI Average |
| Delaware Small Cap Value Class I | 0.90% | Domestic Equity | 0.35% |
| PIMCO Total Return Fund Class A | 1.05% | Domestic Bond | 0.30% |

62.     Although a good gauge of Defendants' imprudence, median-based and average-based comparisons still understate the excessiveness of the investment management fees of the Plan funds because many prudent alternative funds were available (which Defendants failed to consider) that offered lower expenses than the median and average fees.

63.     The above comparisons understate the excessiveness of fees in the Plan throughout the Class Period.  That is because the ICI Median fee is based on a study conducted in 2017 when expense ratios would have been higher than today given the downward trend of expense ratios the last few years.  Indeed, the ICI median expense ratio for domestic equity funds for plans with 1 billion dollars in assets was .33% using 2016 data compared with .30% in 2017.  Accordingly, the median expense ratios in 2020 utilized by similar plans would be lower than indicated above, demonstrating a greater disparity between the 2020 expense ratios utilized in the above chart for the Plan's current funds and the median expense ratios in the same category.

### (2)     Two of the Plan's Primary Mutual Funds Were Not in the Lowest Fee Share Class Available to the Plan

64.     Another fiduciary breach stemming from Defendants' flawed investment monitoring system resulted in the failure to identify available lower-cost share classes of many of the funds in the Plan during the Class Period.

65.     Many mutual funds offer multiple classes of shares in a single mutual fund that are targeted at different investors.  There is no difference between share classes other than cost—the funds hold identical investments and have the same manager.  Because the institutional share

classes are otherwise *identical* to the Investor share classes, but with lower fees, a prudent fiduciary would know immediately that a switch is necessary. *Tibble*, 2017 WL 3523737, at * 13.

66.     Generally, more expensive share classes are targeted at smaller investors with less bargaining power, while lower cost shares are targeted at institutional investors with more assets. Qualifying for lower share classes usually requires only a minimum of a million dollars for individual funds. However, it is common knowledge that investment minimums are often waived for large plans like the Plan. *Sweda v. Univ. of Pennsylvania,* 923 F.3d 320, 329 (3d Cir. 2019) (citing *Tibble II*, 729 F.3d at 1137 n.24).

67.     Here, two of the mutual funds which remained unchanged in the Plan from 2015 to the end of 2019 were not in the lowest share class. In 2019, the total assets under management for these funds was more than ***488 million dollars*** thus easily qualifying them for lower share classes. The following chart provides details on these funds and their assets under management as of the end of 2019:

| Current Fund | 2019 Assets Under Management |
|---|---|
| Delaware Small Cap Value Class I | $91,280,813 |
| Pimco Total Return Fund Class A | $397,541,219 |

68.     In several instances during the Class Period, Defendants failed to prudently monitor the Plan to determine whether the Plan was invested in the lowest-cost share class available for the Plan's mutual funds.

69.     The below chart uses 2020 expense ratios to demonstrate cost differentials between the applicable mutual funds and the cheaper identical shares:

| Current Fund | ER | Lower Class Fund | ER | Excess Fee % |
|---|---|---|---|---|
| Delaware Small Cap Value Class I | .90% | Delaware Small Cap Value Class R6 | 0.72% | 20% |

| Current Fund | ER | Lower Class Fund | ER | Excess Fee % |
|---|---|---|---|---|
| PIMCO Total Return Fund Class A | 1.05% | PIMCO Total Return Fund Class I | 0.80% | 24% |

70.     At all times during the Class Period, Defendants knew or should have known of the existence of cheaper share classes and therefore also should have immediately identified the prudence of transferring the Plan's funds into these alternative investments.

71.     There is no good-faith explanation for utilizing high-cost share classes when lower-cost share classes are available for the exact same investment.  Because the more expensive share classes chosen by Defendants were the same in every respect other than price to their less expensive counterparts, the more expensive share class funds *could not have* (1) a potential for higher return, (2) lower financial risk, (3) more services offered, (4) or greater management flexibility.  In short, the Plan did not receive any additional services or benefits based on its use of more expensive share classes; the only consequence was higher costs for Plan participants.

72.     In other words, given the size of the Plan, Defendants made investments with higher costs (higher expense ratios) available to participants while the same investments with lower costs (lower expense ratios) were available to the detriment of the compounding returns that participants should have received.  This reduced the likelihood that Plan participants would achieve their preferred lifestyle in retirement.

### (3)     The Plan's Recordkeeping and Administrative Costs Were Excessive During the Class Period

73.     Another result of Defendants' imprudent process was the excessive recordkeeping and administrative fees Plan participants were required to pay during the Class Period.

74.     Long-standing DOL guidance explicitly states that employers are held to a "high standard of care and diligence" and must, among other duties, both "establish a prudent process

for selecting … service providers" and "monitor … service providers once selected to see that they continue to be appropriate choices." *See,* "*A Look at 401(k) Plan Fees*," *supra*, at n.3.

75.     The Restatement of Trusts also puts cost-conscious management above all else while administering a retirement plan. *Tibble*, 843 F.3d at 1197-98.

76.     The term "recordkeeping" is a catchall term for the suite of administrative services typically provided to a defined contribution plan by the plan's "recordkeeper." Nearly all recordkeepers in the marketplace offer the same range of services and can provide the services at very little cost.  In fact, several of the services, such as managed account services, self-directed brokerage, Qualified Domestic Relations Order processing, and loan processing are often a profit center for recordkeepers.

77.     Recordkeeping expenses can either be paid directly from plan assets, or indirectly by the plan's investments in a practice known as revenue sharing (or a combination of both or by a plan sponsor).  Revenue sharing payments are payments made by investments within the plan, typically mutual funds, to the plan's recordkeeper or to the plan directly, to compensate for recordkeeping and trustee services that the mutual fund company otherwise would have to provide.

78.     Although utilizing a revenue sharing approach is not *per se* imprudent, unchecked, it is devastating for Plan participants.  "At worst, revenue sharing is a way to hide fees.  Nobody sees the money change hands, and very few understand what the total investment expense pays for.  It's a way to milk large sums of money out of large plans by charging a percentage-based fee that never goes down (when plans are ignored or taken advantage of).  In some cases, employers and employees believe the plan is 'free' when it is in fact expensive." Justin Pritchard, "Revenue Sharing and Invisible Fees" available at    http://www.cccandc.com/p/revenue-sharing-and-invisible-fees (last visited March 19, 2020).

79.     In this matter, using revenue sharing to pay for recordkeeping resulted in a worst-case scenario for the Plan's participants because it saddled Plan participants with above-market recordkeeping fees. For example, looking at the combined amount of direct and indirect compensation paid by the Plan as reported on the Plan's 2019 5500 shows that the Plan was paying over $60 per participant in administrative and recordkeeping costs in 2019. In 2017 and 2018, the per participant costs were even higher, being more than $66 per participant and $64 per participant, respectively. The chart below demonstrates these excessive costs:

|      | Participants | Direct      | Indirect  | Total       | $PP    |
|------|--------------|-------------|-----------|-------------|--------|
| 2015 | 49150        | $2,224,895  | $675,689  | $2,900,584  | $59.01 |
| 2016 | 50722        | $2,494,365  | $668,068  | $3,162,433  | $62.35 |
| 2017 | 49344        | $2,680,799  | $623,059  | $3,303,858  | $66.96 |
| 2018 | 48314        | $2,521,294  | $616,820  | $3,138,114  | $64.95 |
| 2019 | 49901        | $2,473,569  | $558,071  | $3,031,640  | $60.75 |

80.     By way of comparison, we can look at what other plans paid for recordkeeping and administrative costs during the same time period.

81.     The Plan had, conservatively, at least 48,000 participants at all times during the Class Period making it eligible for some of the lowest fees on the market.

82.     NEPC, a consulting group, which recently conducted its 14th Annual Survey titled the NEPC 2019 Defined Contribution Progress Report, which took a survey of various defined contribution plan fees.[6]  The sample size and respondents included 121 Defined Contribution Plans broken up as follows: 71% Corporate; 20% Healthcare, and 9% Public, Not-for-Profit and other. The average plan had $1.1 billion in assets and 12,437 participants.  The median plan had $512 million in assets and 5,440 participants.  *See,* NEPC Report at 1.

83.     NEPC's survey found that the majority of plans with over 15,000 participants paid, on average, slightly over $40 per participant in recordkeeping, trust and custody fees.  Report at

---

[6] Available at https://www.nepc.com/insights/2019-dc-plan-and-fee-survey ("NEPC Report").

19

10. 75% of the plans analyzed with over 15,000 participants paid no more than $50 per participant for recordkeeping. *Id.*

84.     The Plan had tens of thousands of participants making it eligible for some of the lowest fees on the market. Recently, Fidelity – a recordkeeper for hundreds of plans - stipulated in a lawsuit that a Plan with tens of thousands of participants and over a billion dollars in assets could command recordkeeping fees as low as $14-21. *See Moitoso v. FMR LLC*, 451 F.Supp.3d 189, 204 (D. Mass. Mar. 27, 2020).

85.     Moreover, given the size of the Plan's assets during the Class Period and total number of participants, it had the leverage to bargain for reasonable per participant recordkeeping and administrative costs without utilizing revenue sharing which simply cost Plan participants the opportunity to otherwise use the money that went to pay for revenue sharing.

86.     Additionally, because Plan participants were paying more for recordkeeping than they should have as a result of the Plan fiduciaries' conduct, this confirms that the use of higher-cost share classes cannot be justified as a prudent means to pay recordkeeping and administrative costs via revenue sharing.

87.     Moreover, despite the amount of revenue sharing charged by the Plan, there is no indication that the Plan's fiduciaries returned the revenue sharing collected from the Plan's investments back to the Plan's participants as they should have.

**(3)    The Total Plan Costs were Unreasonable Compared to the Plan's Peers**

88.     "Many types of services are required to operate a [defined contribution] plan, including administrative services (*e.g.*, recordkeeping and transaction processing), participant-focused services (*e.g.*, participant communication, education, or advice), regulatory and

compliance services (*e.g.*, plan document services; consulting, accounting, and audit services; and legal advice), and investment management."[7]

89.     "In order to better understand the impact of fees," BrightScope, a leading plan retirement industry analyst, "developed a total plan cost measure that includes all fees on the audited Form 5500 reports as well as fees paid through investment expense ratios."  ICI Study at 55.

90.     Costs are of course important because "[t]he lower your costs, the greater your share of an investment's return."  Vanguard's Principles for Investing Success, at 17.[8]

91.     According to the ICI Study, the median total plan cost for plans over 1 billion is 0.22% of total assets in a plan. ICI Study at 57. Here, the total plan costs during the Class Period ranged from a high of 0.51% in 2018 to a low of 0.45% in 2017. Total plan costs were .46% in 2019. There's little question the plan was paying at least 100% more in total plan costs than its peers. These excessive costs should have been addressed by the Defendants during the Class Period, but, again, this is something the Defendants failed to do to the great detriment of plan participants.

**FIRST CLAIM FOR RELIEF**
**Breach of Fiduciary Duty of Prudence**
**(Asserted against the Committee)**

92.     Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

93.     At all relevant times, the Committee Defendants and its members ("Prudence Defendants") were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. §

---

[7] *See*  BrightScope/ICI Defined Contribution Plan Profile: *A Close Look at 401(k) Plans, 2017* at 55 (August 2020) (hereafter, "ICI Study") available at https://www.ici.org/pdf/20_ppr_dcplan_profile_401k.pdf

[8] Available at https://about.vanguard.com/what-sets-vanguard-apart/principles-for-investing-success/

1002(21)(A), in that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

94.     As fiduciaries of the Plan, these Defendants were subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a).  These fiduciary duties included managing the assets of the Plan for the sole and exclusive benefit of the Plan's participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

95.     The Prudence Defendants breached these fiduciary duties in multiple respects as discussed throughout this Complaint. They did not make decisions regarding the Plan's investment lineup based solely on the merits of each investment and what was in the best interest of the Plan's participants.  Instead, the Prudence Defendants selected and retained investment options in the Plan despite the high cost of the funds in relation to other comparable investments. The Prudence Defendants also failed to control the administrative and recordkeeping expenses of the Plan and to investigate the availability of lower-cost identical products of certain mutual funds and lower cost collective investment trust funds in the Plan.

96.     As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered millions of dollars of losses due to excessive costs and lower net investment returns.  Had Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and the Plan's participants would have had more money available to them for their retirement.

97.     Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Prudence Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duties, and also must

restore any profits resulting from such breaches.  In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in their Prayer for Relief.

98.    The Prudence Defendants knowingly participated in each breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties, and knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches.  Accordingly, each Defendant is also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

## SECOND CLAIM FOR RELIEF
### Failure to Adequately Monitor Other Fiduciaries
### (Asserted against the Board and Humana)

99.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

100.    The Board Defendants and Humana (the "Monitoring Defendants") had the authority and obligation to monitor the Committee and was aware that the Committee had critical responsibilities as a fiduciary of the Plan.

101.    In light of this authority, the Monitoring Defendants had a duty to monitor the Committee and ensure that the Committee was adequately performing its fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that the Committee was not fulfilling those duties.

102.    The Monitoring Defendants also had a duty to ensure that the Committee possessed the needed qualifications and experience to carry out its duties; had adequate financial resources and information; maintained adequate records of the information on which it based its decisions and analysis with respect to the Plan's investments; and reported regularly to the Monitoring Defendants.

103.    The Monitoring Defendants breached their fiduciary monitoring duties by, among other things:

(a)     Failing to monitor and evaluate the performance of the Committee or have a system in place for doing so, standing idly by as the Plan suffered significant losses as a result of the Committee's imprudent actions and omissions;

(b)     failing to monitor the processes by which the Plan's investments were evaluated and the Committee's failure to investigate the availability of identical lower-cost funds; and

(c)     failing to remove the Committee as a fiduciary whose performance was inadequate in that it continued to maintain imprudent, excessively costly, and poorly performing investments within the Plan, and caused the Plan to pay excessive recordkeeping fees, all to the detriment of the Plan and the retirement savings of the Plan's participants.

104.    As a consequence of the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars of losses.  Had Monitoring Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and participants of the Plan would have had more money available to them for their retirement.

105.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Monitoring Defendants are liable to restore to the Plan all losses caused by their failure to adequately monitor the Committee. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in their Prayer for Relief.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray that judgment be entered against Defendants on all claims and requests that the Court awards the following relief:

A.     A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(2) of the Federal Rules of Civil Procedure;

B.     Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C.     A Declaration that the Defendants, and each of them, have breached their fiduciary duties under ERISA;

D.     An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

E.     An order requiring the Company Defendants to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, or a surcharge against the Company Defendant as necessary to effectuate said relief, and to prevent the Company Defendant's unjust enrichment;

F.     Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G.     An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

H.      Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of Plan's fiduciaries deemed to have breached their fiduciary duties;

I.      An award of pre-judgment interest;

J.      An award of costs pursuant to 29 U.S.C. § 1132(g);

K.      An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

L.      Such other and further relief as the Court deems equitable and just.

Date: April 13, 2021                **KIRK LAW FIRM, PLLC**

/s/ Phillip Blair
Phillip Blair, Esquire
KY Bar ID #  94596
P.O. Box 339
888 US 23 South
Paintsville, KY  41240
Phillip.blair@kirklawfirm.net
(606) 297-5888
Fax (606) 297-5870

**CAPOZZI ADLER, P.C.**

/s/ Donald R. Reavey
Donald R. Reavey, Esquire
PA Attorney ID #82498
2933 North Front Street
Harrisburg, PA 17110
donr@capozziadler.com
(717) 233-4101
Fax (717) 233-4103

/s/ Mark K. Gyandoh
Mark K. Gyandoh, Esquire
PA Attorney ID # 88587
**CAPOZZI ADLER, P.C.**
312 Old Lancaster Road
Merion Station, PA 19066
markg@capozziadler.com

(610) 890-0200
Fax (717) 233-4103

Counsel for Plaintiffs and the Putative Class