## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF KENTUCKY

| | |
|---|---|
| KENA MOORE, TIMOTHY K. SWEENEY, RUSSEL A. HOHMAN, SUSAN M. SMITH and VERONICA CARGILL, individually and on behalf of all others similarly situated, | )<br>)<br>)<br>)<br>)<br>) |
| | ) **CIVIL ACTION NO.:** 3:21-cv-232-RGJ |
| Plaintiffs, | )<br>) |
| v. | )<br>) |
| HUMANA INC., THE BOARD OF DIRECTORS OF HUMANA INC., THE HUMANA RETIREMENT PLANS COMMITTEE and JOHN DOES 1-30. | )<br>)<br>)<br>)<br>) |
| Defendants. | ) |

## FIRST AMENDED COMPLAINT

Plaintiffs, Kena Moore, Timothy K. Sweeney, Russell A. Hohman, Susan M. Smith and Veronica Cargill ("Plaintiffs"), by and through their attorneys, on behalf of the Humana Retirement Savings Plan (the "Plan"),[1] themselves and all others similarly situated, state and allege as follows:

### I.      INTRODUCTION

1.      This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the Plan's fiduciaries, which include Humana Inc. ("Humana" or "Company"), the Board of Directors of Humana Inc. and its members during the Class Period[2] ("Board") and the Humana Retirement

---

[1] The Plan is a legal entity that can sue and be sued.  ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plan is not a party.  Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plan and its participants.

[2] The Class Period, as will be discussed in more detail below, is defined as April 13, 2015 through the date of judgment.

Plans Committee and its members during the Class Period ("Committee") for breaches of their fiduciary duties.

2.      To safeguard Plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries. Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B). These twin fiduciary duties are "the highest known to the law." *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 426 (6th Cir. 2002), *cert. denied*, 527 U.S. 1168 (2003).

3.      The Department of Labor has explicitly stated that employers are held to a "high standard of care and diligence" and must, among other duties, both "establish a prudent process for selecting investment options and service providers" and "monitor investment options and service providers once selected to see that they continue to be appropriate choices." *See, "A Look at 401(k) Plan Fees," supra*, at n.3; *see also Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1823 (2015) (*Tibble I*) (reaffirming the ongoing fiduciary duty to monitor a plan's investment options).

4.      Under 29 U.S.C. § 1104(a)(1), a plan fiduciary must give substantial consideration to the cost of investment options. "Wasting beneficiaries' money is imprudent. In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs." Uniform Prudent Investor Act (the "UPIA"), § 7.

5.      "The Restatement … instructs that 'cost-conscious management is fundamental to prudence in the investment function,' and should be applied 'not only in making investments but also in monitoring and reviewing investments.'" *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197-98 (9th Cir. 2016) (*en banc*) (quoting Restatement (Third) of Trusts, § 90, cmt. b) ("*Tibble II*").[3]

---

[3] *See also* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, (Aug. 2013), at 2, available at https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited February 16, 2021) ("You should be

6.      Additional fees of only 0.18% or 0.4% can have a large effect on a participant's investment results over time because "[b]eneficiaries subject to higher fees … lose not only money spent on higher fees, but also lost investment opportunity; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time." *Tibble II*, 843 F.3d at 1198 ("It is beyond dispute that the higher the fees charged to a beneficiary, the more the beneficiary's investment shrinks.").

7.      Most participants in 401(k) plans expect that their 401(k) accounts will be their principal source of income after retirement.  Although at all times 401(k) accounts are fully funded, that does not prevent plan participants from losing money on poor investment choices by plan sponsors and fiduciaries, whether due to poor performance, high fees or both.

8.      At all times during the Class Period (April 13, 2015 through the date of judgment), the Plan had at least 3.4 billion dollars in assets under management and over 48,000 Plan participants with account balances.  At the end of 2018 and 2019, the Plan had over 4.2 billion dollars and 5.3 billion dollars, respectively, in assets under management that were/are entrusted to the care of the Plan's fiduciaries.

9.      The Plan's assets under management qualifies it as a jumbo plan in the defined contribution plan marketplace, and among the largest plans in the United States.  As a jumbo plan, the Plan had substantial bargaining power regarding the fees and expenses that were charged against participants' investments and for recordkeeping and administrative services for the Plan. Defendants, however, failed at their attempts to reduce the Plan's expenses to ensure they were prudent.

---

aware that your employer also has a specific obligation to consider the fees and expenses paid by your plan.").

10.     Plaintiffs allege that during the putative Class Period, Defendants, as "fiduciaries" of the Plan, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties they owed to the Plan, to Plaintiffs, and to the other participants of the Plan by, *inter alia*, failing to control the Plan's administrative and recordkeeping costs.

11.     Defendants' mismanagement of the Plan, to the detriment of participants and beneficiaries, constitutes a breach of the fiduciary duty of prudence, in violation of 29 U.S.C. § 1104.  Their actions were contrary to actions of a reasonable fiduciary and cost the Plan and its participants millions of dollars.

12.     Based on this conduct, Plaintiffs assert claims against Defendants for breach of the fiduciary duty of prudence (Count One) and failure to monitor fiduciaries (Count Two).

## II.     JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001, *et seq*.

14.     This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and/or have significant contacts with this District, and because ERISA provides for nationwide service of process.

15.     Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District.  Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## III.     PARTIES

**Plaintiffs**

16.     Plaintiff, Kena Moore ("Moore"), resides in Schertz, Texas. During her employment, Plaintiff Moore participated in the Plan and was subject to paying the recordkeeping and administrative costs which are the subject of this lawsuit.

17.     Plaintiff, Timothy K. Sweeney ("Sweeney"), resides in Cincinnati, Ohio. During his employment, Plaintiff Sweeney participated in the Plan and was subject to paying the recordkeeping and administrative costs which are the subject of this lawsuit.

18.      Plaintiff, Russell A. Hohman ("Hohman"), resides in Sapulpa, Oklahoma. During his employment, Plaintiff Hohman participated in the Plan and was subject to paying the recordkeeping and administrative costs which are the subject of this lawsuit.

19.     Plaintiff, Susan M. Smith ("Smith"), resides in Austin, Texas. During her employment, Plaintiff Smith participated in the Plan and was subject to paying the recordkeeping and administrative costs which are the subject of this lawsuit.

20.     Plaintiff, Veronica Cargill ("Cargill"), resides in Louisville, Kentucky. During her employment, Plaintiff Cargill participated in the Plan and was subject to paying the recordkeeping and administrative costs which are the subject of this lawsuit.

21.     Each Plaintiff has standing to bring this action on behalf of the Plan because each of them participated in the Plan and were injured by Defendants' unlawful conduct.  Plaintiffs are entitled to receive benefits in the amount of the difference between the value of their accounts currently, or as of the time their accounts were distributed, and what their accounts are or would have been worth, but for Defendants' breaches of fiduciary duty as described herein.

22.     Plaintiffs did not have knowledge of all material facts (including, among other things, total cost and recordkeeping comparisons to similarly-sized plans) necessary to understand

that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was initially filed.

**Defendants**

**Company Defendant**

23.     Humana is the Plan sponsor and a named fiduciary with a principal place of business being 500 West Main Street, Louisville, Kentucky.  The December 31, 2019 Form 5500 of the Human Retirement Savings Plan filed with the United States Department of Labor ("2019 Form 5500") at 1.

24.     Humana is a national provider of health insurance. Humana describes itself as "a leading health and well-being company … ." The December 31, 2019 10-k Report of Human Inc. as filed with the United States Securities and Exchange Commission ("2019 Annual Report") at 3.  As of December 31, 2019, Humana "had approximately 46,000 employees … ." 2019 Annual Report at 15.

25.     Humana appointed the Committee to, among other things, ensure that the fees and expenses paid by the Plan, including, but not limited to, recordkeeping and administrative fees, are no more than reasonable. Humana Retirement Plans Committee Charter ("Charter" at 1).  In addition, the Committee ensures that the investments available to Plan participants are appropriate, had no more expense than reasonable and performed well as compared to their peers. The Humana Retirement Savings Plan as Amended and Restated, effective January 1, 2020 ("Plan Doc.") at 60. Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

26.     Accordingly, the Company had a concomitant fiduciary duty to monitor and supervise those appointees.

27.     Accordingly, Humana during the putative Class Period is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because it exercised discretionary authority to appoint and/or monitor the other fiduciaries, which had control over Plan management and/or authority or control over management or disposition of Plan assets.

### **Board Defendants**

28.     Humana, acting through its Board of Directors, appointed the Committee to, among other things, ensure that the fees and expenses paid by the Plan, including, but not limited to, recordkeeping and administrative fees, are no more than reasonable. Charter at 1. In addition, the Committee ensures that the investments available to Plan participants are appropriate, had no more expense than reasonable and performed well as compared to their peers. Plan Doc. at 60. Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

29.     Accordingly, each member of the Board during the putative Class Period (referred to herein as John Does 1-10) is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each exercised discretionary authority to appoint and/or monitor the other fiduciaries, which had control over Plan management and/or authority or control over management or disposition of Plan assets.

30.     The Board and the unnamed members of the Board during the Class Period (referred to herein as John Does 1-10), are collectively referred to herein as the "Board Defendants."

### **Committee Defendants**

31.      As discussed above, the Committee ensures that the fees and expenses paid by the Plan, including, but not limited to, recordkeeping and administrative fees, are no more than reasonable. Charter at 1. In addition, the Committee ensures that the investments available to Plan

participants are appropriate, had no more expense than reasonable and performed well as compared to their peers. Plan Doc. at 60. As described in the Investment Policy Statement which governs the conduct of the Committee, the Committee must: "[t]wice a year, or more frequently as the Committee in its sole discretion may determine is otherwise necessary or appropriate, the Committee will evaluate the performance of each Investment Option." IPS at 3. As stated in the IPS, each fund in the Plan must be evaluated based on, among other things, its: "[r]eturn compared to the peer group and its benchmarks; … [f]ees and expenses; [and] [a]dherence to stated investment style … ." *Id.*

32.     The Committee and each of its members were fiduciaries of the Plan during the Class Period, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each exercised discretionary authority over management or disposition of Plan assets.

33.     The Committee and unnamed members of the Committee during the Class Period (referred to herein as John Does 11-20), are collectively referred to herein as the "Committee Defendants."

### Additional John Doe Defendants

34.     To the extent that there are additional officers, employees and/or contractors of Humana who are/were fiduciaries of the Plan during the Class Period, or were hired as an investment manager for the Plan during the Class Period, the identities of whom are currently unknown to Plaintiffs, Plaintiffs reserve the right, once their identities are ascertained, to seek leave to join them to the instant action.  Thus, without limitation, unknown "John Doe" Defendants 21-30 include, but are not limited to, Humana officers, employees and/or contractors who are/were fiduciaries of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) during the Class Period.

### IV.     CLASS ACTION ALLEGATIONS

35.     Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the following proposed class ("Class"):[4]

> All persons, except Defendants and their immediate family members, who were participants in or beneficiaries of the Plan, at any time between April 13, 2015 through the date of judgment (the "Class Period").

36.     The members of the Class are so numerous that joinder of all members is impractical.  The 2019 Form 5500 lists 49,901 Plan "participants with account balances as of the end of the plan year."  2019 Form 5500 at 2.

37.     Plaintiffs' claims are typical of the claims of the members of the Class.  Like other Class members, Plaintiffs participated in the Plan and have suffered injuries as a result of Defendants' mismanagement of the Plan. Defendants treated Plaintiffs consistently with other Class members and managed the Plan as a single entity. Plaintiffs' claims and the claims of all Class members arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the Class have been similarly affected by Defendants' wrongful conduct.

38.     There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members.  Common legal and factual questions include, but are not limited to:

> A.     Whether Defendants are/were fiduciaries of the Plan;
>
> B.     Whether Defendants breached their fiduciary duty of prudence by
>
>        engaging in the conduct described herein;

---

[4] Plaintiffs reserve the right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.

C.     Whether the Defendants responsible for appointing other fiduciaries failed to adequately monitor their appointees to ensure the Plan was being managed in compliance with ERISA;

D.     The proper form of equitable and injunctive relief; and

E.     The proper measure of monetary relief.

39.     Plaintiffs will fairly and adequately represent the Class and have retained counsel experienced and competent in the prosecution of ERISA class action litigation.  Plaintiffs have no interests antagonistic to those of other members of the Class.  Plaintiffs are committed to the vigorous prosecution of this action and anticipate no difficulty in the management of this litigation as a class action.

40.     This action may be properly certified under Rule 23(b)(1).  Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants.  Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

41.     In the alternative, certification under Rule 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

**V.     THE PLAN**

42.     The purpose of the Plan is "to provide a source of retirement income and to encourage and assist qualified Employees in maintaining a regular savings program on a before-tax and/or an after tax basis." Plan Doc. at 1.

43.     The Plan is a "defined contribution" or "individual account" plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the Plan provides for individual accounts for each participant and for benefits based solely upon the amount contributed to those accounts, and any income, expense, gains and losses, and any forfeitures of accounts of the participants which may be allocated to such participant's account. Plan Doc. at 14.  Consequently, retirement benefits provided by the Plan are based solely on the amounts allocated to each individual's account.  *Id.*

### Eligibility

44.     In general, regular full-time employees are eligible to participate in the Plan. 2019 Auditor Report at 3. As stated in the Auditor Report: "[t]he Plan is a qualified defined contribution plan established for the benefit of the employees of Humana Inc. and its participating subsidiaries (the 'Company' or 'Humana') who are not employed in Puerto Rico ('eligible employees') … ." 2019 Auditor Report at 6.

### Contributions

45.     There are several types of contributions that can be added to a participant's account, including: an employee salary deferral contribution, an employee Roth 401(k) contribution, an employee after-tax contribution, catch-up contributions for employees aged 50 and over, rollover contributions, discretionary profit sharing contributions and employer matching contributions based on employee pre-tax, Roth 401(k), and employee after-tax contributions. 2019 Auditor Report at 6.

46.     With regard to employee contributions, "[a] Participant, through payroll deductions, may contribute not less than 1% nor more than 35% of the Participant's eligible compensation." *Id*. Humana may elect to make matching contributions to the Plan on behalf of their employees. As detailed in the 2019 Auditor Report: "[t]he Company matches 125% of a Participant's eligible pre-tax, Roth … and catch-up contributions that combined do not exceed 6% of their eligible compensation." 2019 Auditor Report at 7.

47.     Like other companies that sponsor 401(k) plans for their employees, Humana enjoys both direct and indirect benefits by providing matching contributions to Plan participants. Employers are generally permitted to take tax deductions for their contributions to 401(k) plans at the time when the contributions are made. *See generally,* https://www.irs.gov/retirement-plans/plan-sponsor/401k-plan-overview.

48.     Humana and its clients also benefit in other ways from the Plan's matching program.  It is well-known that "[o]ffering retirement plans can help in employers' efforts to attract new employees and reduce turnover." *See,* https://www.paychex.com/articles/employee-benefits/employer-matching-401k-benefits.

49.     Given the size of the Plan, Humana likely enjoyed a significant tax and cost savings from offering a match.

*Vesting*

50.     Participants are immediately vested in their own contributions made to the Plan. 2019 Auditor Report at 8. Participants are subject to a 2 year vesting schedule before any employer matching contributions are considered earned. *Id*. As stated in the Auditor Report: "[g]enerally, once a Participant has completed two years of service, the Company Matching Account contributions vest immediately and become non-forfeitable." *Id.*

*The Plan's Investments*

51.     In theory, the Committee's responsibilities include monitoring and setting reasonable recordkeeping and administrative rates for the Plan.  IPS at 2.  The Committee must carry out this fiduciary responsibility for the exclusive benefit of the plan participants and beneficiaries. Plan Doc. at 1.  But in practice, as alleged below, that is not what happened.

52.     The Plan's assets under management for all funds as of December 31, 2019 was $5,354,192,823.  2019 Auditor Report at 4.

### Payment of Plan Expenses

53.     During the Class Period, administrative expenses were paid for using Plan assets. As described in the Plan Doc.: "[a]ll necessary expenses that may arise in connection with the administration of the Plan and Trust, including recordkeeping fees and expenses, Trustee and brokerage fees, and other expenses associated with fund investments, shall be paid by the Trustee from the income of the Trust … ." Plan Doc. at 50.

## VI.    THE PLAN'S FEES DURING THE CLASS PERIOD WERE UNREASONABLE

54.     As described in the "Parties" section above, Defendants were fiduciaries of the Plan.

55.     Long-standing DOL guidance explicitly states that employers are held to a "high standard of care and diligence" and must, among other duties, both "establish a prudent process for selecting … service providers" and "monitor … service providers once selected to see that they continue to be appropriate choices."  *See,* "*A Look at 401(k) Plan Fees,*" *supra,* at n.3.

56.     Further, ERISA requires fiduciaries to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."  ERISA, § 404 (a)(B).

57.     Defendants' breaches of their fiduciary duties, relating to their overall decision-making, ultimately resulted in excessive administrative and recordkeeping costs for the Plan to the detriment of plan participants.

**A.      The Totality of Circumstances Demonstrate that the Plan Fiduciaries Failed to Administer the Plan in a Prudent Manner**

**(1) The Plan's Recordkeeping and Administrative Costs Were Excessive During the Class Period**

58.     A result of Defendants' imprudent process was the excessive recordkeeping and administrative fees Plan participants were required to pay during the Class Period. The recordkeeper during the Class Period was Charles Schwab, and, as will be discussed in more detail below, it was imprudent to retain Charles Schwab at their quoted rates since the fees charged were excessive.

59.     The Restatement of Trusts puts cost-conscious management above all else while administering a retirement plan. *Tibble*, 843 F.3d at 1197-98.

60.     The term "recordkeeping" is a catchall term for the suite of administrative services typically provided to a defined contribution plan by the plan's "recordkeeper." Nearly all recordkeepers in the marketplace offer the same range of services and can provide the services at very little cost.  In fact, several of the services, such as managed account services, self-directed brokerage, Qualified Domestic Relations Order processing, and loan processing are often a profit center for recordkeepers.

61.     The cost of providing recordkeeping services often depends on the number of participants in a plan.  Plans with large numbers of participants can take advantage of economies of scale by negotiating a lower per-participant recordkeeping fee.  Because recordkeeping expenses are driven by the number of participants in a plan, the vast majority of plans are charged on a per-participant basis.

14

62.     Recordkeeping expenses can either be paid directly from plan assets, or indirectly by the plan's investments in a practice known as revenue sharing (or a combination of both or by a plan sponsor).  Revenue sharing payments are payments made by investments within the plan, typically mutual funds, to the plan's recordkeeper or to the plan directly, to compensate for recordkeeping and trustee services that the mutual fund company otherwise would have to provide.

63.     Although utilizing a revenue sharing approach is not *per se* imprudent, unchecked, it is devastating for Plan participants.  "At worst, revenue sharing is a way to hide fees.  Nobody sees the money change hands, and very few understand what the total investment expense pays for.  It's a way to milk large sums of money out of large plans by charging a percentage-based fee that never goes down (when plans are ignored or taken advantage of).  In some cases, employers and employees believe the plan is 'free' when it is in fact expensive."  Justin Pritchard, "Revenue Sharing and Invisible Fees" available at http://www.cccandc.com/p/revenue-sharing-and-invisible-fees (last visited March 19, 2020).

64.     Further, a plan's fiduciaries must remain informed about overall trends in the marketplace regarding the fees being paid by other plans, as well as the recordkeeping rates that are available by conducting a Request for Proposal ("RFP") in a prudent manner to determine if recordkeeping and administrative expenses appear high in relation to the general marketplace, and specifically, of like-situated plans.  More specifically, an RFP should happen frequently if fee benchmarking reveals the recordkeeper's compensation to exceed levels found in other, similar plans. *George v. Kraft Foods Glob., Inc.*, 641 F.3d 786, 800 (7th Cir. 2011); *Kruger v. Novant Health, Inc.*, 131 F. Supp. 3d 470, 479 (M.D.N.C. 2015); *see also* NEPC 2019 Defined Contribution Progress Report at 10 ("Best Practice is to compare fees and services through a record keeping vendor search Request for Proposal process).

65.      Although the Plan engaged in a request for proposal process beginning in 2014, this process was clearly deficient since it resulted in recordkeeping fees above industry averages for jumbo plans and amounts paid by similarly-situated plans.  In 2014, the Plan failed to negotiate a recordkeeping fee better than $37 per participant when the number of Plan participants with account balances was 46,563 as of the end of 2014.[5]  *See* 2014 Form 5500.  As of year-end  2015, the Plan had 49,150 participants with account balances.  *See* 2015 Form 5500.

66.      As direct evidence that the Plan could have negotiated a lower price by the start of the Class Period, the Plan's fiduciaries in fact paid a per participant recordkeeping price of $23 per participant in 2019 when the number of Plan participants with account balances was 49, 901, almost exactly the same number of participants as there were four years earlier.   This came at a cost to Plan participants of at least $3 million in damages.

67.      There's no good faith explanation for this failure, as will be discussed below. To make matters worse, the recordkeeping fee actually increased in 2021 to $28 which is yet another indication of the Plan's flawed process for setting its administrative and recordkeeping fees.

68.      By way of comparison, we can look at what other similarly-situated plans paid for recordkeeping and administrative costs during the same time period.

69.      The Plan had, conservatively, at least 48,000 participants at all times during the Class Period with billions of dollars in assets making it eligible for some of the lowest fees on the market.

70.      Recently, Fidelity – a recordkeeper for hundreds of plans - stipulated in a lawsuit that a Plan with tens of thousands of participants and over a billion dollars in assets could command

---

[5] $37 is likely conservative. Discovery will show whether participants paid additional revenue recordkeeping and related administrative services through indirect compensation such as revenue sharing.

recordkeeping fees as low as $14-21. *See Moitoso v. FMR LLC*, 451 F.Supp.3d 189, 204 (D. Mass. Mar. 27, 2020).

71.     Case law is in accord that large plans since 2014 can bargain for low recordkeeping fees. *See*, *e.g.*, *Spano v. Boeing*, Case 06-743, Doc. 562-2, Jan 29, 2016 (S.D. Ill. Dec. 30, 2014) (declaration that Boeing's 401(k) plan recordkeeping fees have been $18 per participant for the past two years); *George*, 641 F.3d at 798 (plaintiffs' expert opined market rate of $20–$27 and plan paid record-keeper $43–$65).

72.     In addition, looking at recordkeeping costs for plans of a similar size in 2018 shows that the Plan was paying higher recordkeeping fees than its peers. The chart below analyzes a few well managed plans having over 34,000 participants and over $2.5 billion dollars in assets under management:

| Plan | Participants | Assets | Total RK Fee | RK Fee/PP |
|---|---|---|---|---|
| Deseret 401(k) Plan | 34,357 | $3,380,994,203 | $878,028 | $25 |
| Danaher Corporation & Subsidiaries Savings Plan | 35,357 | $4,565,702,706 | $988,267 | $28 |
| Publicis Benefits Connection 401(k) Plan | 42,316 | $2,547,763,175 | $1,167,408 | $28 |
| Kaiser Permanente Supplemental Savings Plan and Retirement Plan | 47,358 | $3,104,524,321 | $3,104,524,321 | $27 |

Thus, the Plan, with over 49,901 participants and over $5 billion dollars in assets in 2019 should have been able to negotiate a recordkeeping cost in the low $20 range from the beginning of the Class Period to the present.

73.     Another indication that the Defendants lacked a prudent process for selecting and monitoring its recordkeeping and administrative fees is that it stayed with the same recordkeeper throughout the Class Period despite the fact that it continued to charge excessive fees. ERISA requires that fiduciaries put the best interests of plan participants before its own interests. "Best

Practices for Plan Fiduciaries," at 36, published by Vanguard, 2019.[6] Here, despite the fact that the Defendants apparently determined that Schwab was charging an excessive fee of $37 per participant from 2014 to 2019, the Plan decided to continue to use the services of Schwab when it offered to discount its services to $23 per participant in 2019. However, almost immediately after obtaining this lower fee, Schwab notified the Defendants that it's fee would increase to $28 per participant in 2021. Schwab indicated that it needed to charge more because of certain proprietary Schwab target date funds selected by the Defendants. The Defendants should not have chosen proprietary funds offered by its own recordkeeper when such a choice resulted in higher recordkeeping fees. Such a selection is suspect and should have been questioned by the Defendants. It would appear that the Plan chose convenience and its relationship with Schwab over the interests of plan participants.

74.     In sum, given the size of the Plan's assets during the Class Period and total number of participants, it had the leverage to bargain for reasonable per participant recordkeeping and administrative costs. These excessive recordkeeping fees cost Plan participants the opportunity to otherwise use the money that went to pay for revenue sharing.

**FIRST CLAIM FOR RELIEF**
**Breach of Fiduciary Duty of Prudence**
**(Asserted against the Committee)**

75.     Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

76.     At all relevant times, the Committee Defendants and its members ("Prudence Defendants") were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

---

[6] Available at https://institutional.vanguard.com/iam/pdf/FBPBK.pdf?cbdForceDomain=false.

77.     As fiduciaries of the Plan, these Defendants were subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a).  These fiduciary duties included managing the assets of the Plan for the sole and exclusive benefit of the Plan's participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

78.     The Prudence Defendants failed to control the administrative and recordkeeping expenses of the Plan.

79.     As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered millions of dollars of losses due to excessive costs.  Had Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and the Plan's participants would have had more money available to them for their retirement.

80.     Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Prudence Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches.  In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in their Prayer for Relief.

81.     The Prudence Defendants knowingly participated in each breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties, and knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches.  Accordingly, each Defendant is also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

**SECOND CLAIM FOR RELIEF**
**Failure to Adequately Monitor Other Fiduciaries**
**(Asserted against the Board and Humana)**

82.     Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

83.     The Board Defendants and Humana (the "Monitoring Defendants") had the authority and obligation to monitor the Committee and was aware that the Committee had critical responsibilities as a fiduciary of the Plan.

84.     In light of this authority, the Monitoring Defendants had a duty to monitor the Committee and ensure that the Committee was adequately performing its fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that the Committee was not fulfilling those duties.

85.     The Monitoring Defendants also had a duty to ensure that the Committee possessed the needed qualifications and experience to carry out its duties; had adequate financial resources and information; maintained adequate records of the information on which it based its decisions and analysis with respect to the Plan's investments; and reported regularly to the Monitoring Defendants.

86.     The Monitoring Defendants breached their fiduciary monitoring duties by, among other things:

(a)     Failing to monitor and evaluate the performance of the Committee or have a system in place for doing so, standing idly by as the Plan suffered significant losses as a result of the Committee's imprudent actions and omissions;

(b)     failing to remove the Committee as a fiduciary whose performance was inadequate in that it caused the Plan to pay excessive recordkeeping fees, all to the detriment of the Plan and the retirement savings of the Plan's participants.

87.     As a consequence of the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars of losses.  Had Monitoring Defendants complied with their fiduciary

obligations, the Plan would not have suffered these losses, and participants of the Plan would have had more money available to them for their retirement.

88.      Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Monitoring Defendants are liable to restore to the Plan all losses caused by their failure to adequately monitor the Committee. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in their Prayer for Relief.

<u>**PRAYER FOR RELIEF**</u>

**WHEREFORE**, Plaintiffs pray that judgment be entered against Defendants on all claims and requests that the Court awards the following relief:

A.      A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(2) of the Federal Rules of Civil Procedure;

B.      Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C.      A Declaration that the Defendants, and each of them, have breached their fiduciary duties under ERISA;

D.      An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

E.      An order requiring the Company Defendants to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29

U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, or a surcharge against the Company Defendant as necessary to effectuate said relief, and to prevent the Company Defendant's unjust enrichment;

F.      Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G.      An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

H.      Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of Plan's fiduciaries deemed to have breached their fiduciary duties;

I.      An award of pre-judgment interest;

J.      An award of costs pursuant to 29 U.S.C. § 1132(g);

K.      An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

L.      Such other and further relief as the Court deems equitable and just.


Date: August 26, 2021                          **CAPOZZI ADLER, P.C.**

                                               /s/ Donald R. Reavey            .
                                               Donald R. Reavey, Esquire
                                               PA Attorney ID #82498
                                               (Admitted *Pro Hac Vice*)
                                               2933 North Front Street
                                               Harrisburg, PA 17110
                                               donr@capozziadler.com
                                               (717) 233-4101
                                               Fax (717) 233-4103

/s/ Mark K. Gyandoh                 .
Mark K. Gyandoh, Esquire
PA Attorney ID # 88587
(Admitted *Pro Hac Vice*)
**CAPOZZI ADLER, P.C.**
312 Old Lancaster Road
Merion Station, PA 19066
markg@capozziadler.com
(610) 890-0200
Fax (717) 233-4103

**KIRK LAW FIRM, PLLC**

/s/ Phillip Blair                 
Phillip Blair, Esquire
KY Bar ID #  94596
P.O. Box 339
888 US 23 South
Paintsville, KY  41240
Phillip.blair@kirklawfirm.net
(606) 297-5888
Fax (606) 297-5870

Counsel for Plaintiffs and the Putative Class