# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF KENTUCKY

| | | |
|---|---|---|
| KENA MOORE, TIMOTHY K. SWEENEY, RUSSEL A. HOHMAN, SUSAN M. SMITH and VERONICA CARGILL, individually and on behalf of all others similarly situated,<br><br><br><br><br>Plaintiffs,<br><br>v.<br><br>HUMANA INC., THE BOARD OF DIRECTORS OF HUMANA INC., THE HUMANA RETIREMENT PLANS COMMITTEE and JOHN DOES 1-30.<br><br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No.: 3:21-cv-232-RGJ |

**Expert Report of Veronica M. Bray**

Date: October 10, 2023

**<u>CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER</u>**

# EXHIBIT 2

CONFIDENTIAL

## Table of Contents

I.      Engagement………………………………………………….……..3

II.     Qualifications and Experience ................................................................3

III.    Summary of Opinions…………………………………………………..7

IV.     Fiduciary Responsibilities………………………………………………8

V.      Recordkeeping Services and Fees…………………………………….…12

VI.     Defendants lacked retirement plan fee reduction strategies…………………..16

VII.    Defendants lacked expertise of effectively negotiating reasonable recordkeeping fees……………………………………………………………….22

VIII.   Summary and Conclusion……………………………………………….........................30

## Exhibits

1.      Materials Considered
2.      Veronica M. Bray- Curriculum Vitae
3.      Veronica M. Bray- Prior Testimony & Expert Engagements

CONFIDENTIAL

## I.    Engagement

1.    I have been engaged by Capozzi Adler, P.C., counsel for the Plaintiffs in this matter, to provide expert opinion and analysis of the oversight, process, decisions, and actions taken by Humana Inc., and the Humana Retirement Plans Committee and its members, ("Defendants") during the Class Period[1] for their fiduciary responsibilities of the ongoing review and negotiating of recordkeeping costs for the Humana Retirement Savings Plan, ("the Plan"). In this report, I will opine as to whether Defendants' actions were consistent with the standard of care practiced by a prudent fiduciary acting in the best interest of Plan participants, and the losses suffered by participants as a result of Defendants' failure to review and negotiate recordkeeping fees.

2.    I am being compensated at the rate of $650 per hour. My compensation does not depend on my opinions or the outcome of this case. My opinions are based on my review of public information, the documents produced during discovery, depositions taken in the case, and my professional retirement plan industry experience. My opinions on this matter are ongoing. I reserve the right to supplement, revise, or amend these opinions.

3.    A list of the materials considered in this matter is attached hereto as Exhibit 1.

## II.    Qualifications and Experience

4.    I hold a Bachelor of Science in Business Administration from the University of North Carolina in Greensboro. I have held a Financial Industry Regulatory Authority (FINRA) Series 6 and 63 licenses, North Carolina Life Insurance

---

[1] The Class Period is defined as April 13, 2015, through the date of judgment.  *See* May 30, 2023, Order granting the Parties' Stipulation Regarding Class Certification and Dismissal of the Board of Directors of Humana Inc.

CONFIDENTIAL

License, and industry related designations. I regularly attend industry related conferences, workshops, and training.

5.  My career and experience in the retirement plan industry spans two decades. I have worked in several roles within the 401(k)-retirement plan industry. One of my roles was in 401(k) retirement plan third-party recordkeeping and administrative services at Paychex Securities, a large retirement plan recordkeeper. During my tenure, I prepared cost and service comparisons for recordkeeping, administrative, and investments for prospective and current plan sponsor clients. I also provided retirement plan third-party administrative services for plan sponsor clients, support for converting their retirement plan to the various Paychex retirement plan recordkeeping platforms, managed and trained employees in a retirement plan administrative and recordkeeping district office.

6.  I also provided Employee Retirement Income Security Act of 1974, ("ERISA") governed retirement plan advisor consulting services for Gate City Advisors, a Top 100 Retirement Plan Advisor Firm in the country (by Plan Adviser Magazine). During my tenure with this firm, I guided 401(k) and 403(b) plan sponsors through their fiduciary responsibilities, including their periodic review of service providers' fees through benchmarking and taking their retirement plan out to bid. I also assisted my clients with plan conversions to other recordkeepers when there was a better fit and/or would result in lower fees and enhanced services. I also advised clients regarding investment mapping, selection, monitoring, and ongoing reviews.

7.  In my present role, I assist retirement plan fiduciaries, plan sponsors, and committees with their search, evaluation, and selection of all retirement plan service

CONFIDENTIAL

providers for their organization's retirement benefits offering. I have screened and requested proposals from hundreds of retirement plan advisor firms for retirement plan fiduciary and non-fiduciary advisory services, recordkeepers for recordkeeping and administrative services, third-party administrators for retirement plan administrative services, auditors for retirement plan audits, and other retirement plan service providers.

8.  Currently, I am the founder and Chief Executive Officer of Retirement Plan Advisor Search. Retirement plan fiduciaries and plan sponsors hire my firm to assist with the search for one or more service providers for their organization's retirement plan.  These service providers include finding their third-party administrator, recordkeeper, custodian, advisor, trustee, auditor, investment manager, and/or attorney for their organization's 401(k) or 403(b) retirement plan. I also train my committees on best practices for fiduciary governance and how to pay close attention to plan related fees. I also perform annual reviews with my clients to benchmark their plans to ensure the service providers they hire are continuing to perform the originally agreed upon services they hired the service provider to perform for their organization's retirement plan, and their fees remain reasonable.

9.  Since 2003, I have consulted with hundreds of retirement plan fiduciaries and retirement plan committees on all the moving parts of their organizations' retirement plans, including but not limited to:

a.  Creating and maintaining a foundation for procedural prudence including the plan's investment policy statement, plan fee policy statement, committee

CONFIDENTIAL

charter, fiduciary acknowledgement letters, fiduciary file maintenance, and facilitating committee fiduciary training and quarterly plan review meetings,

b.      presenting total plan cost reports to plan sponsors and committees,

c.      consulting plan fiduciaries and committees on 401(k) retirement plan design scenarios, compliance testing, fiduciary responsibilities, and best practices,

d.      breaking out individual costs and total retirement plan costs,

e.      facilitating employee education meetings,

f.      collaborating with committees on employee communication strategies and strategies to improve participant outcomes,

g.      providing legislative and regulatory updates and shared related case studies,

b.      training human resources managers, certified public accountants, retirement plan advisors, and other interested professionals on retirement plan related content.

10.    As a thought leader in the retirement plan industry, I am invited to speak at industry related conferences and events such as the National Association for Plan Advisors (NAPA), the Society for Professional Asset Managers and Recordkeepers (SPARK), Institutional Investors' (II) annual Retirement Plan Advisor Summit, various Society for Human Resource Professionals (SHRM) continuing education chapter meetings, and other professional associations' continuing education meetings on industry related content.

11.    Since 2018, I have served as an expert witness and consultant to retirement plan related matters and litigation for both plaintiffs and defendants.

12.    My curriculum vitae is attached as Exhibit 2.

CONFIDENTIAL

### III.    Summary of Opinions

13.    Retirement plans the size of this Plan have leverage to obtain the best pricing with their retirement plan service providers.  Defendants lacked the knowledge and expertise in performing their fiduciary responsibilities for the Plan. Specifically, Defendants failed to effectively negotiate reasonable recordkeeping fees, understand total compensation being paid to the Plan's recordkeeper, and employ other strategies to reduce fees being charged to Plan participants.

14.    In my report, I will share industry best practices in operating and overseeing a retirement plan. I will also provide examples of how Defendants failed at meeting their fiduciary responsibility of paying reasonable plan fees. Defendants' failure to effectively negotiate recordkeeping fees and employ other strategies to reduce Plan fees cost Plan participants millions of dollars from their retirement accounts. Table 1 below is a snapshot of this mega-sized Plan's assets and participants.

15.    **Table 1**[2]

| Plan Year | Plan Assets | Plan Participants |
|---|---|---|
| 2015 | $3,437,831,428 | 49,150 |
| 2016 | $3,900,087,026 | 50,722 |
| 2017 | $4,639,915,750 | 49,344 |
| 2018 | $4,284,188,066 | 48,314 |
| 2019 | $5,344,450,090 | 49,901 |
| 2020 | $6,268,925,601 | 52,238 |
| 2021 | $7,329,299,080 | 57,246 |
| 2022 | $6,431,866,718 | 58,735 |

---

[2] *See* Humana_Moore005923, 005991, 006059, 006130, 005832, 006331, 006414, and Humana 2022 Form 5500 at p. 30 and 72.

CONFIDENTIAL

## IV.     Fiduciary Responsibilities

16.     Under ERISA, retirement plan fiduciaries are held to certain standards for overseeing the administration and ongoing activities of their organization's defined contribution retirement plan[3]. In 2022, there were 621,473 401(k) retirement plans with over 7.5 trillion dollars in assets and 78.2 million participants[4]. The Employee Benefits Security Administration, ("EBSA"), an agency within the United States Department of Labor's ("DOL"), provides guidance to retirement plan fiduciaries for hiring and monitoring of retirement plan service providers. The hiring of a retirement plan service provider is a fiduciary function, and fiduciaries are required to monitor all retirement plan service providers. The DOL assumes plan fiduciaries "normally conduct requests for proposal (RFPs) from service providers at least once every three to five years."[5] EBSA has issued several communications to guide plan fiduciaries addressing how to meet their fiduciary responsibilities. An EBSA guide from September of 2021, titled "Meeting Your Fiduciary Responsibilities," enumerates the responsibilities of plan fiduciaries.[6] These responsibilities include:

a.     acting solely in the interest of plan participants and their beneficiaries and with the exclusive purpose of providing benefits to them;

b.     carrying out their duties prudently;

c.     following the plan documents (unless inconsistent with ERISA);

d.     diversifying plan investments; and

---

[3] *See* ERISA | U.S. Department of Labor (dol.gov). (Last accessed October 10, 2023)
[4] *See* 2022 Recordkeeping Survey | PLANSPONSOR. (Last accessed October 10, 2023)
[5] *See* 29 CFR Part 2550, Reasonable Contract or Arrangement Under Section 408(b)(2) Federal Register/Vol. 75, No. 136 / Friday July 16, 2010 / Rules and Regulations 41625. (Last accessed October 10, 2023)
[6] *See* Meeting Your Fiduciary Responsibilities (dol.gov). (Last accessed October 10, 2023)

Ex. 2 - 9

CONFIDENTIAL

    e.    paying only reasonable plan expenses.

17.    The duty to act prudently is one of a fiduciary's central responsibilities under ERISA. Prudence focuses on the process for making fiduciary decisions. Therefore, it is wise to document decisions and the basis for those decisions.[7] The duty to pay only reasonable fees for plan services and to act solely in the best interest of participants has been a key tenet of ERISA since its passage.[8]

18.    According to a report by the American Society of Pension Professionals and Actuaries, retirement plan sponsors face more cost pressures than ever.[9] Fifty percent of Large-Mega defined contribution plans with $100 million or more in plan assets have identified reducing plan costs as a core focus this year.[10]

19.    In 2023, Callan's Defined Contribution Trends Survey reported that plan governance and process have been the most key areas of focus for retirement plan sponsors for the last 3 years.[11] Plan governance and process include formalizing a committee and holding regular committee meetings. It also includes ensuring the committee is trained on how the retirement plan is administered, best administration practices, fiduciary responsibilities, and how to review the plan's administration, fees, and investment objectives using a repeatable, documented process. Since 2015, formal fiduciary training has ranked as one of the top ten most key areas of focus for plan sponsors.[12]

---

[7] *See* Meeting Your Fiduciary Responsibilities (dol.gov) (Last accessed October 10, 2023)
[8] *See* https://institutional.vanguard.com/iam/pdf/FBPBK.pdf?cbdForceDomain=false (Last accessed October 10, 2023)
[9] *See* Why Digital Recordkeepers Are Poised to Disrupt Retirement Plan Market | AMERICAN SOCIETY OF PENSION PROFESSIONALS & ACTUARIES (asppa.org) (Last accessed October 10, 2023)
[10] *See* Why Digital Recordkeepers Are Poised to Disrupt Retirement Plan Market | AMERICAN SOCIETY OF PENSION PROFESSIONALS & ACTUARIES (asppa.org) (Last accessed October 10, 2023)
[11] *See* Callan Institute 2023 Defined Contribution Trends Survey at 6, 14.
[12] *Id* at 10; *see also* Callan Institute 2019 Defined Contribution Trends Survey at 10.

CONFIDENTIAL

20.     Based on my extensive experience educating dozens of retirement plan sponsors and fiduciaries on how to meet their fiduciary responsibilities, I offer below best practices that a prudent retirement plan fiduciary and committees follow when overseeing their organization's retirement plan and services providers:

a.     Establish a formal retirement plan committee with an odd number of members for voting purposes, adding an additional attendee to keep meeting minutes that documents all plan related decisions, discussions, and activities.

b.     Hold regularly scheduled quarterly committee meetings, follow an agenda, formalize, and repeat a documented process for overseeing their organization's retirement plan.

c.     Train all committee members in their roles and fiduciary responsibilities and have ongoing related training at each committee meeting.

d.     Establish an Investment Policy Statement, (IPS), and review this policy at least annually to ensure it continues to meet the plan's objectives. The IPS should also outline the process for selecting the plan's qualified default investment alternative, target date funds, and stable value funds and require that investments be diversified.

e.     Review all plan investments quarterly, ensure investments remain diversified, continue to follow the IPS, and document the process for retaining or replacing investments.

CONFIDENTIAL

f.    Ensure the plan is operated per the Plan Document. Since 401(k) retirement plans are qualified retirement plans by the Internal Revenue Service, (IRS), they must meet certain requirements to take advantage of its tax benefits. The Plan Document outlines the day-to-day operations of the plan, and the plan sponsor is bound to it. The Plan Document includes information on when the employee becomes eligible to participate in the plan, employee deferral limits, whether there is an employer match, and if the match has a vesting schedule, and other important plan information.

g.    Maintain the appropriate fidelity bond coverage for the retirement plan and consider whether fiduciary liability insurance is necessary for your organization.

h.    Ensure all required notices are sent to participants and their beneficiaries.

i.    Prepare and annually review and update, if necessary, a Fee Policy Statement (described in more detail below).

j.    Review all plan fees at each quarterly meeting, annually benchmark these fees against other like plans, and negotiate fees with plan service providers if fees are not in line with the benchmarks.

k.    Perform a formal request for proposal for all plan services providers every 3-5 years, documenting the project and decisions made because of the outcome of the project.

l.    Document the hiring process of service providers with strong cybersecurity practices by ensuring all plan service providers responsible for maintaining

11

plan records and keeping participant data confidential and plan accounts secure follow strong cybersecurity practices.

m.    Review all plan related decisions annually ensuring the plan design, investment decisions, and employee education services remain in alignment with the organization's goals and are in the best interest of participants and their beneficiaries.

n.    Hire one or more experts to assist the committee with meeting their fiduciary responsibilities should the committee lack the expertise in one or more functions of the retirement plan and monitor the expert.

## V.    Recordkeeping services and fees

21.    Defined contribution plans are complex to maintain and administer and are subject to an array of rules and regulations that govern all qualified tax-deferred employee benefit plans. These include Section 401(a) of the Internal Revenue Code (IRC),[13] which establishes the requirements that employee benefit plans must meet to qualify for the deferral of federal income tax. Employers sponsoring their organization's defined contribution plan typically hire service providers, also known as recordkeepers, to operate their retirement plan.

22. Recordkeeping is a term for all the administrative services provided to defined contribution plans by a retirement plan service provider. There are dozens of retirement plan recordkeepers providing services to defined contribution retirement plans and these services are the same, regardless of the size of the retirement plan.

---

[13] *See* A Guide to Common Qualified Plan Requirements | Internal Revenue Service (irs.gov) (Last accessed October 10, 2023)

CONFIDENTIAL

23.    Recordkeeping services are necessary for all defined contribution plans, regardless of asset size and participant size. Recordkeeping services include:

a.    keeping records of all the transactions that take place within the retirement plan;

b.    plan sponsor support with a plan contact;

c.    plan sponsor website;

d.    trust and custody services;

e.    transaction processing

f.    transferring information from the plan sponsor to the recordkeeper, fund companies, and other service providers associated with the plan;

g.    participant support services (communications, enrollment meetings, educational meetings, call centers, interactive voice response systems, online access to view and make changes to their account, educational on demand videos and whitepapers, pre-recorded and live webinars and online calculators, beneficiary notices, loan, hardship, and distributions processing, participant quarterly statements, and preparation and sending related materials to participants like the required annual notices,);

h.    plan document creation and maintenance;

i.    plan design consulting services;

j.    plan compliance testing and reporting

k.    annual required From 5500 preparation;

l.    operating plan per the plan document ensuring compliance.

CONFIDENTIAL

24.    Third-party service providers provide these services on behalf of defined contribution plans. Some recordkeepers provide only recordkeeping and related services and some recordkeepers are subsidiaries of financial services and insurance companies that also market mutual funds and insurance products.

25.    In my experience, prudent and knowledgeable retirement plan fiduciaries review and control all retirement plan related fees annually, at a minimum. They have ongoing conversations with their plan's service providers, negotiate services and fees, and document these interactions.

26.    Recordkeeping fees can be paid by a plan sponsor in several ways. They can be paid out of participant assets or by the plan sponsor. They can also be paid as a percentage of plan assets or on a per participant basis. Sometimes plan sponsors will pay all or a portion of the retirement plan recordkeeping fees.

27.    There are several ways plan fiduciaries can control costs for their participants investing in their employer's retirement plan. Relationship pricing, fee levelization, and taking the retirement plan out to bid via a request for proposal process are the most popular cost control strategies. These cost control strategies will be further explained throughout my report.

28.    Over the last decade, I have seen a rapid decline in my client's retirement plan recordkeeping fees. This decline is due to several factors including, but not limited to, increased fee transparency resulting from the fee disclosure regulation,[14]

---

[14] *See* 29 U.S.C. §1108(b)(2).

CONFIDENTIAL

ongoing technology enhancements,[15] recordkeeper consolidation,[16] and continuous ERISA excessive fee litigation.[17]

29.    In 2020, Fidelity quoted a $14 to $21 per participant recordkeeping fee in a lawsuit[18]. In Table 2 below, I identify five mega sized retirement plans with billions of dollars in assets and thousands of participants which maintain reasonable recordkeeping fees.

**Table 2[19]**

| Plan Name | Plan Assets | # Participants | Reasonable Recordkeeping Fee/Participant |
|---|---|---|---|
| Federal Express Corporation Pilots' Retirement Savings Plan | $4,747,535,340 | 5,918 | $20.81 |
| Clifton Larson Allen, LLP 401(K) Retirement Plan | $1,241,954,741 | 9,043 | $13.71 |
| BlackRock Retirement Savings Plan | $3,828,146,761 | 12,996 | Blackrock pays all RK and Trustee fees, admin fee $2.50 |
| The Vanguard Retirement and Savings Plan | $8,185,182,391 | 22,485 | $12.05 |
| The Cargill Partnership Plan | $7,721,733,222 | 44,511 | $15.11 |

---

[15] *See* Why Digital Recordkeepers Are Poised to Disrupt Retirement Plan Market | AMERICAN SOCIETY OF PENSION PROFESSIONALS & ACTUARIES (asppa.org) (Last accessed October 10, 2023)
[16] *See* Recordkeeper Consolidation: A Retirement Plan Industry Trend |… (captrust.com) (Last accessed October 10, 2023)
[17] *See* Rise in Retirement Plan Excessive Fee Litigations (rixtrema.com) (Last accessed October 10, 2023)
[18] *See* Moitoso v FMRLLC, 451 F.Supp.3d 189, 204 (D. Mass. Mar 27, 2020)
[19] *See* Federal Express Corporation Pilots' Retirement Savings Plan 2021 Form 5500, CliftonLarsonAllenLLP 401(K)Retirement Plan 2021 Form 5500, BlackRock Retirement Savings Plan 2021 Form 5500, The Vanguard Retirement and Savings Plan 2020 Form 5500, and The Cargill Partnership Plan 2022 Form 5500.

CONFIDENTIAL

30.     All retirement plan asset sizes can be significantly impacted by a reduction in
recordkeeping fees.[20] For example, take an employee with 35 years until retirement
and a current 401(k) account balance of $25,000. If returns on investments in this
employee's account over the next 35 years average 7 percent and fees and expenses
reduce the average returns by 0.5 percent, the employee's account balance will
grow to $227,000 at retirement, even if there are no further contributions to the
account. If fees and expenses are 1.5 percent, however, the employee's account
balance will grow to only $163,000. The 1 percent difference in fees and expenses
would reduce the account balance at retirement by 28 percent.[21]

## VI.     Defendants lacked retirement plan fee reduction strategies.

31.     In the retirement plan industry, it is a known fact that retirement plan recordkeepers
offer discounts for recordkeeping services if the plan sponsor utilizes one or more
additional proprietary revenue generating products or services[22]. Recordkeepers also
offer competitive recordkeeping fees if an organization places their retirement plan
types and assets, like the Defendants' plans, with the recordkeeper. This is called
relationship pricing. The recordkeeper will provide discounted pricing for
recordkeeping services based on the overall relationship of the client. The more
proprietary products and services the plan sponsor utilizes, the steeper the
recordkeeping fee discount. Acquiring and retaining a recordkeeping client at a
competitive fee gives the recordkeeper the opportunity to generate other revenue

---

[20] *See* A Look at 401(k) Plan Fees (dol.gov) (Last accessed October 10, 2023)
[21] *See* A Look at 401(k) Plan Fees (dol.gov) (Last accessed October 10, 2023)
[22] See Some retirement plan record keepers resort to aggressive sales tactics with proprietary products -
InvestmentNews (Last accessed October 10, 2023)

CONFIDENTIAL

sources, like the recordkeepers proprietary target date funds, brokerage accounts, and managed account services.

32.     During the Class Period, Defendants did not leverage their mega sized plan assets and participants, as well as other potential plan assets, to negotiate lower recordkeeping fees. When asked  if being aware of any negotiations with Schwab asking them to reduce their recordkeeping fee based on the fact they could either recordkeep for other Humana plans or there was a possibility they could recordkeep for other Humana plans, Senior Vice President of Total Rewards, Jessica Klein, who was testifying as Humana's corporate designee, stated, "I am not aware of any conversations that happened to that effect, including the potential negotiation of other of our plans, no[23]."

33.     Plan sponsors can get as much five to six basis points recordkeeping fee reduction for using the recordkeeper's proprietary target date funds.[24][25] During the Class Period, the Plan's recordkeeper was making between 5 to 35 basis points from participants invested in their proprietary target date funds. Had Defendants had the knowledge and expertise to negotiate fees with the Plan's recordkeeper since they were using the proprietary target date funds, Defendants could have negotiated an even further reduction in recordkeeping fees.

34.     During the Class Period, the Plan's investment options included the Schwab Managed Retirement Trust Fund target date suite ("SMRT"). Over 800 million to over 2 billion dollars of Plan assets were invested in the Schwab proprietary target date funds. The

---

[23] *See* Deposition transcript of Jessica Klein. P. 87, 8-18.
[24] *See* [Some retirement plan record keepers resort to aggressive sales tactics with proprietary products - InvestmentNews (Last accessed October 10, 2023)](#)
[25] 5 basis points is equal to 0.05%, 6 basis points is equal to 0.06%

CONFIDENTIAL

total Plan assets in the Schwab target date funds each year, investment management fee charged to plan participants, and the estimated total amount paid to Schwab during the Class Period are in Table 3[26].

**Table 3**

| Plan Year | Total assets in Schwab Proprietary Target Date Funds | Investment Management Fee | Total Paid to Schwab 2015 to 2022 |
|---|---|---|---|
| 2015[27] | $613,525,794 | 0.35% | $2,147,340 |
| 2016 | $1,011,680,583 | 0.35% | $3,540,882 |
| 2017 | $1,268,545,265 | 0.35% | $4,439,908 |
| 2018 | $1,597,101,291 | 0.35% | $5,589,854 |
| 2019 | $1,203,410,388 | 0.33% | $3,971,254 |
| 2020 | $1,922,549,104 | 0.33% | $6,344,412 |
| 2021 | $2,347,722,918 | 0.05% | $1,173,861 |
| 2022 | $2,059,456,211 | 0.05% | $1,029,728 |
| Total | | | $28,237,239 |

Plan participants paid over 28 million dollars to Schwab for investing in the Schwab proprietary target date funds. Yet, Defendants did not use this information as leverage for recordkeeping fee reductions.

35.    Defendants were not consistent in the process for reviewing and selecting the Plan's target date funds. At the December 3, 2015, Retirement Plans Committee Meeting, Retirement Plans Committee member Mark Preston, reviewed the SMRT funds along with Schwab's passive target date option, the Schwab Index Retirement Trusts ("SIRT"), with the committee noting the SMRT funds have outperformed the SIRT funds over a 5-year period[28]. Due to the outperformance of the SMRT

---

[26] *See* Humana_Moore005222, 004722, 005222004720, 005024, 004973, 004921, 005167, 005081 and 004593
[27] Prorated to account for the Class Period beginning April 13, 2015.
[28] *See* Humana_Moore001763

CONFIDENTIAL

funds, the Committee expressed continued support for the Plan's current option (SMRT)[29].

36.     Four years later, at the September 15, 2019, Retirement Plans Committee Meeting, the SMRT and SIRT funds were reviewed along with other target date fund providers[30]. Fidelity and Vanguard's target date funds had the same expense ratio of 0.05%, the same expense ratio as the SIRT[31]. The Committee discussed the lower fees and recordkeeping credits Schwab would give the Plan if the SIRT funds were used. Fidelity and Vanguard did not offer revenue credits; however, both had the same amount of proposed annual savings as the SIRT funds[32]. Todd Castleton, outside counsel for Humana, stated that SMRT has generally outperformed SIRT[33]. The Committee voted to replace the current Schwab SMRT with Schwab's SIRT product offering, even though the SMRT option outperformed the SIRT in the latest reporting period and the Committee recognized this outperformance at previous committee meetings and used this information as support for their decision to keep the SMRT[34] in the Plan. The screenshot below is from the Retirement Plans Committee Meeting Deck reviewed during this meeting that illustrates the underperformance of the SIRT compared to the SMRT [35].

---

[29] See Humana_Moore001763
[30] See Humana_Moore003175
[31] *See* Humana_Moore003175
[32] *See* Humana_Moore003175
[33] *See* Humana_Moore003177
[34] *See* Humana_Moore003204
[35] *See* Humana_Moore003178

19

CONFIDENTIAL

| Weighted Performance 06-30-20 | | | |
|---|---|---|---|
| Candidate Provider | 1 Year | 3 Years | 5 Years |
| Schwab Proposed SMRT 25 bps | 3.96% | 6.40% | 6.44% |
| Schwab Proposed SIRT 5 bps | 3.32% | 6.28% | 6.39% |

37.    During the 2021 Plan year, Defendants replaced the SMRT target date suite with the SIRT Class IV.[36] During the Class Period, the previous target date suite expense ratio ranged from 33 to 35 basis points. The Schwab Indexed Retirement Trusts Class IV had a 5-basis points expense ratio. Based on the documents I reviewed for this case, there is no documentation of why the Plan did not utilize the lower cost Class I of the Schwab Indexed Retirement Trusts incepted in 2009 that were 7 basis points, when Plan assets reached the $100 million asset minimum to invest in this share class, until the 5-basis points Class IV were incepted[37].

38.    During the Class period, the Plan also had the Schwab Personal Choice Retirement Account, (PCRA), also known as a participant self-directed brokerage account.[38] Participants invested in hundreds of investment options that were available through the PCRA[39]. There were hundreds of investment options that shared revenue with

---

[36] See Humana_Moore005222
[37] See Indexed Retirement Trust Funds® | Charles Schwab Trust Bank (schwabtrustbankcollectives.com) (Last accessed October 10, 2023)
[38] See Humana_Moore005082, 004594, 005168, 004912, 004974, 004721, 005223, and 006204
[39] See Humana_Moore005924-27, 005992-95, 006060-63, 005833-36, 006415-18, 006332,35, and 006611-14

CONFIDENTIAL

Schwab for the participants investing in these funds.[40] Defendants did not consider the additional millions of dollars of revenue Schwab was making from the Plan to negotiate a lower recordkeeping fee.

39.     Another trend, and industry best practice is retirement plan fee leveling, also called fee levelization. Plan sponsors have been seeking a way to allow for more equitable sharing of plan expenses.[41] Fee levelization is a payment method for recordkeeping and other retirement plan related fees. Participants pay an equitable portion for investing in the retirement plan regardless of the investment option's expense ratio, revenue sharing, or recordkeeping costs.

40.     In the Field Assistance Bulletin (FAB) 2003-03, the DOL indicates that allocating plan expenses is a fiduciary decision that requires fiduciaries to act prudently.[42] As early as 2013, prudent retirement plan fiduciaries were looking for ways for participants to share equitable retirement plan service provider fees and implementing the fee leveling payment method for their retirement plans.[43] Whatever allocation method is used, the failure by fiduciaries to engage in a process to consider an equitable method of allocation of plan costs and revenue sharing would be imprudent and a breach of fiduciary duty.[44]

41.     "Currently (during and before the Class Period), the revenue sharing is credited to the plan and is used to offset the recordkeeping fees of all participants, not just those participants who have paid the revenue sharing fees.[45]" It wasn't until December 3,

---

[40] *See* Humana_Moore005924-27, 005992-95, 006060-63, 005833-36, 006415-18, 006332,35, and 006611-14
[41] *See* Is Fee Levelization Right for Your 401(k) Plan? (shrm.org) (Last accessed October 10, 2023)
[42] *See* planadviser.com/awareness-of-fee-levelization-is-on-the-rise/ (Last accessed October 10, 2023)
[43] *See* Is Fee Levelization Right for Your 401(k) Plan? (shrm.org) (Last accessed October 10, 2023)
[44] *See* planadviser.com/awareness-of-fee-levelization-is-on-the-rise/ (Last accessed October 10, 2023)
[45] *See* Humana_Moore001762

CONFIDENTIAL

2015, the Humana Retirement Plans Committee discussed fee leveling for their Plan participants.[46] A prudent and knowledgeable fiduciary staying up to date on the trends in fee payment methods would have implemented this cost reduction strategy for their plan participants far before the 2016 plan year.

## VII.    Defendants lacked expertise in effectively negotiating reasonable recordkeeping fees.

42.    In my experience, prudent fiduciaries of a retirement plan the size of the Plan formalize a process for monitoring all plan related fees by establishing a Fee Policy Statement, ("FPS"), to help fulfill their duty to monitor reasonableness of all retirement plan related fees. While ERISA does not require plan fiduciaries to have an FPS, ERISA does require that plan fiduciaries understand their plan's fees and ensure they are reasonable for the services provided to their retirement plan.

43.    An FPS outlines the process retirement plan fiduciaries follow to identify all plan related fees, keep retirement plan related fees reasonable, how the fees will be paid, how often the fees will be reviewed, how the participants will be notified regarding plan fees, and documenting all decisions. The FPS is reviewed annually or more frequently if there is a change in one or more retirement plan services providers, or members of the retirement plan committee. I have screened hundreds of retirement plan advisory firms that serve in an ERISA 3(21) co-fiduciary, and ERISA 3(38) discretionary fiduciary capacity and a Fee Policy Statement is included with their fiduciary process deliverables.

---

[46] *See* Humana_Moore001762

CONFIDENTIAL

44.     Had Defendants prepared, maintained, and followed an FPS for the Plan, the recordkeeping costs and fees charged to Plan participants would have been reasonable during the Class Period because Plan fees would have been reviewed at a regular cadence and fee negotiations would have taken place at least annually.

45.     Hiring a service provider in and of itself is a fiduciary function.[47] Plan fiduciaries also must establish and follow a formal review process at reasonable intervals. The retirement plan industry best practice, and what I train my plan sponsor clients, is to perform a formal review process every 3 to 5 years. The DOL also assumes "plans normally conduct requests for proposal from service providers at least every three to five years."[48]

46.     Defendants had multiple opportunities to negotiate competitive recordkeeping fees with the Plan's recordkeeper. Defendants wrapped up a request for proposal from 2014 in 2015, performed one request for proposal for a recordkeeper for the Plan in 2019, and did not begin another request for proposal until late 2022, ironically after Plaintiffs filed this lawsuit[4950]. A plan the size of Defendants', merging assets of retirement plans of acquired organizations into the Plan, adding hundreds of millions of dollars and thousands of participants each year should perform this task at least every three years, if not more frequently. Defendants did not renegotiate recordkeeping fees each time they merged a retirement plan into the Plan.

---

[47] *See* Meeting Your Fiduciary Responsibilities (dol.gov) (Last accessed October 10, 2023).
[48] *See* 29 CFR Part 2550 – Reasonable Contract or Arrangement Under Section 408(b)(2) – Fee Disclosure; Interim Final Rule. Federal Register/Vol. 75, No. 136 / Friday, July 16, 2010 / Rules and Regulations at 41625
[49] *See* Humana_Moore006169
[50] *See* Deposition transcript of Jessica Klein, p.88, 10-13

CONFIDENTIAL

47.     When asked about conducting the Request for Proposal in 2014, Senior Vice President of Total Rewards, Jessica Klein, was asked, "did the Committee take into consideration the size of the plan in terms of assets and participant numbers … to possibly negotiate for lower recordkeeper fees?" Ms. Klein's response was, "No. The only reason that the size of the plan was really considered was to ensure that we had a provider that could support a plan of our size.[51]"In my experience, I absolutely leverage, and train my clients to leverage plan assets and participant size to negotiate the highest level of services and lowest fees from their recordkeeper, especially during a request for proposal project.

48.     Defendants' process for reviewing the annual benchmarking surveys was flawed. According to Ms. Klein, "we conduct a benchmarking survey every year, and you would see in the minutes, we did do that between 2014 and 2019 forward through present[52]." When asked about where the information for the peer groups used for comparison came from, Ms. Klein stated, "we customize the benchmarking group to ensure that it's a reasonably close set of peers, both from a recordkeeping perspective and a value of the plan perspective.[53]"

49.     RixTrema's Planisphere is a third-party database that stores retirement plan Form 5500 data[54]. For defined contribution plans that filed Form 5500s in 2021, Planisphere reported there were 813 retirement plans with over 10,000 participants

---

[51] *See* Deposition of Jessica Klein, p. 56, 14-22
[52] *See* Deposition transcript of Jessica Klein, p. 52 6-9.
[53] *See* Deposition transcript of Jessica Klein, p. 77, 20-24
[54] *See* Win 401(k) plans & comply with fiduciary regulation (rixtrema.com) (Last accessed October 10, 2023)

CONFIDENTIAL

and $500 million or more in retirement plan assets. Narrowing down the list to the same industry as Defendants, there are 75 plans.

50.    The Retirement Plans Committee received a report from an outside consultant, Roland Criss, they engaged to perform an annual benchmarking survey for the Plan. According to the report for the Plan year ending December 31, 2018, the peer group used to compare the Plan's recordkeeping fees constructed by Roland Criss was 11 retirement plans with over 10,000 participants and $500 million or more in plan assets[55]. The peer group comparisons were for smaller plans with smaller participant sizes. When comparing a mega plan to a large plan, the Plan's fees will always be below the median and mean because smaller plans pay more for retirement plan related fees.

51.     The same report shared a year over year fee comparison from 2014 to 2018. Roland Criss stated the Plan's total fees as a percentage of assets have declined[56]. The below chart from the report does not show the recordkeeping fees getting any lower. However, during the Class Period, the Plan assets and participants increased.

## Findings and Opinion

### Year Over Year Fee Comparison

Table 5 on this page is a comparison of the Plan's fees since 2014.  The Plan's total fees as a percentage of assets have declined.

Table 5 – Year Over Year Fee Comparison

| Service Categories | 2014 Total % | 2015 Total % | 2016 Total % | 2017 Total % | 2018 Total % |
|---|---|---|---|---|---|
| Investment Management – Various | 0.31% | 0.30% | 0.32% | 0.32% | 0.26% |
| Custody/Trust Services | 0.03% | 0.03% | 0.02% | 0.02% | 0.02% |
| Recordkeeping/TPA - Schwab | 0.03% | 0.03% | 0.03% | 0.03% | 0.03% |
| Communication/Education – Schwab | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| Total | 0.37% | 0.36% | 0.37% | 0.37% | 0.31% |

---

[55] *See* Humana_Moore002384
[56] *See* Humana_Moore002396

CONFIDENTIAL

52.     The Committee meeting minutes only stated the plan level and participant level fees were at or below the benchmark mean for all plans and did not recognize the recordkeeping fee remaining the same for each year[57]. A knowledgeable fiduciary with expertise in effectively negotiating recordkeeping fees with their recordkeeper would have recognized the recordkeeping fee had not been reduced during the period and used this information to negotiate a recordkeeping fee reduction with Schwab.

53.     Defendants engaged another outside third-party, Institutional Investment Consulting, ("IIC"), to perform an annual benchmarking survey for the plan[58]. A report from December 31, 2021, included 124 retirement plans with assets between $2.5 billion and $10 billion, and between 11,623 and 90,502 participants. The Plan had $7.2 billion and 57,541 participants at the time the report was shared with the Committee.  RixTrema reported 258 defined contribution plans that fall within that asset and participant range. It is no surprise the Plan's recordkeeping fees were below the custom benchmark group since the Plan is one of the lager plans in the sample group being compared, again, to smaller plans in the benchmark group. Defendants did not know how to review the benchmarking surveys and request the consultant to use an actual benchmark group that had the same assets and participants as the Plan.

54.     IIC prepared another benchmarking report on December 31, 2021. This report only had 42 retirement plans in the comparison peer group with assets ranging from $2.5 billion to $12 billion and participants ranging from 20,627 to 96,826. The Plan had

---

[57] *See* Humana_Moore002466
[58] See Humana_Moore002640

$7.2 billion in plan assets and 57,541 participants[59]. The Plan fell in the middle of the recordkeeping fees, because the plan's assets and participant size were in the middle of the peer group sample. The report was flawed, and Defendants should have requested a benchmark report with peer group comparisons of the size of the Plan.

55.    A prudent retirement plan fiduciary has constant fee reduction conversations with their recordkeeper. From September of 2015 to December of 2019, or for five consecutive years, the Plan grew almost 2 billion dollars in assets and nearly 1,000 participants, however the Plan's recordkeeping fee was never reduced[60]. When asked if there were any direct negotiations with Schwab related to asking them to reduce their recordkeeping fees, Ms. Klein responded she was not aware of any negotiations outside of the request for proposal process that began in 2019[61]. Over this five-year period, the Plan's recordkeeper was making more money while providing the same standard services[62].   There should have been a recordkeeping fee reduction over that five-year period. Defendants did not request a fee reduction from their Plan's recordkeeper.

56.    Ms. Klein was asked again, "between February 2021 and October 2022, which is when I believe the price was dropped to $22 per participant, did anybody specifically negotiate, try to negotiate with Schwab about reducing their recordkeeping fee." Ms. Klein stated, "No, we did not during that period of time, and I am not aware we would

---

[59] *See* Humana_Moore005755
[60] *See* Humana_Moore005508, 004601, 005174, 004912, and 004916
[61] *See* Deposition transcript of Jessica Klein, p.79, 12-19
[62] *See* Humana_Moore005081, 004593, 005167, 004916, and 004973

have done that, particularly in light of the continuation of our benchmarking that we do on an annual basis. Nothing pointed us to that.[63]"

57.    The Charles Schwab Explanation of Fees and Services lists out their Standard Services and the service agreements for the Plan outline the services that will be provided by Schwab to the Plan. Upon review, in my experience, and confirmed by the Plan's Senior Vice President of Total Rewards, there are no unique services Schwab is providing to the Plan to warrant an unreasonable recordkeeping fee[64].

58.    Because the Committee was advised at the October 3, 2019, Retirement Plans Committee Meeting that Schwab will terminate its contract with GuidedChoice for advice services, in March 2020 the Plan removed the Guided Choice Asset Management services, and added another revenue generating proprietary service from Schwab, the Schwab Managed Account Services.[65][66] The Schwab Managed Account services provides participants access to a Schwab advice consultant. The advice consultant facilitates participant access to Morningstar Retirement Manager, (MRM). MRM provides discretionary advice for Plan participants.

59.    Coincidentally, after adding another revenue generating Schwab service, and undergoing a request for proposal in 2019, the Plan's recordkeeping fee was reduced from $37 per participant to $23 per participant. When asked if prior to accepting Schwab's $23 per participant proposal, there were any negotiations between committee members or anybody else with Schwab to attempt to see if the $23 per participant could be lowered any more, Ms. Klein stated "I'm not aware of

---

[63] *See* Deposition transcript of Jessica Klein, p. 92, 16-24, and p. 93, 1-3.
[64] *See* Deposition transcript of Jessica Klein, p. 55 22-24 and p. 56 1-11.
[65] *See* Humana_Moore002928
[66] *See* Humana_Moore005033

CONFIDENTIAL

any conversations that happened outside of the process[67]." This fee reduction was way overdue. If Defendants had knowledge of industry best practices to reduce Plan fees, a recordkeeping fee reduction would have happened far before 2019.

60.    A prudent and knowledgeable fiduciary would know what share classes are available for each investment option in their retirement plan to ensure participants have access to the lowest cost investment options. Defendants did not have the expertise to research and investigate share class options with the Plan's recordkeeper.

61.    With the implementation of the lower cost Class IV target date funds and Schwab making less profits from the target date funds, Schwab notified Defendants of an increase in recordkeeping fees[68]. The recordkeeping fee went from $23 per participant to $28 per participant. With all of the proprietary Schwab products and services the Plan was utilizing, during the Class Period, a prudent knowledgeable fiduciary would know how much total compensation is being paid to Schwab and use as leverage to negotiate a lower recordkeeping fee.

62.    Defendants have a long-standing relationship with Schwab, as the Plan has had the same recordkeeper for at least two decades. [69] Retirement plan fiduciaries with the expertise of negotiating fees with their recordkeeper use their long-term relationships as leverage to negotiate the lowest fees and high level of services. Defendants did not leverage the Plan's almost 20-year relationship to negotiate the best recordkeeping fees for their participants.

---

[67] *See* Deposition transcript of Jessica Klein, p. 85, 15-22
[68] *See* Humana_Moore004728
[69] *See* Deposition of Jessica Klein p. 49 2-4

CONFIDENTIAL

## VIII.  Summary and Conclusion

63.    Based on documents reviewed for this case there is little evidence supporting the Plan fiduciaries understood strategies for controlling all retirement plan related costs. This report demonstrates Defendants' lack of monitoring the Plan's recordkeeper and recordkeeping fees and that they did not have a documented process for monitoring reasonableness of fees, nor a Fee Policy Statement.

64.    Had Defendants understood the benchmarking reports they were reviewing, relationship pricing, and how to effectively negotiate retirement plan recordkeeping fees, Plan participants would not have lost millions of dollars in their retirement accounts.

65.    Considering all the proprietary Schwab products and services the Plan has been utilizing during the Class Period, a reasonable recordkeeping for the Plan is between $12 to $20 per participant which is in line with the rates for the plans I cite in paragraph 28.

66.    Based on information from Defendants, Table 4 is an estimated calculation of damages due to Defendants lack of negotiating recordkeeping fees during the Class Period. The Plan's total recordkeeping fee is taken from Defendants' answers to interrogatories.

CONFIDENTIAL

Table 4[70]

| Plan Year | Plan Assets | Plan Participants | Plan's Total Recordkeeping fee | Plan's Recordkeeping Fee/Participant | Estimated Damages at $12/participant | Estimated Damages at $20/participant |
|---|---|---|---|---|---|---|
| 2015[71] | $3,437,831,428 | 49,150 | $1,597,047 | $32.49 | $1,007,248 | $614,048 |
| 2016 | $3,900,087,026 | 50,722 | $2,494,365 | $49.18 | $1,885,701 | $1,479,925 |
| 2017 | $4,639,915,750 | 49,344 | $2,680,799 | $54.33 | $2,088,671 | $1,693,919 |
| 2018 | $4,284,188,066 | 48,314 | $2,521,294 | $52.19 | $1,941,526 | $1,555,014 |
| 2019 | $5,344,450,090 | 49,901 | $2,473,569 | $49.57 | $1,874,757 | $1,475,549 |
| 2020 | $6,268,925,601 | 52,238 | $1,474,347 | $28.22 | $847,491 | $429,587 |
| 2021 | $7,329,299,080 | 57,246 | $2,488,076 | $43.46 | $1,801,124 | $1,343,156 |
| 2022 | $6,431,866,718 | 58,735 | $2,957,592 | $50.35 | $2,252,772 | $1,782,892 |
| 2023[72] | $6,431,866,718 | 58,735 | $2,957,307 | $50.35 | $2,252,487 | $1,782,607 |
| | | | | **Estimated Damages** | **$15,951,777** | **$12,156,697** |

67.    Due to this lack of expertise in negotiating recordkeeping fees, lack of oversight

and fiduciary responsibilities, Plan participants suffered losses in their retirement

savings accounts between $12,156,697 and $15,951,777.

68.    Table 5 below is the actual contracted rate during the Class Period compared to

what reasonable recordkeeping fees should be, and estimated damages.

---

[70] *See* Humana_Moore005861, 005930, 005998, 006066, 005767, 006260, 006338, and Humana 2022 Form 5500
filing p2, and 07.29.22 Moore v. Humana_Response_And_Objections_To_Rogs_With_Verification_And_COS.pdf
[71] Prorated to account for the Class Period starting April 13, 2015.
[72] Assumption plan assets, participants, and recordkeeping fee remain the same as 2022.

CONFIDENTIAL

**Table 5**

| Plan Year | Plan Assets | Plan Participants | Plan's Recordkeeping Fee/Participant | Cost to Participants | Estimated Damages at $12/participant | Estimated Damages at $20/participant |
|---|---|---|---|---|---|---|
| 2015[73] | $3,437,831,428 | 49,246 | $37 | $1,307,919 | $424,190 | $706,983 |
| 2016 | $3,900,087,026 | 51,041 | $37 | $1,888,517 | $612,492 | $1,020,820 |
| 2017 | $4,639,915,750 | 50,234 | $37 | $1,858,658 | $100,468 | $1,004,680 |
| 2018 | $4,284,188,066 | 49,529 | $37 | $1,832,573 | $594,348 | $990,580 |
| 2019 | $5,344,450,090 | 49,491 | $37 | $1,831,167 | $593,892 | $989,820 |
| 2020 | $6,268,925,601 | 52,104 | $28 | $1,458,912 | $625,248 | $1,042,080 |
| 2021 | $7,329,299,080 | 54,556 | $28 | $1,527,568 | $654,672 | $1,091,120 |
| 2022 | $6,431,866,718 | 68,393 | $22 | $1,054,646 | $820,716 | $1,367,860 |
| 2023[74] | $6,431,866,718 | 61,137 | $22 | $1,345,014 | $733,644 | $1,222,740 |
| | | | | Estimated Damages | $5,159,670 | $9,436,683 |

69.     Estimated damages from the Schwab contracted rate are between

$5,159,670 and $9,436,683.  Table 4 and 5 present an alternative range of

damages depending on whether one estimates damages based on

Defendants' answers to interrogatories or based on the Schwab contracted

rate.

Respectfully Submitted,



Veronica M. Bray

---

[73] Prorated to account for the Class Period starting April 13, 2015.
[74] Projects damages through the end of 2023.

EXHIBIT 1

## Materials Considered

## Legal Documents

Complaint, Kena Moore, Timothy K. Sweeny, Russel A. Hohman, Susan M. Smith, and Veronica Cargill, individually and on behalf of all others similarly situated, Plaintiffs, v. Humana, Inc, The Board of Directors of Humana, Inc., The Humana Retirement Plans Committee, and John Does 1-30. Defendants. 3:21-cv-00232-RGJ, United States District Court for the Western District of Kentucky

## Meeting Minutes, Disclosures, Depositions, and other related Documents

Humana_Moore00508
Humana_Moore001762
Humana_Moore001763
Humana_Moore002085
Humana_Moore002384
Humana_Moore002396
Humana_Moore002466
Humana_Moore002640
Humana_Moore002644
Humana_Moore002928
Humana_Moore003175
Humana_Moore003177
Humana_Moore003178
Humana_Moore003204
Humana_Moore004593
Humana_Moore004594
Humana_Moore004601
Humana_Moore004721
Humana_Moore004722
Humana_Moore004728
Humana_Moore004731
Humana_Moore004911
Humana_Moore004912
Humana_Moore004916

Humana_Moore004917
Humana_Moore004918
Humana_Moore004919
Humana_Moore004920
Humana_Moore004921
Humana_Moore004973
Humana_Moore004974
Humana_Moore005024
Humana_Moore005033
Humana_Moore005036
Humana_Moore005037
Humana_Moore005038
Humana_Moore005081
Humana_Moore005082
Humana_Moore005088
Humana_Moore005090
Humana_Moore005167
Humana_Moore005168
Humana_Moore005174
Humana_Moore005222
Humana_Moore005223
Humana_Moore005224
Humana_Moore005225
Humana_Moore005226
Humana_Moore005227
Humana_Moore005230
Humana_Moore005755
Humana_Moore005767
Humana_Moore005832
Humana_Moore005833
Humana_Moore005834
Humana_Moore005835

Humana_Moore005836
Humana_Moore005861
Humana_Moore005923
Humana_Moore005930
Humana_Moore005991
Humana_Moore005992
Humana_Moore005993
Humana_Moore005994
Humana_Moore005995
Humana_Moore005998
Humana_Moore006059
Humana_Moore006060
Humana_Moore006061
Humana_Moore006062
Humana_Moore006066
Humana_Moore006130
Humana_Moore006169
Humana_Moore006202
Humana_Moore006203
Humana_Moore006204
Humana_Moore006212
Humana_Moore006213
Humana_Moore006215
Humana_Moore006260
Humana-Moore004720
Humana_Moore006215
Humana-Moore006331
Humana-Moore006332
Humana-Moore006333
Humana-Moore006334
Humana-Moore006335
Humana-Moore006338

Humana_Moore006414

Humana_Moore006415

Humana_Moore006416

Humana_Moore006417

Humana_Moore006418

Humana_Moore006611

Humana_Moore006612

Humana_Moore006613

Humana_Moore006614

07.29.22 Moore v. Humana_Response_And_Objections_To_Rogs_With_Verification_And_COS.pdf

Deposition of Jessica Klein

2023.07.28-FRE 408 Letter to Plaintiff's Counsel.pdf

Humana 2022 Form 5500

**Whitepapers, articles, industry related publications, and other publicly available information**

ERISA | U.S. Department of Labor (dol.gov)

2022 Recordkeeping Survey | PLANSPONSOR

29 CFR Part 2550, Reasonable Contract or Arrangement Under Section 408(b)(2) Federal Register/Vol. 75, No. 136 / Friday July 16, 2010 / Rules and Regulations 41625

Meeting Your Fiduciary Responsibilities (dol.gov)

FBPBK.pdf (vanguard.com)

Why Digital Recordkeepers Are Poised to Disrupt Retirement Plan Market | AMERICAN SOCIETY OF PENSION PROFESSIONALS & ACTUARIES (asppa.org)

Callan Institute 2023 Defined Contribution Trends Survey at 6, 14

Callan Institute 2019 Defined Contribution Trends Survey at 10

A Guide to Common Qualified Plan Requirements | Internal Revenue Service (irs.gov)

29 U.S.C. §1108(b)(2)

Recordkeeper Consolidation: A Retirement Plan Industry Trend |… (captrust.com)

Rise in Retirement Plan Excessive Fee Litigations (rixtrema.com)

Moitoso v FMRLLC, 451 F.Supp.3d 189, 204 (D. Mass. Mar 27, 2020)

A Look at 401(k) Plan Fees (dol.gov)

https://www.investmentnews.com/some-retirement-plan-record-keepers-resort-to-aggressive-sales-tactics-with-proprietary-products-66894

Is Fee Levelization Right for Your 401(k) Plan? (shrm.org)

Awareness of Fee Levelization Is on the Rise | PLANADVISER

Indexed Retirement Trust Funds® | Charles Schwab Trust Bank (schwabtrustbankcollectives.com)

Federal Express Corporation Pilots' Retirement Savings Plan 2021 Form 5500

CliftonLarsonAllenLLP 401(k) Retirement Plan 2021 Form 5500

BlackRock Retirement Savings Plan 2021 Form 5500

The Vanguard Retirement and Savings Plan 2020 Form 5500

The Cargill Partnership Plan 2022 Form 5500

Fee Considerations for Small Plans | PLANSPONSOR

Win 401(k) plans & comply with fiduciary regulation (rixtrema.com)

EXHIBIT 2



P: 336-848-2710

E: veronica@retirementplanadvisorsearch.com

# Veronica M. Bray

## <u>Training, Qualifications and Certifications</u>

Certified Financial Consultant by the Institute of Financial Consultants
Bachelor of Science in Business Administration from the University of North Carolina at Greensboro
Held Accredited Retirement Plan Consultant by the Society of Professional Asset-Managers & Recordkeepers
Held FINRA SERIES 6 and 63 Security Licenses
Held NC Life Insurance License

## <u>Professional Experience</u>

Contracting Companies                                     June 2018-Present
**Expert Witness and Consultant**

- Expert witness and consultant to retirement plan related litigation cases for both Plaintiffs and Defendants attorneys
- Provide professional opinion and experience with retirement plan best practices for jumbo and micro plans
- Develop expert reports supporting experiences and opinions about retirement plan best practices, reasonable administrative, recordkeeping and related qualified retirement plan fees
- Deposition experience
- Perform special research projects for litigating firms
- Engaged and opined on retirement plan related lawsuits, such as Duke University, Cornell University, Massachusetts Financial Services (MFS Funds), Norton Hospital, Principal Financial, and Duke Energy

RPAS                                                     February 2016-Present
**CEO**

- Started organization that facilitates the request for proposal process & procurement for 401(k), 403(b), 457(b), 401(a), defined benefit & other non-qualified retirement plans, including the search for recordkeepers, third party administrators, plan auditors, plan actuaries, & financial advisors for institutions throughout the United States
- Meet with retirement plan committees to draft a request for proposal & facilitate the request for proposal process for a new service provider and/or to perform their periodic review of service provider(s)
- Assist plan sponsors with negotiating fees & services with all plan providers
- Assist plan sponsors, when requested, to be the liaison during a plan transition to another service provider
- Industry Thought Leader, Plan & present industry related seminars for continuing education credit for Financial Advisors, Plan Sponsors, Human Resource Managers, Chief Financial Officers, Business Owners, & Certified Public Accountants
- Panelist at the Society for Professional Asset-Managers & Recordkeepers (SPARK) Forums
- Presenter at the National Association for Plan Advisors (NAPA) 401(k) Summits
- Panelist at the Bernard Robinson & Co. annual CPA continuing

education workshops
- Presenter at the Leading Age North Carolina Annual Conferences
- Presenter at the Retirement Plan Advisor Summits

## Gate City Advisors                                    October 2013-February 2016
**Business Development & On-Going Relationship Manager**
- New 401(k) & 403(b) retirement plan client development for a retirement plan focused advisory firm
- On-boarded new clients & maintained over 80 retirement plan client relationships
- Educated retirement plan committees of their fiduciary responsibilities
- Assisted plan sponsors with their periodic review of service providers, negotiated plan fees, & when applicable, assisted with the transition of their plan to another service provider
- Educated plan participants when there was a transition about the new website, call center, & cost difference when applicable
- Planned & presented industry related seminars for continuing education credit for Human Resource Managers, Chief Financial Officers, Business Owners & Certified Public Accountants

## Paychex Securities, Inc.                               October 2003-September 2013
**District Manager & Regional Retirement Plan Consultant**
- Built a team of 12 retirement plan consultants delivering retirement plan outsourcing solutions (recordkeeping, third party administration, custodial and trustee) to organizations
- Member of the District Manager Advisory Council for fiscal year 2012, 2013
- Developed & led multiple top award-winning employees (Circle of Excellence Winners, Conference Award Winners & an Inner Circle Elite Winner) during my management tenure
- Large Market Retirement Plan Consultant for one of the largest recordkeepers in the country
- Educated plan sponsors about retirement plan administration, & recordkeeping efficiencies including cost & service comparisons
- Assist plan sponsors with conversion of their retirement plan to the Paychex platform
- Train & educate participants on the website, call center, & other resources available to them
- Handpicked by Executive Leadership to Mentor & Coach other Managers
- Trained new retirement plan consultant classes at the corporate office in Rochester, NY
- Trained & mentored newly hired retirement plan consultants
- Elected for the Paychex Management Development Program

### Board & Volunteer Experience

Thrive Community

January 2022-Present

**Board Member**

- Assist with organization's fundraising efforts
- Organize annual fundraiser
- Distribute survey to targeted populations
- Attend monthly board meetings

Human Resource Management Association of Greensboro

January 2013- Present

**Past President, President, and Vice President**

- Lead a 17 Board of Directors for 280-member not-for-profit association
- Responsible for relevant speakers and educational programs
- Scheduling of chapter meetings and organization decisions
- Developed formal accounting system for financial oversight
- Organization succession planning Committee
- Association member

Community Housing Solutions of Greensboro

January 2016-July 2022

**Board Chair**

- Lead bi-monthly Board of Directors meetings
- Developed and implemented 3-year Strategic Plan
- Developed Executive Director Succession Plan
- Developed and implemented Executive Director Annual Performance Reviews
- Assist with community projects

Girl Scouts Troop 2051

January 2016-2021

**Troop Treasurer**

- Responsible for troop financials and reporting to the Girl Scouts Council

Greensboro Airport Rotary

January 2015-July 2020

**Club Member**

Greensboro Elk's Club

January 2017-Present

**Club Member**

Our Lady of Grace

September 2012-Present

**Religious Education Teacher & Substitute Teacher**

EXHIBIT 3

## Expert Bray List of Related Expert Consulting

1. David Clark, et al., v. Duke University, et al., Kathi Lucas, et al., v. Duke University, No. 1:2016cv01044, United States District Court for the Middle District of North Carolina, Expert Report and Deposition, Plaintiffs-Settled

2. Latasha Davis, Individually and as a Representative of a Class of Participants and Beneficiaries in and on Behalf of Washington University Retirement Savings Plan; Jennifer Elliott, Individually and as a Representative of a Class of Participants and Beneficiaries in and on Behalf of Washington University Retirement Savings Plan; Marla Aliece Sims-King, Individually and as a Representative of a Class of Participants and Beneficiaries in and on Behalf of Washington University Retirement Savings Plan v. Washington University, No. 4:2017cv01641, United States District Court for the Eastern District of Missouri, Expert Report and Deposition, Plaintiffs-Settled

3. Mary Hartshorne et al. v. The Roman Catholic Diocese of Albany, New York, et al., In the Matter of Joseph F Pofit, et al., for the Dissolution of St. Clare's Corporation Pursuant to Section (a)(1)(A) and (D) of the Not-for-Profit Corporation Law, No. 2019-1989, New York Supreme Court for the County of Schenectady, Expert Rebuttal Report, Defendants

4. Casey Cunningham individually and as representative of a class of participants and beneficiaries on behalf of the Cornell University Retirement Plan for the Employees of the Endowed Colleges at Ithaca and the Cornell University Tax Deferred Annuity Plan v. Cornell University and the Retirement Plan Oversight Committee, No. 2016cv06525, United States District Court for the Southern District of New York, Expert Consulting, Plaintiffs-Settled

5. Geneva Henderson, Helen Dulock, Rena Guzman, Jacqueline Goldberg, Connie Corpening, Joanne Rackstraw, Joann D Wright, Deon M Moore, Cynthia T James, Huberta W Waller, Jacqueline Blackwell, and Kathryn T Presley individually and as representatives of a class of participants and beneficiaries on behalf of the Emory University Retirement Plan and the Emory Healthcare, Inc. Retirement Savings and Matching Plan v. Emory University, Emory Healthcare, Inc., Emory Pension Board, Emory Investment Management, and Mary L Cahill, No. 2016cv02920, United States District Court for the Northern District of Georgia, Expert Consulting, Plaintiffs-Settled

6. Melissa Velazquez, individually and as representative of a class of similarly situated persons, and on behalf of the Massachusetts Financial Services Company Defined Contribution Plan and the Massachusetts Financial Services Company MFSavings Retirement Plan v. Massachusetts Financial Services Company d/b/a MFS Investment Management, the Massachusetts Financial Services Company Retirement Committee, the Massachusetts Financial Services Company Retirement Investment Committee, MFS Service Center, Inc., and John Does 1-30, No. 2017cv11249, United States District Court for the District of Massachusetts, Expert Consulting, Plaintiffs-Settled

7. Jennifer Baker, as a representative of a class of similarly situated persons, and on behalf of the Incentive-Investment Plan for John Hancock Employees, v. John Hancock Life Insurance Company (U.S.A.), No. 2020cv10397, United States District Court for the District of Massachusetts, Expert Consulting, Plaintiffs-Settled

8. Chris Carrigan, Michael Venti, and Sylvain Yelle, individually and as representatives of a class of similarly situated persons, and on behalf of the Xerox Corporation Savings Plan v. Xerox Corporation, Xerox Corporation Plan Administrator Committee, and John Does 1-30,

No. 2021cv01085, United States District Court for the District of Connecticut, Expert Consulting, Plaintiffs-Settled

9. Donald S. Bloom, David C. Greenfield, Damian L. Smikle and Justin A. Sternhell, on Behalf of the Profit Sharing Plan for Employees of AllianceBernstein l. P., Themselves, and All Others Similarly Situated v. AllianceBernstein, L.P., Compensation and Workplace Practices Committee of AllianceBernstein Corporation, Ramon De Oliveira, Paul L. Audet, Daniel G. Kaye, Kristi Matus, Mark Pearson, Bertram L. Scott, Tara Thompson Popernik, Daniel Loewy, Administrative Committee, Investment Committee, and Jane and John Does 1-20, No. 2022cv10576, United States District Court for the Southern District of New York, Expert Consulting, Plaintiffs

10. Denis J. Conlon and Nicole Travis, Individually, and on Behalf of All Others Similarly Situated, v. The Northern Trust Company, The Northern Trust Company Employee Benefit Administrative Committee, and Does 1-30, No. 2021cv2940, United States District Court for the Northern District of Illinois Eastern Division, Expert Consulting, Plaintiffs

11. David J. Hastings, on Behalf of Himself and All Others Similarly Situated v Principal Life Insurance Company; Benefits Plans Administrative Committee: Benefit Plans Investment Committee, No. 2021cv00047, United States District Court for the Southern District of Iowa, Expert Consulting, Plaintiffs

12. David Ravarino, et al. v Voya Financial, Inc. et al., No. 2021cv1658, United States District Court for the District of Connecticut, Expert Consulting, Plaintiffs

13. Donna Disselkamp and Erica Hunter, individually and on behalf of all others similarly situated v. Norton Healthcare, Inc., Richard S. Wolf, G. Hunt Rounsavall, Stephen A. Williams, Donald H. Robinson, The Norton Healthcare Retirement Plan Investment Committee, and Jane and/or John Does 1-25, No. 2018cv48, United States District Court for the Western District of Kentucky, Expert Consulting, Plaintiffs-Settled

14. Barbara Goodman, Lisa Countryman, Sharon Clarke, Cheryl Gallops, Sherri Stuckey, Lauren Spivey, and Tiffany Hairston-Lott, individually, and on behalf of all others similarly situated v. Columbus Regional Healthcare System, Inc., No. 2021cv15, United States District Court for the Middle District of Georgia Columbus Division, Expert Consulting, Plaintiffs-Settled

15. Lauren Marie Barbiero, Kimberly Jo Lopez, and William Kenneth Lopez, Individually and on Behalf of All Others Similarly Situated v. Charles Schwab Investment Advisory, Inc., No. 2021cv07034, United States District Court for the Northern District of California, Expert Consulting, Plaintiffs

16. Richard A. Kong, et al., v. Trader Joe's Company, et al., No. 202005790, United States District Court for the Central District of California, Expert Consulting, Plaintiffs-Settled

17. Katherine Cutrone, on Behalf of Herself and All Others Similarly Situated, v. The Allstate Corporation; The Allstate 401(k) Committee; The Allstate 401(k) Administrative Committee; The Allstate 401(k) Investment Committee; And Does -30, No. 2020cv6463, United States District Court for the Northern District of Illinois Eastern District, Expert Consulting, Plaintiffs

18. Elizabeth Gomes, Eva M. Connors, Jennifer Bowen, Katisha Shoulders, Kenneth N. Marenga, Pamela Prisco Carpenter, Steven Peters, Zhanna Karp, Individually, and on Behalf of All Others Similarly Situated v. State Street Corporation, State Street Bank & Trust Company, North America Regional Benefits Committee of State Street Corporation, Investment Committee of State Streeet Corporation, and Jane and John Does 1-20,

No.2021cv10863, United States District Court for the District of Massachusetts, Expert Consulting, Plaintiffs

19. Jillyn Peterson, Gabe Hare, Robert Heynen and Adam Krajewski, individually and on behalf of all others similarly situated v. Insurance Services Office, Inc., The Plan Administration Committee of Insurance Services Office, Inc., The Trusts Investment Committee of Insurance Services Office, Inc., and John Does 1-30, No. 2020cv13223, United States District Court for the District of New Jersey, Expert Report, Plaintiffs

Also currently consulting on 14 other cases that are not yet public information.