# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF
## KENTUCKY LOUISVILLE DIVISION

### *ELECTRONICALLY FILED*

|  |  |
|---|---|
| KENA MOORE, TIMOTHY K. SWEENEY, RUSSEL A. HOHMAN, SUSAN M. SMITH and VERONICA CARGILL, individually and on behalf of all others similarly situated,<br><br>        Plaintiffs,<br><br>    v.<br><br>HUMANA INC. and THE HUMANA RETIREMENT PLANS COMMITTEE,<br><br>        Defendants. | Civil Action No. 3:21-cv-00232-RGJ-RSE<br><br>Oral Argument Requested |

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION TO EXCLUDE THE EXPERT OPINIONS AND TESTIMONY OF PETE SWISHER

Michael P. Abate
KAPLAN JOHNSON ABATE & BIRD LLP
710 West Main Street, 4th Floor
Louisville, KY 40202
Telephone: 502-416-1630
Facsimile: 502-540-8282
mabate@kaplanjohnsonlaw.com

Brian D. Boyle (*pro hac vice*)
Deanna M. Rice (*pro hac vice*)
O'MELVENY & MYERS LLP
1625 Eye Street NW
Washington, DC 20006
Telephone: 202-383-5300
Facsimile: 202-383-5414
bboyle@omm.com
derice@omm.com

Catalina Vergara (*pro hac vice*)
Noah Ickowitz (*pro hac vice*)
O'MELVENY & MYERS LLP
400 South Hope Street, 18th Floor
Los Angeles, CA 90071
Telephone: 213-430-6000
Facsimile: 213-430-6407
cvergara@omm.com
nickowitz@omm.com

*Attorneys for Defendants*

## TABLE OF CONTENTS

**Page**

I.     INTRODUCTION .................................................................................................1

II.    BACKGROUND ..................................................................................................4

III.   LEGAL STANDARD............................................................................................7

IV.    ARGUMENT .......................................................................................................8

     A.    Mr. Swisher's Opinions About the Committee's Processes for Monitoring Plan Recordkeeping Fees Are Supported by Extensive Industry Experience and Consistent With Governing Case Law............................8

     B.    Mr. Swisher's Opinion That the Plan's Recordkeeping Fees Were Reasonable Is Also Well Supported and Admissible ............................................15

V.     CONCLUSION...................................................................................................17

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acosta v. WPN Corp.*,
2018 WL 3707418 (W.D. Pa. Aug. 3, 2018) ........................................................................ 11

*Baumeister v. Exelon Corp.*,
2023 WL 6388064 (N.D. Ill. Sept. 29, 2023) ....................................................................... 14

*Crouch v. John Jewell Aircraft, Inc.*,
2016 WL 157464 (W.D. Ky. Jan. 12, 2016) ........................................................................... 3

*Cunningham v. Cornell Univ.*,
2019 WL 4735876 (S.D.N.Y. Sept. 27, 2019), *aff'd*, 86 F.4th 961 (2d Cir. 2023) ............... 12

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579 (1993) .............................................................................................................. 7

*Huang v. TriNet HR III, Inc.*,
2023 WL 3092626 (M.D. Fla. Apr. 26, 2023) ................................................................. 2, 15

*In re Greyhound Lines Trial Grp.*,
2008 WL 11343421 (E.D. Ky. Oct. 22, 2008) ....................................................................... 4

*In re Scrap Metal Antitrust Litig.*,
527 F.3d 517 (6th Cir. 2008) ................................................................................................. 7

*In re Se. Milk Antitrust Litig.*,
2010 WL 8228885 (E.D. Tenn. Dec. 8, 2010) ..................................................................... 13

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999) .............................................................................................................. 7

*Lee v. Smith & Wesson Corp.*,
760 F.3d 523 (6th Cir. 2014) ................................................................................................. 7

*Marshall v. Northrop Grumman Corp.*,
2019 WL 4058583 (C.D. Cal. Aug. 14, 2019) ................................................................. 2, 15

*Matousek v. MidAmerican Energy Co.*,
51 F.4th 274 (8th Cir. 2022) ............................................................................................... 16

*McLean v. 988011 Ontario, Ltd.*,
224 F.3d 797 (6th Cir. 2000) ............................................................................................... 13

*Morales v. Am. Honda Motor Co.*,
151 F.3d 500 (6th Cir. 1998) ................................................................................................. 8

*Pfeil v. State St. Bank & Tr. Co.*,
806 F.3d 377 (6th Cir. 2015) ............................................................................................. 4, 8

*Sigetich v. Kroger Co.*,
2023 WL 2431667 (S.D. Ohio Mar. 9, 2023) ..................................................................... 13

*Smith v. CommonSpirit Health*,
37 F.4th 1160 (6th Cir. 2022) ........................................................................................... 4, 17

**TABLE OF AUTHORITIES**

(Continued)

**Page(s)**

*Stryker Corp. v. XL Ins. Am.*,
  2020 WL 13443035 (W.D. Mich. July 22, 2020) ................................................ 11

*Surles ex rel. Johnson v. Greyhound Lines, Inc.*,
  474 F.3d 288 (6th Cir. 2007) ........................................................................... 7

*Tibble v. Edison Int'l*,
  575 U.S. 523 (2015).......................................................................................... 14

*Tibble v. Edison International*,
  843 F.3d 1187 (9th Cir. 2016) .......................................................................... 14

*Troudt v. Oracle Corp.*,
  369 F. Supp. 3d 1134 (D. Colo. 2019)........................................................ 3, 11, 12

**Statutes**

29 U.S.C. § 1104(a)(1)............................................................................................. 8, 14

Defendants Humana Inc. and the Humana Retirement Plans Committee (the
"Committee," and collectively with Humana Inc., "Defendants" or "Humana") submit this
memorandum in opposition to Plaintiffs' Motion to Exclude the Expert Opinions and Testimony
of Pete Swisher ("Pls.' Mot. to Exclude"), DE 100.  Defendants request oral argument on the
motion under Local Rule 7.1(f).

## I.    INTRODUCTION

Defendants' expert Pete Swisher has decades of experience as an independent fiduciary
and consultant for retirement plans and is widely recognized as a thought leader in the industry.
Plaintiffs do not challenge Mr. Swisher's qualifications, nor could they reasonably do so—Mr.
Swisher is indisputably qualified to testify regarding fiduciary practices.  Plaintiffs instead argue
that Mr. Swisher's opinions about the reasonableness of the particular processes adopted by the
Committee should be excluded because "there is virtually no basis in the factual record for his
conclusion that Humana's oversight was prudent when between 2015-2019 the Plan's
recordkeeping fees remained at $37 per participant when simultaneously the industry-wide
recordkeeping fees were decreasing."  Pls.' Mot. to Exclude at 3–4.  On that limited ground, they
argue that Mr. Swisher's opinions—opinions rooted in Mr. Swisher's extensive experience and
deep understanding of how retirement plan fiduciaries approach fiduciary governance—are
unsupported *ipse dixit* and contrary to controlling case law.  Plaintiffs are wrong.

Plaintiffs' arguments for exclusion rest on a central, unsupported premise—that no matter
what Mr. Swisher has observed in the industry or how favorably the Committee's oversight
processes compared to those of similarly situated fiduciaries, it simply is not possible for the
Committee to have appropriately monitored the Plan's recordkeeping fees because those fees did
not decrease between competitive RFPs conducted in 2014 and 2019.  *See* Pls.' Mot. to Exclude
at 3–4.  That argument finds no support in the law.  While ERISA fiduciaries have a continuing

duty to monitor plan expenses—they cannot hire a recordkeeper and then do nothing to ensure that the arrangement remains reasonable over time—nothing in ERISA requires fiduciaries to revisit plan recordkeeping agreements at any set intervals.  Plaintiffs, moreover, ignore that their own expert opines that it is a "best practice" for plan fiduciaries to conduct RFPs every three to five years,[1] which is precisely what the Committee did here.  They also ignore that courts have held that fiduciaries who employed materially the same processes used by the Committee— regular competitive bidding, coupled with benchmarking exercises—were entitled to summary judgment on that basis.  *See, e.g.*, *Huang v. TriNet HR III, Inc.*, 2023 WL 3092626, at *11 (M.D. Fla. Apr. 26, 2023) (granting summary judgment for defendants on recordkeeping-fee claim); *Marshall v. Northrop Grumman Corp.*, 2019 WL 4058583, at *11 (C.D. Cal. Aug. 14, 2019) (same).

Mr. Swisher's opinion that the Committee's monitoring processes were sound is well-supported by his extensive experience in the retirement plan industry, and he explained in detail which features of the factual record led him to conclude that the Committee's approach was thorough, effective, and in line with industry practices.  Mr. Swisher also specifically explained the basis for his opinion that it was reasonable for the Committee not to attempt to negotiate a further fee reduction between the 2014 and 2019 RFPs, again drawing on his vast experience and observation of fiduciary decision-making processes to evaluate the Committee's actions, which included annual benchmarking between RFPs.  Courts evaluating ERISA fiduciary breach claims commonly consider the type of experience-based testimony about industry practices offered by

---

[1] *See* Ex. 2 (Bray Expert Report) ¶ 20(k), DE 97-3; Ex. 4 (Bray Depo. Tr.) at 129:7–10, DE 97-5. Defendants incorporate by reference the exhibits submitted in support of their motion for summary judgment.  *See* Exs. 1–28, DE 97-1–24, DE 98–98-6.  Defendants likewise incorporate by reference the additional exhibits submitted in support of their opposition to Plaintiffs' motion for summary judgment.  *See* Exs. 29–32, DE 104-1–6.

Mr. Swisher, which fundamentally differs from testimony about the reasonableness of plan recordkeeping fees that rests on nothing more than an expert's say-so, like Plaintiffs' expert Ms. Bray's opinion in this case. *See, e.g.*, *Troudt v. Oracle Corp.*, 369 F. Supp. 3d 1134, 1138–41 (D. Colo. 2019). Plaintiffs' mere disagreement with Mr. Swisher's opinion that the Committee's approach was reasonable in the circumstances is not a basis for exclusion.

Plaintiffs also ask the Court to exclude Mr. Swisher's opinion that the Committee's use of multiple, competitive RFPs produced reasonable recordkeeping fees, but their argument depends on the assertion that, despite the RFPs, the Committee "did not follow a prudent process." Pls.' Mot. to Exclude at 8. As explained in Defendants' motion for summary judgment, DE 97, the evidence is insufficient even to create a genuine issue on the question of fiduciary breach, let alone to establish imprudence as a matter of law so as to preclude Mr. Swisher's opinion. Plaintiffs do not contest that if the Committee ***did*** follow a prudent process (consistent with Mr. Swisher's opinions), it logically follows that the resulting fees were reasonable (as Mr. Swisher opines was the case). And Plaintiffs' argument that the law forecloses Mr. Swisher from relying on published industry survey data in further support of his reasonableness opinion (*see* Pls.' Mot. to Exclude at 8–9) fares no better.

At bottom, Plaintiffs' attacks on Mr. Swisher's opinions reduce to nothing more than disagreement with his conclusions, which is not a basis for exclusion. *See, e.g.*, *Crouch v. John Jewell Aircraft, Inc.*, 2016 WL 157464, at *20 (W.D. Ky. Jan. 12, 2016) ("Any disagreement with the [expert's] conclusions . . . is proper fodder [for] cross-examination, not a reason to exclude his opinion."); *In re Greyhound Lines Trial Grp.*, 2008 WL 11343421, at *4 (E.D. Ky. Oct. 22, 2008) (recognizing that "disagreement with [expert's] opinions and conclusions is insufficient to exclude him from testifying"). Plaintiffs' motion should be denied.

## II.     BACKGROUND

Plaintiffs allege that Defendants breached ERISA's duty of prudence by failing to monitor the Plan's recordkeeping fees, which Plaintiffs assert were excessive.  *See generally* First Am. Compl., DE 17.  To prevail on their claim, Plaintiffs must prove that (1) Defendants did not employ a prudent process for monitoring the Plan's recordkeeping fees and (2) the Plan's fees were "excessive relative to the services rendered."  *Smith v. CommonSpirit Health*, 37 F.4th 1160, 1169 (6th Cir. 2022); *see Pfeil v. State St. Bank & Tr. Co.*, 806 F.3d 377, 384 (6th Cir. 2015).

Both parties retained experts to offer opinions on these two central issues.  Defendants' expert Pete Swisher has extensive experience with retirement plans and is recognized as one of the top experts on fiduciary governance in the country.  Ex. 5 (Swisher Report) ¶¶ 1–14, Appendix A (CV), DE 97-7.  Mr. Swisher has published numerous articles and white papers about retirement plan and fiduciary issues, including in peer-reviewed publications, and authored an 892-page textbook for retirement plan advisors published by the American Retirement Association.  *Id.* ¶¶ 4, 7, Appendix A (CV).  Mr. Swisher speaks regularly at national conferences and is deeply involved in government affairs, providing industry feedback for various fee-transparency initiatives by the Department of Labor—the agency that enforces ERISA.  *Id.* ¶¶ 4, 6, Appendix A (CV).

In his report, Mr. Swisher discussed at length how, in his experience, retirement plan fiduciaries approach their obligation to monitor recordkeeping expenses.  As Mr. Swisher explained, the central objective of any monitoring process is to ensure that fees are reasonable, and retirement plan fiduciaries may use a variety of tools to help them achieve that aim.  *See id.* ¶¶ 31–39, 44–49, 64, 74.  Common approaches include benchmarking fees against data from industry surveys or consultant databases and engaging in competitive bidding processes such as

RFPs and RFIs. *Id.* ¶¶ 44–49. Among these options, "benchmarking has become, by far the most widespread practice for ensuring that recordkeeping costs remain reasonable." *Id.* ¶ 46. While "a competitive bidding process is a useful way to obtain market rates, especially when fiduciaries are uncertain as to whether current fees are reasonable, it is time consuming and costly for plan sponsors, and can be disruptive if it leads to a change in the recordkeeper." *Id.* ¶ 48. For that reason, among others, "consultants frequently advise plan sponsors to conduct formal competitive bidding only when they are open to the possibility of making a change in service provider, and not more frequently than every 3-5 years." *Id.* Mr. Swisher's observations align with the results of industry surveys published by one of the country's largest investment consulting firms, the Callan Institute, which show that benchmarking against consultant databases is the most common method for assessing recordkeeping fees, with a smaller percentage of plans (around 15–16 percent) reporting that they had conducted an RFP in the last year. *Id.* ¶ 49.

Mr. Swisher applied his experience in the industry, and the specific observations about industry practices described in his report, to evaluate the record and opine about how the Committee's processes compared with those adopted by similarly situated fiduciaries. Consistent with typical practices for large plans, Humana assigned responsibility for overseeing the Plan's recordkeeping arrangements to a fiduciary committee that met regularly, documented the topics discussed and decisions made in meeting minutes and associated presentations, and was supported by both internal staff and outside consultants. *Id.* ¶¶ 65–73.

With respect to recordkeeping fees, the Committee conducted competitive RFPs in 2014, 2019, and 2022–23, a practice that, while not required, is a common and accepted approach for ensuring that fees are reasonable. *Id.* ¶¶ 47–49, 76–94. And, Mr. Swisher opined, while there is

no one "correct" way to perform a recordkeeping RFP (*id.* ¶ 77), the record indicated that the Committee's approach was well-considered and in line with industry practices (*id.* ¶¶ 76–94). Each RFP was conducted with "the assistance of an independent, experienced consultant"—in both 2014 and 2019, Institutional Investment Consulting ("IIC")—as is the "preferred practice" in the retirement plan industry. *Id.* ¶ 78.[2]  The vendors selected to receive the RFPs were "highly qualified" (*id.* ¶¶ 80, 87), and IIC's evaluation of the RFP responses placed appropriate weight on factors such as service and price (*id.* ¶¶ 81, 88–91).  The proposals submitted by the Plan's recordkeeper, Schwab, were lower than bids from other large, well-known recordkeepers, a strong indication that Schwab's fees were not excessive.  *Id.* ¶¶ 86, 89, 91, 115–20.  Mr. Swisher also noted that the Committee continued to monitor Plan recordkeeping fees between RFPs through annual benchmarking performed by professional consultants, and the Plan's fees at all times compared favorably against the peer groups in the benchmarking studies.  *See id.* ¶¶ 95–108.  Taken together, Mr. Swisher opined, the Committee's efforts "exceeded the level of diligence of a typical plan sponsor" monitoring recordkeeping fees.  *Id.* ¶ 75.

Based in the first instance on the fact that the Plan's fees were set through periodic competitive bidding, which by its nature yields market rates for the specific services provided to a plan, Mr. Swisher opined that the Plan's recordkeeping fees were reasonable throughout the Class Period.  *Id.* ¶¶ 74, 94, 115–20.  In further support of that conclusion, Mr. Swisher noted that the Plan's fees were consistently at the low end of the range paid by comparable plans as

---

[2] Mr. Swisher did not opine about the Committee's specific process for the 2022–23 RFP, because the record does not include documents reflecting the details of that process, which began after the cut-off date for documents produced in this case.  *See* Ex. 5 (Swisher Report) ¶ 93, DE 97-7.  As noted in Mr. Swisher's report, Humana's 30(b)(6) witness, Jessica Klein, testified to the fact that the Committee conducted an additional RFP in 2022–23.  *See id.*; Ex. 3 (Klein Depo. Tr.) at 88:3–13, DE 97-4.

reflected in the benchmarking reports prepared for the Committee by its consultants and also compared favorably against recordkeeping fee data in published industry surveys. *Id.* ¶¶ 121–25.

Mr. Swisher also submitted a rebuttal report responding to certain opinions offered by Plaintiffs' expert Veronica Bray. *See* Ex. 32 (Swisher Rebuttal Report), DE 104-6.

## III.   LEGAL STANDARD

District courts act as the "gatekeeper" for admission of expert testimony under Federal Rule of Evidence 702. *Surles ex rel. Johnson v. Greyhound Lines, Inc.*, 474 F.3d 288, 295 (6th Cir. 2007); *see Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993). "Parsing the language of the Rule," the Sixth Circuit has explained that "a proposed expert's opinion is admissible, at the discretion of the trial court, if the opinion satisfies three requirements"—qualification, relevance, and reliability. *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 528–29 (6th Cir. 2008). The Rule 702 "inquiry is a flexible one," and "its focus must be solely on principles and methodology, not on the conclusions they generate." *Lee v. Smith & Wesson Corp.*, 760 F.3d 523, 526 (6th Cir. 2014) (brackets and citation omitted).

While the Supreme Court in *Daubert* "set forth a list of non-exhaustive factors to guide district courts in assessing reliability," the inquiry is "context-specific" and "'must be tied to the facts of a particular case.'" *Surles*, 474 F.3d at 295 (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999)). Where "non-scientific expert testimony is involved," the specific considerations outlined in *Daubert* "may be pertinent," or "the relevant reliability concerns" instead "may focus upon personal knowledge or experience." *Id.* (citation omitted). In all events, "Rule 702 should be broadly interpreted on the basis of whether the use of expert testimony will assist the trier of fact." *Morales v. Am. Honda Motor Co.*, 151 F.3d 500, 516 (6th Cir. 1998) (citation and alterations omitted).

## IV.    ARGUMENT

Plaintiffs do not dispute that Mr. Swisher is well qualified to testify regarding the practices adopted by retirement plan fiduciaries, nor do they take issue with the large majority of Mr. Swisher's opinions about how, in his experience, retirement plan fiduciaries approach oversight of plan recordkeeping expenses.  Plaintiffs focus their criticism, instead, on Mr. Swisher's application of that experience to the facts of this case—and, in particular, on Mr. Swisher's opinion that the Committee appropriately monitored Plan recordkeeping fees between the 2014 and 2019 RFPs.  *See* Pls.' Mot. to Exclude at 3–7.  Contrary to Plaintiffs' argument that Mr. Swisher's opinion is unsupported *ipse dixit*, Mr. Swisher thoroughly explained the basis for his opinion on this point and every other, tying his broad experience and deep understanding of industry practices to the record developed in discovery.  And Mr. Swisher's opinion fully comports with ERISA's prudence standard, under which the conduct of similarly situated fiduciaries serves as the touchstone.  *See* 29 U.S.C. § 1104(a)(1)(B); *Pfeil*, 806 F.3d at 384–85.  Mr. Swisher's opinions easily satisfy the test for admissibility, and Plaintiffs' motion should be denied.

### A.    Mr. Swisher's Opinions About the Committee's Processes for Monitoring Plan Recordkeeping Fees Are Supported by Extensive Industry Experience and Consistent With Governing Case Law

Mr. Swisher applied insights gained from his decades of experience in the retirement plan industry—and specific observations about industry practices described in his reports—to evaluate the record in this case and offer his opinion about how the Committee's fiduciary processes compared to those of similarly situated fiduciaries.  With respect to recordkeeping fees in particular, Mr. Swisher noted that the Committee put the Plan's recordkeeping arrangement out for competitive bidding in 2014, 2019, and 2022–23, a practice that, while not required, is a common and accepted means of ensuring reasonable fees. Ex. 5 (Swisher Report) ¶¶ 47–49, 74–

94, DE 97-7.  And while there is no single "correct" way to conduct a recordkeeping RFP (*id.* ¶ 77), Mr. Swisher explained why his review of the record indicated that the approach taken by the Committee and its consultant, IIC, was effective and consistent with industry practices (*id.* ¶¶ 74–94).

Plaintiffs do not challenge Mr. Swisher's opinions about the thoroughness or appropriateness of the RFPs, but contend that Mr. Swisher's opinion that it was reasonable not to press for even lower fees between the 2014 and 2019 RFPs is unsupported *ipse dixit*.  *See* Pls.' Mot. to Exclude at 4 ("Even if the 2015 RFP was reasonable, it does not explain why Defendants abandoned their fiduciary duties until 2019 when fees were finally significantly reduced to $23 per participant."); *id.* at 5 (asserting that Mr. Swisher "provided no basis to support his conclusion that the Committee could assume for years that recordkeeping fees were still reasonable").  Mr. Swisher, however, thoroughly explained the basis for his opinion on this point: "Because an RFP by nature yields market rates for the specific services required by their plan, fiduciaries who engage in them have reasonable assurance that their fees are reasonable for the scope of services they require."  Ex. 5 (Swisher Report) ¶ 74, DE 97-7.  And "because the costs of recordkeeping services do not significantly change over short periods, fiduciaries can have reasonable assurance that the fees they obtained from RFPs will remain at the market rate for an extended time period after conducting the RFP."  *Id.*  Here, moreover, the Committee not only performed multiple RFPs, but also worked with outside consultants to perform annual benchmarking exercises, and the results provided further assurance that the Plan's recordkeeping fees remained reasonable and in line with market rates between RFPs.  *See id.* ¶¶ 95–108. [3]

---

[3] *See also* Ex. 30 (Swisher Depo. Tr.) at 103:4–19 (testifying "that the pattern of conducting an RFP every three to five years that Humana followed . . . supplemented by benchmarking reports

On the specific issue of attempting to renegotiate fees between RFPs, Mr. Swisher noted that, in his experience, fiduciaries evaluating recordkeeping service arrangements often place significant emphasis on factors in addition to cost—including the level and quality of service provided—and view it as counterproductive to "continuously ask for discounts" without a concrete basis for doing so.  Ex. 30 (Swisher Depo. Tr.) at 145:14–148:9, 159:3–161:16, DE 104-3; Ex. 5 (Swisher Report) ¶ 38, DE 97-7.  Overemphasis on achieving rock-bottom fees, Mr. Swisher explained, can shift the focus away from the high quality of service that fiduciaries appropriately value and interfere with efforts to build stable, productive relationships with plan service providers.  *See id.*  Plaintiffs mischaracterize Mr. Swisher's opinion as improperly suggesting that plan fiduciaries may place service providers' interests above those of plan participants (*see* Pls.' Mot. to Exclude at 7), when his actual point is that participants benefit when fiduciaries foster stable, positive relationships with service providers who are focused on providing high-quality services (Ex. 30 (Swisher Depo. Tr.) at 72:21–74:4, 145:14–148:9, DE 104-3; Ex. 5 (Swisher Report) ¶ 38, DE 97-7).

Given these considerations, Mr. Swisher opined, "for plans that engage in RFPs and achieve substantial fee reductions through those processes—as Humana achieved for the Plan in 2014 and 2019—typical industry practice is that fees are not renegotiated until the term of the contract nears expiration unless there are significant changes to the plan that alter service requirements or intervening information (e.g., benchmarking exercises) indicates that existing fee arrangements are no longer reasonable."  Ex. 32 (Swisher Rebuttal Report) ¶ 59, DE 104-6.

---

and information provided by their consultants gave them an excellent in[sight] into the marketplace.  Over time[,] the RFPs dissolved any doubt as to whether they were getting market rates, so I believe that that is fully consistent with industry practices and that the time period was appropriate."), 113:20–114:8, DE 104-3.

Because there were no such changes to the Plan's service requirements between 2014 and 2019 and annual benchmarking confirmed that the Plan's recordkeeping fees remained reasonable,[4] Mr. Swisher concluded that it was consistent with broader industry practice for the Committee not to negotiate an additional fee reduction between 2014 and 2019—i.e., during the five-year term of the contract entered into with Schwab in 2014.  Ex. 32 (Swisher Rebuttal Report) ¶¶ 59–60, DE 104-6; *see* Ex. 17 (2014 Schwab Services Agreement and Subsequent Amendments), DE 97-20.

Courts routinely consider experience-based testimony concerning retirement plan industry practices when evaluating fiduciary breach claims under ERISA, and Mr. Swisher's opinions fit squarely within those parameters.  *See, e.g.*, *Troudt*, 369 F. Supp. 3d at 1142–43 (permitting expert to testify to "the extent his opinions regarding prudent practices are based on his familiarity with industry standards and practices" for monitoring 401(k) plan recordkeeping fees); *Acosta v. WPN Corp.*, 2018 WL 3707418, at *5–6 (W.D. Pa. Aug. 3, 2018) (permitting expert to testify about what she believed was the "prevailing fiduciary standard" for a retirement committee's monitoring of an investment manager when she used "her experience and specialized knowledge to apply that standard to the facts in this case").[5]  Courts have distinguished such testimony from true impermissible *ipse dixit*, such as where a proffered expert witness points to nothing beyond general "experience" to assert what a reasonable fee for a given plan would have been—exactly the type of testimony Plaintiffs have offered through their expert,

---

[4] *See* Ex. 20 (Committee Minutes Compilation) at 2, 4–6, 9, 14, 18–19, DE 97-23; Exs. 22–28 (2015–2021 Benchmarking Reports), DE 98–98-6.

[5] Courts in the Sixth Circuit have allowed similar testimony about compliance with industry standards in other contexts, too.  *See, e.g.*, *Stryker Corp. v. XL Ins. Am.*, 2020 WL 13443035, at *4 (W.D. Mich. July 22, 2020) (permitting "experts to testify as to industry custom and practice, and to testify about whether the parties acted in accordance with that custom or practice").

Ms. Bray.  *See, e.g.*, *Troudt*, 369 F. Supp. 3d at 1138–41 (allowing expert testimony regarding fiduciary practices but excluding opinion about what constitutes a reasonable fee, as to which expert did not disclose any underlying methodology); *Cunningham v. Cornell Univ.*, 2019 WL 4735876, at *9–10 (S.D.N.Y. Sept. 27, 2019) (excluding testimony regarding purported losses attributable to recordkeeping fees where experts did not explain methodology underlying asserted "reasonable" fee levels), *aff'd*, 86 F.4th 961 (2d Cir. 2023); *see also* Defs.' Mot. to Exclude at 7–11, DE 99.

Plaintiffs object to Mr. Swisher's reference to benchmarking reports prepared by one of the Committee's consultants, Roland Criss, arguing that Mr. Swisher provides no basis to support his position that Roland Criss used a reasonable comparison group to benchmark the Plan's fees.  Pls.' Mot. to Exclude at 5–6.  Plaintiffs note in particular that Roland Criss included in its comparison group plans with more than 10,000 participants and $500 million in assets, and plans near the bottom of that range would be smaller than the Humana Plan.  *See id.*  But Mr. Swisher explained that, in his experience, "including smaller plans in benchmarking exercises does not make those exercises inappropriate or unhelpful to fiduciaries," as for "any cohort of plans within a given size range[,] necessarily, some will be at the top of the range, others at the bottom."  Ex. 32 (Swisher Rebuttal Report) ¶ 78, DE 104-6; *see* Ex. 5 (Swisher Report) ¶ 100, DE 97-7.[6]  While Plaintiffs and their expert contend it would have been better to use different parameters to craft the comparison group, that is not a basis for excluding Mr. Swisher's opinion

---

[6] The particular thresholds used in Roland Criss's benchmarking reports (Exs. 22–25, DE 98–98-3)—over $500 million in assets and more than 10,000 participants—are, in any case, "reasonable, commonly used thresholds to signify large plans that can leverage their size to obtain competitive fees."  *See* Ex. 32 (Swisher Rebuttal Report) ¶ 78, DE 104-6; *see also* Ex. 30 (Swisher Depo. Tr.) at 134:24–135:16 (noting these are "common thresholds for the jumbo plan market of which there are relatively few" plans), DE 104-3.

that the Committee reasonably relied on its consultants' reports as further confirmation that the Plan's fees remained reasonable.  *See McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 801 (6th Cir. 2000) (asserted "weaknesses in the factual basis of an expert witness' opinion . . . bear on the weight of the evidence rather than on its admissibility") (citation omitted); *see also In re Se. Milk Antitrust Litig.*, 2010 WL 8228885, at *2 (E.D. Tenn. Dec. 8, 2010) (plaintiffs' and their experts' disagreement with defense expert's fact-based conclusions was "not a basis to challenge whether he should be permitted to testify").

Plaintiffs argue that the law precludes Mr. Swisher's opinion that Roland Criss used reasonable criteria for constructing its benchmarking groups, pointing to case law noting that "common sense dictates that plans of different sizes have different bargaining power, resulting in different services and/or fees."  Pls.' Mot. to Exclude at 6 (quoting *Sigetich v. Kroger Co.*, 2023 WL 2431667, at *10 (S.D. Ohio Mar. 9, 2023)).  But *Sigetich* and similar cases do not address fiduciary benchmarking practices.  They hold only that identifying some plans of different sizes that paid lower fees does not raise a plausible inference that a plan's fees were excessive relative to the services rendered.  *See Sigetich*, 2023 WL 2431667, at *10.  It does not follow that fiduciaries cannot reasonably benchmark recordkeeping fees against peer groups that include plans of broadly similar, though not identical, size as part of an ongoing oversight process, particularly when the fees in question were set through competitive bidding that necessarily accounts for the specific characteristics of the plan, including its size.  And nothing in the law dictates use of the specific size cut-offs favored by Plaintiffs and their expert rather than those selected by the Committee's professional consultant years before this litigation began.

There is no more merit to Plaintiffs' broader attempt to portray Mr. Swisher's opinions about the Committee's oversight process as somehow at odds with the continuing nature of

ERISA's fiduciary duties. *See* Pls.' Mot. to Exclude at 5–7. There is no dispute that ERISA fiduciaries have an ongoing duty to monitor plan expenses—something the Committee indisputably did by putting the Plan's recordkeeping services out for competitive bidding every three to five years and working with consultants to benchmark the Plan's fees annually.[7] Plaintiffs attempt to twist that continuing duty into a duty to constantly renegotiate plan fees, but neither *Tibble v. Edison International*, 843 F.3d 1187 (9th Cir. 2016), nor any other authority supports that understanding. *Tibble* simply reflects the general requirement that plan fiduciaries take steps to ensure that expenses are "reasonable." *Tibble*, 843 F.3d at 1197–98; *see also, e.g.*, *Baumeister v. Exelon Corp.*, 2023 WL 6388064, at *7 (N.D. Ill. Sept. 29, 2023) ("The duty of prudence includes a continuing duty to monitor plan expenses and incur only costs that are reasonable in amount and appropriate with respect to the services rendered.") (internal quotation marks omitted) (citing *Tibble*, 843 F.3d at 1197). No court has applied that standard to hold that fiduciaries breach their duties by not constantly pursuing ever-lower fees where a plan's fees have been set through regular market competition.

The ultimate measure for determining what satisfies the continuing duty to monitor is the context-specific statutory standard, under which fiduciaries must act "'with the care, skill, prudence, and diligence' that a prudent person 'acting in a like capacity and familiar with such matters' would use." *Tibble v. Edison Int'l*, 575 U.S. 523, 531 (2015) (quoting 29 U.S.C. § 1104(a)(1)). Mr. Swisher's opinions, which reflect his evaluation of the Committee's processes relative to those adopted by similarly situated fiduciaries, align with that standard. Indeed, courts have held that fiduciaries were entitled to summary judgment on recordkeeping

---

[7] *See* Ex. 3 (Klein Depo. Tr.) at 52:3–9, 88:3–13, DE 97-4; Ex. 16 (2014 RFP Executive Overview), DE 97-19; Ex. 18 (2019 RFP Executive Summary), DE 97-21; Exs. 22–28 (2015–2021 Benchmarking Reports), DE 98–98-6.

fee claims where, as here,[8] they put plan recordkeeping arrangements out for competitive bidding at regular intervals and benchmarked fees against the market—without suggesting any requirement that fiduciaries *also* seek fee reductions between RFPs.  *See TriNet*, 2023 WL 3092626, at *11 (granting summary judgment for defendants where fiduciaries conducted RFPs or RFIs in 2015, 2018, and 2021 and performed "regular benchmarking exercises in the interim"); *Marshall*, 2019 WL 4058583, at *11 (granting summary judgment for defendants where fiduciaries "benchmarked [the plan recordkeeper] and renegotiated fees starting in 2010 and 2011, and the new RFP for recordkeeping services issued in 2014").

In short, Mr. Swisher's opinions about the Committee's processes for monitoring Plan recordkeeping fees are well-supported and consistent with the law.  There is no basis to exclude them.

### B.    Mr. Swisher's Opinion That the Plan's Recordkeeping Fees Were Reasonable Is Also Well Supported and Admissible

In addition to his opinions about the Committee's monitoring processes, Mr. Swisher also opined that the resulting recordkeeping fees—set through competitive bidding and monitored with annual benchmarking performed by reputable consultants—were reasonable.  *See* Ex. 5 (Swisher Report) ¶¶ 115–23, DE 97-7; Ex. 30 (Swisher Depo. Tr.) at 103:4–19, 113:20– 114:8, DE 104-3.  Plaintiffs ask the Court to exclude this opinion as well, but their second attack depends on the first:  Plaintiffs do not dispute that, if Mr. Swisher's opinions about the reasonableness of the Committee's oversight process are sound, it is logical to conclude that the Plan's fees were not excessive.  After all, Schwab's fees compared favorably to the other bids submitted in the 2014 and 2019 RFPs, and the Plan's fees were lower than most comparator

---

[8] *See* Ex. 3 (Klein Depo. Tr.) at 52:3–9, 88:3–13, DE 97-4; Ex. 16 (2014 RFP Executive Overview), DE 97-19; Ex. 18 (2019 RFP Executive Summary), DE 97-21; Exs. 22–28 (2015– 2021 Benchmarking Reports), DE 98–98-6.

plans in the annual benchmarking reports prepared by Roland Criss and IIC. *See* Ex. 5 (Swisher Report) ¶¶ 116–23, DE 97-7; *see also* Ex. 16 (2014 RFP Executive Overview) at 9, DE 97-19; Ex. 18 (2019 RFP Executive Summary) at 2, DE 97-21; Exs. 22–28 (2015–2021 Benchmarking Reports), DE 98–98-6. Plaintiffs instead repeat their flawed premise that "defendants did not follow a prudent process"—seemingly, because they did not renegotiate recordkeeping fees between the 2014 and 2019 RFPs— and argue that it requires exclusion of Mr. Swisher's opinion that the fees remained reasonable between 2014 and 2019. Pls.' Mot. to Exclude at 8–9. As explained above, there is no basis to exclude Mr. Swisher's opinions about the Committee's process, and Plaintiffs certainly have not established that the Committee's actions were imprudent as a matter of law. *Supra* Section IV.A. It follows that there is likewise no basis to exclude Mr. Swisher's opinion that the recordkeeping fees secured and monitored by the Committee were reasonable.

Moreover, separate from any metrics connected to the Committee's oversight process, Mr. Swisher also compared the Plan's recordkeeping fees against objective external benchmarks—specifically, fees paid by other large retirement plans as reported in industry surveys published by NEPC, an investment consulting firm. *See* Ex. 5 (Swisher Report) ¶¶ 124– 25 (citing NEPC surveys), DE 97-7. Plaintiffs argue that the figures in the NEPC surveys cannot serve as points of comparison for the Plan's fees "because they do not account for the services provided by the recordkeepers in the survey." Pls.' Mot. to Exclude at 8. In purported support of that argument, Plaintiffs cite cases holding that allegations that a plan paid fees *above* industry averages do not on their own raise a plausible inference of imprudence because above-average fees may be justified by above-average services. *See Matousek v. MidAmerican Energy Co.*, 51 F.4th 274, 280 (8th Cir. 2022) (noting mismatch between alleged "total compensation" paid to

plan recordkeeper, which covered everything the recordkeeper did for the plan, and "industry-wide averages that reflect[ed] only basic recordkeeping services"); *CommonSpirit*, 37 F.4th at 1169 (explaining that comparison to industry average, without more, did not plausibly suggest imprudence because other plans "might offer fewer services and tools to plan participants"). Mr. Swisher, however, considered the specific services provided to the Plan and observed that the Plan's recordkeeping fees were at the *low* end of the NEPC survey ranges even though the Plan received a *high* level of service. Ex. 5 (Swisher Report) ¶¶ 22, 56–62, 124–125, DE 97-7. On those facts, the only logical conclusion is that the Plan's fees were reasonable in light of the level of service the Plan obtained, as Mr. Swisher opines.[9]

## V.    CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' Motion to Exclude, DE 100.

//

//

//

//

//

---

[9] Notably, the cases Plaintiffs now misguidedly cite to challenge Mr. Swisher's reliance on the NEPC surveys in fact support entry of summary judgment for Defendants. As those cases explain, it is impossible to draw any conclusions about whether recordkeeping fees are excessive without considering the particular services provided in exchange for those fees. *See, e.g.*, *CommonSpirit*, 37 F.4th at 1169 (recordkeeping-fee plaintiff must prove that fees were "excessive relative to the services rendered"). And Plaintiffs' expert did not analyze the specific services provided to the Plan or how they compared to those received by the six cherry-picked plans she asserts paid fees "in line" with her proposed "reasonable" fee range. *See* Ex. 4 (Bray Depo. Tr.) at 163:24–164:4 ("Q . . . [Y]ou've not done any analysis to verify whether the services that were actually contracted for by these plans were similar to the services that Humana contracted for in its own recordkeeping arrangement, correct? A Correct."), DE 97-5.

Dated: February 6, 2024

Respectfully submitted,

*/s/ Catalina Vergara*
Catalina Vergara (*pro hac vice*)
Noah Ickowitz (*pro hac vice*)
O'MELVENY & MYERS LLP
400 South Hope Street, 18th Floor
Los Angeles, CA 90071
Telephone: 213-430-6000
Facsimile: 213-430-6407
cvergara@omm.com
nickowitz@omm.com

Brian D. Boyle (*pro hac vice*)
Deanna M. Rice (*pro hac vice*)
O'MELVENY & MYERS LLP
1625 Eye Street NW
Washington, DC 20006
Telephone: 202-383-5300
Facsimile: 202-383-5414
bboyle@omm.com
derice@omm.com

Michael P. Abate
KAPLAN JOHNSON ABATE & BIRD LLP
710 West Main Street, 4th Floor
Louisville, KY 40202
Telephone: 502-416-1630
Facsimile: 502-540-8282
mabate@kaplanjohnsonlaw.com

*Attorneys for Defendants Humana Inc. and the Humana Retirement Plans Committee*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on February 6, 2024, a copy of the foregoing was electronically filed with the Clerk of Court using the CM/ECF system, which will automatically send email notification of such filing to all counsel of record.

*/s/ Catalina Vergara*
*Counsel for Defendants*
