## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF KENTUCKY

| | | |
|---|---|---|
| KENA MOORE, TIMOTHY K. SWEENEY, RUSSEL A. HOHMAN, SUSAN M. SMITH and VERONICA CARGILL, individually and on behalf of all others similarly situated, | ) ) ) ) ) ) | **CIVIL ACTION NO.:** 3:21-cv-00232-RGJ |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| HUMANA INC., THE BOARD OF DIRECTORS OF HUMANA INC., THE HUMANA RETIREMENT PLANS COMMITTEE and JOHN DOES 1-30. | ) ) ) ) ) | |
| Defendants. | ) | |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE
TESTIMONY AND OPINIONS OF PLAINTIFFS' EXPERT VERONICA BRAY**

**TABLE OF CONTENTS**

I.    INTRODUCTION .................................................................................................. 1

II.   BRAY'S METHODS, EXPERT OPINIONS, AND CONCLUSIONS .............................. 3

III.  LEGAL STANDARDS FOR EXCLUSION OF EXPERT TESTIMONY ......................... 7

IV.   ARGUMENT ....................................................................................................... 9

      A.    Ms. Bray Articulate a Discernable Methodology to support her Conclusion that Defendants' Recordkeeping fees were Excessive and Defendants failed to Implement a Prudent Process to Monitor Recordkeeping Fees ............................... 10

      B.    Ms. Bray Provides a Discernable Methodology to Support Her Opinion that "the Plan purportedly could have obtained recordkeeping services between $12 and $20 per participant. ................................................................................... 13

      C.    Ms. Bray Opines that recordkeeping fees are excessive "relative to the services rendered" in accordance with the holding of *CommonSpirit*, 37 F.4th 1160. .......... 15

            1.    Ms. Bray opines that the Plan's recordkeeping fees were "excessive relative to the services rendered" in comparision to the comparator Plans. .... 16

            2.    Ms. Bray opines that eh Plan's recordkeeping fees were "excessive relative to the services rendered" in comparision to itself .......................... 18

      D.    Bray Opines that the Plan Defendants failed to follow a Prudent Process with regard to the Defendant's RFP Process .................................................... 19

      E.    Not one case Defendants cite is applicable to the facts of this case in support of Defendants motion to Exclude Bray''s Expert Testimony ..................................... 20

V.    CONCLUSION ................................................................................................... 22

# TABLE OF AUTHORITIES

PAGE(S)

**Cases**

*Can–Am Eng'g Co. v. Henderson Glass, Inc.*,
814 F.2d 253 (6th Cir.1987) ............................................................................9

*Cunningham v. Cornell University*
2019 WL 4735876 (S.D.N.Y. Sep. 27, 2019) 86 F.4th 961 (2d Cir. 2023)......................................21

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579 (1993)................................................................................8, 9, 10

*Deal v. Hamilton County Bd. of Educ.*,
392 F.3d 840 (6th Cir. 2004) ............................................................................9

*Eimers v. Lindsay Corp.*,
2021 WL 5647993 (E.D. Tenn. Dec. 1, 2021) ............................................................ 8, 15

*Eimers v. Lindsay Corp.*,
No. 1:19-cv-44, 2022 WL 1721451 (E.D. Tenn. May 27, 2022)................................. 8, 15

*Huang v. TriNet HR III Inc.*,
2023 WL 3092626 (M.D. Fla. Apr. 26, 2023)..........................................................20, 21

*Jahn v. Equine Servs., PSC*,
233 F.3d 382 (6th Cir. 2000) ......................................................................9, 10

*Kumho Tire Co., Ltd. v. Carmichael*,
*526 U.S. 137* (1999) ................................................................................9

*Little Hocking Water Ass'n, Inc. v. E.I. du Pont de Nemours and Co.*,
90 F. Supp. 3d 746 (S.D. Ohio 2015)....................................................................3

*Marshall v. Northrop Grumman Corp.*,
2019 WL 4058583 (C.D. Cal. Aug. 14, 2019)..........................................................21

*Moitoso v FMRLLC*,
451 F.Supp.3d 189, 204 (D. Mass. Mar 27, 2020) ............................................6, 15, 18

*Moore v. Humana, Inc.*,
2022 WL 20766503 (W.D. Ky. Mar. 31, 2022) ("*Moore I*") ........................................1, 3

*Moore v. Humana, Inc.*,
2022 WL 20766504 (W.D. Ky. Dec. 2, 2022)("*Moore II*") ....................................*Passim*

*Pledger v. Reliance Tr. Co.*,
2019 WL 4439606 (N.D. Ga. Feb. 25, 2019) ........................................................................21

*Quiet Tech. DC–8, Inc. v. Hurel–Dubois UK Ltd.*,
326 F.3d 1333 (11th Cir.2003) ............................................................................................1

*Reed v. MedStar Health, Inc.*,
2023 WL 5154507 (D. Md. Aug. 10, 2023) ........................................................................21

*In re Scrap Metal Antitrust Litig.*,
527 F.3d 517 (6th Cir. 2008) ..............................................................................1, 3, 8, 16

*Smith v. CommonSpirit Health*,
37 F.4th 1160 (6th Cir. 2022) ....................................................................................*Passim*

**Statutes**

Fed. R. Evid. 702 ..............................................................................................8, 9, 10, 16

Plaintiffs, Kena Moore, Timothy K. Sweeney, Russell A. Hohman, Susan M. Smith, and Veronica Cargill ("Plaintiffs"), by and through their attorneys, respectfully submit this Opposition to Defendants' Motion to Exclude the Testimony and Opinions of Plaintiffs' Expert Veronica Bray. *See* ECF No. 99 ("Defs. Mem.").

## I.    INTRODUCTION

Defendants' Motion to Exclude the Testimony and Opinions of Plaintiffs' Expert Veronica Bray ("Ms. Bray" or "Bray") is meritless. Defendants misrepresent the evidence and methodology Ms. Bray used in her conclusions to support their desperate motion. Ms. Bray's findings, that Defendants' processes did not meet the fiduciary standard of care, are clearly stated in her report, and further explained in her deposition testimony. Ms. Bray's opinions are based on reliable evidence, sound methodology, and assist the finder of fact. Defendants' disagreement with Ms. Bray's conclusions and methods are irrelevant as to whether Ms. Bray's expert testimony is admissible. Defendants may disagree with Ms. Bray's interpretation of the record, but nonetheless "[t]he identification of such flaws in generally reliable scientific evidence is precisely the role of cross-examination." *In re Scrap Metal Antitrust Litig.*, 527 F.3d at 530 (quoting *Quiet Tech. DC–8, Inc. v. Hurel–Dubois UK Ltd.*, 326 F.3d 1333, 1344 (11th Cir.2003).

Furthermore, like in their Motion for Summary Judgment, Defendants try to relitigate their same failed argument that Bray failed to allege the Plan's recordkeeping fees were "excessive relative to the services rendered" that this court rejected as a matter of law in Defendants' motions to dismiss and for reconsideration of Defendants' Motion to Dismiss. *Moore v. Humana, Inc.,* 2022 WL 20766503 *3 (W.D. Ky. Mar. 31, 2022) ("*Moore I*") reconsideration denied, 2022 WL 20766504 (W.D. Ky. Dec. 2, 2022)(""*Moore II*"). *See also* Def. Mem. at 15-17. First, this argument fails because despite Defendants' mischaracterization of Ms. Bray's opinions, Plaintiffs'

expert Veronica Bray does opine that the Plan's recordkeeping fees were "excessive relative to the services rendered" in comparison to the comparator plans offered by Ms. Bray in accordance with the holding of *Smith v. CommonSpirit Health*,. 37 F.4th 1160 (6th Cir. 2022). Bray Rtp.[1]  ¶¶ 22, 23, 29, 57. Second, this Court already rejected this argument because "Plaintiffs also include another important comparison: the Plan itself. Plaintiffs allege that the Plan's fiduciaries later negotiated the recordkeeping fee, decreasing it to $23 per participant with the same plan and the same recordkeeper. Defendants do not argue, nor would it make sense to argue, that the Plan offered dissimilar services compared to itself." *Moore II*, 2022 WL 20766504, at *3." Discovery is complete and confirms Plaintiffs' allegations. Ms. Bray's findings confirm that over this five-year period when recordkeeping fees were at $37 per participant, the Plan's recordkeeper was making more money while providing the same standard services. Bray Rep. ¶ 55 citing Klein Dep. 79:12-19. In 2019, the Plan's recordkeeping fee was reduced from $37 per participant to $23 per participant while providing the same services, showing that the Plan fiduciaries could have significantly reduced recordkeeping fees for the entire period instead of maintaining fees at $37 per participant. Bray Rep. ¶ 59. Therefore, Ms. Bray's conclusion that recordkeeping fees were "excessive relative to the services rendered" satisfies the holding of *CommonSpirit* when compared to itself. 37 F.4th 1160 (6th Cir. 2022).

Defendants' sole arguement to exclude Bray's testimony is that "Ms. Bray's opinion is not grounded in any discernible methodology." Def. Mem. at 1. Yet, Defendants make several arguments that are completely irrelevant to their motion. First, Defendats take cheap shots at Ms. Bray's credentials while attempting to bolster the credentials of their expert, Pete Swisher.

---

[1] Plaintiffs' declaration and exhibits filed in support of Plaintiffs' concurrently filed Motion in Opposition to Defendants' motion to summary judgment are incorporated to this memorandum of law so as not to burden the Court with duplicative docket entries.

However, Defendants' opinions on Ms. Bray's credentials are irrelevant because Defendants never argue that she is unqualified to give her expert optinon. Furthermore, Defendants' expert Pete Swisher's report is completely irrelevant to this motion because his opinions have nothing to do with whether Ms. Bray followed a discernible methodology in her conclusions. Should this Court deny Plaintiffs' Motion for Summary Judgment and Motion to Exclude, Plaintiffs will be happy to argue at trial that Ms. Bray's expert opinion is more credible than Mr. Swisher's, however, that issue is irrelevant here because it bears on "the weight of the evidence rather than on its admissibility." *Little Hocking Water Ass'n, Inc. v. E.I. du Pont de Nemours and Co.*, 90 F. Supp. 3d 746, 757 (S.D. Ohio 2015) (quoting *In re Scrap Metal*, 527 F.3d at 529–31).

Furthermore, Defendants continue to bring up Plaintiffs' mooted original complaint and compare it to the operative Amended Complant. Def. Mem. at 2-3. This Court has already upheld Plaintiffs' Amended Complaint, twice. *Moore I* WL 20766503 *3  reconsideration denied, *Moore II* 2022 WL 20766504. Plaintiffs' origional complaint now has no relevancy to this case. The only relevant point is that Defendants' motion should be denied because Plaintiffs' expert articulated a discernable metholodgy in support of her expert conclusions.

## II.     BRAY'S METHODS, EXPERT OPINIONS, AND CONCLUSIONS

Ms. Bray was retained to "provide expert opinion analysis of the oversight, process, decisions, and actions taken by Humana Inc., and the Humana Retirement Plans Committee and its members, ("Defendants") during the Class Period for their fiduciary responsibilities of the ongoing review and negotiating of recordkeeping costs for the Humana Retirement Savings Plan, ("the Plan")." Bray Expert Report ("Bray Rpt.") at ¶ 1.[2] Bray opines, "Retirement plans the size of this

---

[2] Although not being challenged, Bray's qualifications are further laid out in Exhibit 2 of her Expert Report

Plan have leverage to obtain the best pricing with their retirement plan service providers. Defendants lacked the knowledge and expertise in performing their fiduciary responsibilities for the Plan. Specifically, Defendants failed to effectively negotiate reasonable recordkeeping fees, understand total compensation being paid to the Plan's recordkeeper, and employ other strategies to reduce fees being charged to Plan participants." ¶ 13.

"Had Defendants understood the benchmarking reports they were reviewing, relationship pricing, and how to effectively negotiate retirement plan recordkeeping fees, Plan participants would not have lost millions of dollars in their retirement accounts." ¶ 64. "Considering all the proprietary Schwab products and services the Plan has been utilizing during the Class Period, a reasonable recordkeeping fee for the Plan is between $12 to $20 per participant which is in line with the rates for the plans I cite in paragraph 28" in Bray's expert report. ¶ 65. "Due to this lack of expertise in negotiating recordkeeping fees, lack of oversight and fiduciary responsibilities, Plan participants suffered losses in their retirement savings accounts between $12,156,697 and $15,951,777." ¶ 67.

In support of her conclusions, Ms. Bray explains the fiduciary responsibilities required for recordkeeping fees under ERISA. ¶¶ 16-20. Bray states, "The duty to act prudently is one of a fiduciary's central responsibilities under ERISA. Prudence focuses on the process for making fiduciary decisions…The duty to pay only reasonable fees for plan services and to act solely in the best interest of participants has been a key tenet of ERISA since its passage." ¶ 17. Bray then provides an extensive list of best practices that a prudent retirement plan fiduciary and committees follow when overseeing their organization's retirement plan and services providers. ¶ 20.

Ms. Bray then devotes a section of her Report explaining how Recordkeeping services and fees work and how fees are determined. ¶ 21-30. Bray provides a detailed list of "Recordkeeping

4

services … necessary for all defined contribution plans, regardless of asset size and participant size." ¶ 21. Importantly for this motion, Bray opines, "The Charles Schwab Explanation of Fees and Services lists out their Standard Services and the service agreements for the Plan outline the services that will be provided by Schwab to the Plan. Upon review, in my experience, and confirmed by the Plan's Senior Vice President of Total Rewards, there are no unique services Schwab is providing to the Plan to warrant an unreasonable recordkeeping fee." ¶ 57 citing Klein Dep. 55:22-24, 56:1-11.

Ms. Bray explains, "Over the last decade, I have seen a rapid decline in my client's retirement plan recordkeeping fees." ¶ 28. Bray further opines, "prudent and knowledgeable retirement plan fiduciaries review and control all retirement plan related fees annually, at a minimum. They have ongoing conversations with their plan's service providers, negotiate services and fees, and document these interactions." ¶ 28. However, Bray explains, "During the Class Period, Defendants did not leverage their mega sized plan assets and participants, as well as other potential plan assets, to negotiate lower recordkeeping fees." Bray also cites quotes from Defendants' 30(b)(6) deponent showing that Defendants never even *attempted* to negotiate with their recordkeeper to lower recordkeeping fees. ¶¶ 25, 46, 47; *citing* Klein Dep. 56: 4-22, 79:12-19, 87: 8-18.

Bray also provides a table listing the Plan's per participant recordkeeping fees from 2015-2023, including the Plan's total assets and number of plan participants per year. ¶ 66 Table 4. Bray summarizes the key findings from this information, "From September of 2015 to December of 2019, or for five consecutive years, the Plan grew almost 2 billion dollars in assets and nearly 1,000 participants, however the Plan's recordkeeping fee was never reduced." ¶ 55 citing Humana_Moore00508, 004601, 005174, 004912, and 004916. "Over this five-year period, the

5

Plan's recordkeeper was making more money while providing the same standard services." *Id.* citing Klein Dep. 79:12-19. There should have been a recordkeeping fee reduction over that five-year period. Defendants did not request a fee reduction from their Plan's recordkeeper." ¶ 66. Then in 2019, after Defendants underwent an RFP process, "Plan's recordkeeping fee was reduced from $37 per participant to $23 per participant," while retaining the same recordkeeping services from Schwab. ¶ 55, ¶ 57. Bray concluded, "This fee reduction was way overdue. If Defendants had knowledge of industry best practices to reduce Plan fees, a recordkeeping fee reduction would have happened far before 2019." ¶ 50. However, the very next year, "The recordkeeping fee went from $23 per participant to $28 per participant. With all of the proprietary Schwab products and services the Plan was utilizing, during the Class Period, a prudent knowledgeable fiduciary would know how much total compensation is being paid to Schwab and use as leverage to negotiate a lower recordkeeping fee." ¶ 61.

In comparison with the Plan, Bray provides a chart where she identifies, "five mega sized retirement plans with billions of dollars in assets and thousands of participants which maintain reasonable recordkeeping fees." ¶ 29 citing Federal Express Corporation Pilots' Retirement Savings Plan 2021 Form 5500, CliftonLarsonAllenLLP 401(K)Retirement Plan 2021 Form 5500, BlackRock Retirement Savings Plan 2021 Form 5500, The Vanguard Retirement and Savings Plan 2020 Form 5500, and The Cargill Partnership Plan 2022 Form 5500. Significantly, all the mega sized comparator plans had less Plan participants than the Plan, giving the Plan greater bargaining power to negotiate recordkeeping fees than the comparator plans. Comparing ¶ 66 Table 4 with ¶ 29 Table 2. Furthermore, Bray identified that, "In 2020, Fidelity quoted a $14 to $21 per participant recordkeeping fee in a lawsuit." ¶ 29 citing *Moitoso v FMRLLC*, 451 F.Supp.3d 189, 204 (D. Mass.

Mar 27, 2020). Therefore, Bray concluded, "a reasonable recordkeeping for the Plan is between $12 to $20 per participant which is in line with the rates for the plans I cite in paragraph 28." ¶ 65.

Furthermore, Bray criticized the Defendants RFP process. Bray explains that Fiduciaries should, "Perform a formal request for proposal for all plan services providers every 3-5 years." ¶ 65. Bray opined that the 2019 RFP should have been conducted at least two years earlier, because the Plan grew significantly in both size and assets, the Plan acquired assets of other organization's retirement plans pursuant to mergers, and there was a general decrease off recordkeeping fees in the marketplace. Bray Rep. ¶ 46. Bray opined these circumstances necessitated conducting RFPs at the shorter three-year end of the fiduciary standard to conduct an RFP every three to five years. *Id.* Furthermore, Bray opined the 2019 RFP was not conducted in accord with fiduciary best practices because there were insufficient negotiations that would have led to lower, more competitive bids. Bray Dep. 146:3-148:14. Likewise, Bray opined the 2014 RFP did not consider how the Plan's large size influenced potential fees. Bray Rpt. ¶ 47 citing Klein Dep. 56:4-22.

For all the reasons stated above, Bray concluded, ""Had Defendants understood the benchmarking reports they were reviewing, relationship pricing, and how to effectively negotiate retirement plan recordkeeping fees, Plan participants would not have lost millions of dollars in their retirement accounts." ¶ 64. "Considering all the proprietary Schwab products and services the Plan has been utilizing during the Class Period, a reasonable recordkeeping fee for the Plan is between $12 to $20 per participant which is in line with the rates for the plans I cite in paragraph 28" in Bray's expert report.  ¶ 65. "Due to this lack of expertise in negotiating recordkeeping fees, lack of oversight and fiduciary responsibilities, Plan participants suffered losses in their retirement savings accounts between $12,156,697 and $15,951,777." ¶ 67.

### III.    LEGAL STANDARDS FOR EXCLUSION OF EXPERT TESTIMONY

Rule 702 allows an expert to testify if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Civ. P. 702.

The expert testimony must "both rest[] on a reliable foundation" and be "relevant to the task at hand." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993). "The Sixth Circuit has identified three requirements for admissibility under Rule 702: (1) 'the witness must be qualified by knowledge, skill, experience, training, or education'; (2) 'the testimony must be relevant, meaning that it will assist the trier of fact to understand the evidence or to determine a fact in issue'; and (3) 'the testimony must be reliable.'" *Eimers v. Lindsay Corp.,* 2021 WL 5647993, at *4 (E.D. Tenn. Dec. 1, 2021), rev'd on other grounds by *Eimers v. Lindsay Corp.,* No. 1:19-cv-44, 2022 WL 1721451 (E.D. Tenn. May 27, 2022) (quoting *In re Scrap Metal Antitrust Litig*., 527 F.3d 517, 528-29 (6th Cir. 2008)). The Sixth Circuit has held, "a court must be sure not 'to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other.'" *In re Scrap Metal*, 527 F.3d 517, 529 (6th Cir. 2008) (quoting Fed. R. Evid. 702 advisory committee's note, 2000 amendment). Ultimately, "rejection of expert testimony is the exception, rather than the rule." *Id.* at 530 (quotation marks omitted).

In assessing the relevance and reliability of proffered expert testimony, the district court must determine:

whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether the reasoning or methodology properly can be applied to the facts in issue.

Daubert, 509 U.S. at 592–93, 113 S.Ct. 2786.

"'[S]cientific knowledge' establishes the standard of evidentiary reliability," *Id.* at 590, 113 S.Ct. 2786, and to be considered appropriately scientific, the expert need not testify to what is "'known' to a certainty" but must only state "an inference or assertion ... derived by the scientific method." *Id.* Testimony meets this threshold when "an expert, whether basing testimony on professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice in the relevant field." *Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137*, (1999). Experts are permitted a wide latitude in their opinions, including those not based on firsthand knowledge, so long as "the expert's opinion [has] a reliable basis in the knowledge and experience of the discipline." *Daubert,* 509 U.S. at 592, 113 S.Ct. 2786. The court explained that relevance of proposed scientific testimony is established through Rule 702's " 'helpfulness' standard" which "requires a valid scientific connection to the pertinent inquiry as a precondition for admissibility." Id. at 591–92, 113 S.Ct. 2786. In the end, Rule 702 embodies a flexible approach and its "overarching subject is the scientific validity ... of the principles that underlie the proposed submission. The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate." *Jahn v. Equine Servs., PSC*, 233 F.3d 382, 388 (6th Cir. 2000) quoting Daubert, 509 U.S. at 594–95, 113 S.Ct. 2786.

Importantly, *Daubert's* "'gatekeeper' doctrine was designed to protect juries and is largely irrelevant in the context of a bench trial." *Deal v. Hamilton County Bd. of Educ.*, 392 F.3d 840, 852 (6th Cir. 2004); *Can–Am Eng'g Co. v. Henderson Glass, Inc*., 814 F.2d 253, 255 (6th Cir.1987) (same).

## IV.    ARGUMENT

9

### A. Ms. Bray Articulates a Discernable Methodology to support her Conclusion that Defendants' Recordkeeping fees were Excessive and Defendants failed to Implement a Prudent Process to Monitor Recordkeeping Fees.

Experts are permitted a wide latitude in their opinions, including those not based on firsthand knowledge, so long as "the expert's opinion [has] a reliable basis in the knowledge and experience of the discipline." *Daubert,* 509 U.S. at 592, 113 S.Ct. 2786. The court explained that relevance of proposed scientific testimony is established through Rule 702's "'helpfulness' standard" which "requires a valid scientific connection to the pertinent inquiry as a precondition for admissibility." Id. at 591–92, 113 S.Ct. 2786. In the end, Rule 702 embodies a flexible approach and its "overarching subject is the scientific validity ... of the principles that underlie the proposed submission. The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate." *Jahn v. Equine Servs., PSC*, 233 F.3d 382, 388 (6th Cir. 2000) quoting Daubert, 509 U.S. at 594–95, 113 S.Ct. 2786.

To put it bluntly, Defendants' assertion that "Ms. Bray's opinion is not grounded in any discernible methodology" is completely ridiculous and requires completely ingnoring the entirity of Ms. Bray's report. Def. Mem. at 1. Bray articulates Defendants' fiduciary duties, details why and how Defendants breached those duties, explains what Defendants should have done to meet their fiduciary duties, details why Defendants' breach of those fiduciaries led to a loss for the Plan, details what the Plan's recordkeeping fees were and what fees would have been had Defendants followed a prudent process, provides examples of plans that were able to provide reasonable fees, and calculate damages based on this information. See Bray Rpt. generally, *See also* supra SECTION II. BRAY'S METHODS, EXPERT OPINIONS, AND CONCLUSIONS.

10

To briefly summarize, Bray states, "The duty to act prudently is one of a fiduciary's central responsibilities under ERISA. Prudence focuses on the process for making fiduciary decisions…The duty to pay only reasonable fees for plan services and to act solely in the best interest of participants has been a key tenet of ERISA since its passage." ¶ Ms. Bray explains, "Over the last decade, I have seen a rapid decline in my client's retirement plan recordkeeping fees." ¶ 28. Bray further opines, "prudent and knowledgeable retirement plan fiduciaries review and control all retirement plan related fees annually, at a minimum. They have ongoing conversations with their plan's service providers, negotiate services and fees, and document these interactions." ¶ 28. However, Bray explains, "During the Class Period, Defendants did not leverage their mega sized plan assets and participants, as well as other potential plan assets, to negotiate lower recordkeeping fees." Bray also cites quotes from Defendants' 30(b)(6) deponent showing that Defendants never even *attempted* to negotiate with their recordkeeping to lower recordkeeping fees. ¶¶ 25, 46, 47; *citing* Klein Dep. 56: 4-22, 79:12-19, 87: 8-18.

Bray also provides a table listing The Plan's per participant recordkeeping fees from 2015-2023, including the Plan's total assets and number of plan participants per year. ¶ 66 Table 4. Bray summarizes the key findings from this information, "From September of 2015 to December of 2019, or for five consecutive years, the Plan grew almost 2 billion dollars in assets and nearly 1,000 participants, however the Plan's recordkeeping fee was never reduced." ¶ 55 citing Humana_Moore00508, 004601, 005174, 004912, and 004916. "Over this five-year period, the Plan's recordkeeper was making more money while providing the same standard services." *Id.* citing Klein Dep. 79:12-19. There should have been a recordkeeping fee reduction over that five-year period. Defendants did not request a fee reduction from their Plan's recordkeeper." ¶ 66. Then in 2019, after Defendants underwent an RFP process, "Plan's recordkeeping fee was reduced from

$37 per participant to $23 per participant," while retaining the same recordkeeping services from Schwab. ¶ 55, ¶ 57. Bray concluded, "This fee reduction was way overdue. If Defendants had knowledge of industry best practices to reduce Plan fees, a recordkeeping fee reduction would have happened far before 2019." ¶ 50

In comparison with the Plan, Bray provides a chart where she identifies, "five mega sized retirement plans with billions of dollars in assets and thousands of participants which maintain reasonable recordkeeping fees." ¶ 29 Significantly, all the mega sized comparator plans had less Plan participants than the Plan, giving the Plan greater bargaining power to negotiate recordkeeping fees than the comparator plans. Comparing ¶ 66 Table 4 with ¶ 29 Table 2. Furthermore, Bray identified that, "In 2020, Fidelity quoted a $14 to $21 per participant recordkeeping fee in a lawsuit." ¶ 29 citing Moitoso v FMRLLC, 451 F.Supp.3d 189, 204 (D. Mass. Mar 27, 2020). Therefore, Bray concluded, "a reasonable recordkeeping for the Plan is between $12 to $20 per participant which is in line with the rates for the plans I cite in paragraph 28." ¶ 65.

For all the reasons stated above and addition reasons articulated in her Report, Bray concluded, "[h]ad Defendants understood the benchmarking reports they were reviewing, relationship pricing, and how to effectively negotiate retirement plan recordkeeping fees, Plan participants would not have lost millions of dollars in their retirement accounts." ¶ 64. "Considering all the proprietary Schwab products and services the Plan has been utilizing during the Class Period, a reasonable recordkeeping for the Plan is between $12 to $20 per participant which is in line with the rates for the plans I cite in paragraph 28" in Bray's expert report. ¶ 65. "Due to this lack of expertise in negotiating recordkeeping fees, lack of oversight and fiduciary responsibilities, Plan participants suffered losses in their retirement savings accounts between $12,156,697 and $15,951,777." ¶ 67.

**B. Ms. Bray Provides a Discernable Methodology to Support Her Opinion that "the Plan purportedly could have obtained recordkeeping services between $12 and $20 per participant.**

Defendants further argue that Bray "offers no discernable methodology for her core opinion: that the Plan's recordkeeping fees were excessive because the Plan purportedly could have obtained recordkeeping services for between $12 and $20 PPPY during the Class Period." Def. Mem.at 7. Of course, this is not true. Bray opined, "reasonable recordkeeping for the Plan is between $12 to $20 per participant **which is in line with the rates for the plans I cite in paragraph 28.**" ¶ 64. (emphasis added).

Bray provides a table listing The Plan's per participant recordkeeping fees from 2015-2023, including the Plan's total assets and number of plan participants per year. ¶ 66 Table 4. Bray summarizes the key findings from this information, "From September of 2015 to December of 2019, or for five consecutive years, the Plan grew almost 2 billion dollars in assets and nearly 1,000 participants, however the Plan's recordkeeping fee was never reduced." ¶ 55 citing Humana_Moore00508, 004601, 005174, 004912, and 004916. "Over this five-year period, the Plan's recordkeeper was making more money while providing the same standard services." *Id.* citing Klein Dep. 79:12-19. There should have been a recordkeeping fee reduction over that five-year period. Defendants did not request a fee reduction from their Plan's recordkeeper." ¶ 66. Then in 2019, after Defendants underwent an RFP process, "Plan's recordkeeping fee was reduced from $37 per participant to $23 per participant," while retaining the same recordkeeping services from Schwab. ¶ 55, ¶ 57. Bray concluded, "This fee reduction was way overdue. If Defendants had knowledge of industry best practices to reduce Plan fees, a recordkeeping fee reduction would have happened far before 2019." ¶ 50. However, the very next year, "The recordkeeping fee went from $23 per participant to $28 per participant. With all of the proprietary Schwab products and services

the Plan was utilizing, during the Class Period, a prudent knowledgeable fiduciary would know how much total compensation is being paid to Schwab and use as leverage to negotiate a lower recordkeeping fee." ¶ 61.

Ms. Bray explains, "Over the last decade, I have seen a rapid decline in my client's retirement plan recordkeeping fees." ¶ 28. Bray further opines, "prudent and knowledgeable retirement plan fiduciaries review and control all retirement plan related fees annually, at a minimum. They have ongoing conversations with their plan's service providers, negotiate services and fees, and document these interactions." ¶ 28. However, Bray explains, "During the Class Period, Defendants did not leverage their mega sized plan assets and participants, as well as other potential plan assets, to negotiate lower recordkeeping fees." Bray also cites quotes from Defendants' 30(b)(6) deponent showing that Defendants never even *attempted* to negotiate with their recordkeeping to lower recordkeeping fees. ¶¶ 25, 46, 47; *citing* Klein Dep. 56: 4-22, 79:12-19, 87: 8-18. Therefore, without even *attempting* to leverage their plan size and relationship with the Defendants, including during the Defendants' RFP process, Defendants reduced from $37 per participant to $23 per participant.

In comparison with the Plan, Bray provides a chart where she identifies, "five mega sized retirement plans with billions of dollars in assets and thousands of participants which maintain reasonable recordkeeping fees." ¶ 29 citing Federal Express Corporation Pilots' Retirement Savings Plan 2021 Form 5500, CliftonLarsonAllenLLP 401(K)Retirement Plan 2021 Form 5500, BlackRock Retirement Savings Plan 2021 Form 5500, The Vanguard Retirement and Savings Plan 2020 Form 5500, and The Cargill Partnership Plan 2022 Form 5500. Significantly, all the mega sized comparator plans had less Plan participants than the Plan, giving the Plan greater bargaining power to negotiate lower recordkeeping fees than the comparator plans. Comparing ¶ 66 Table 4

14

with ¶ 29 Table 2. Furthermore, identified that, "In 2020, Fidelity quoted a $14 to $21 per participant recordkeeping fee in a lawsuit." ¶ 29 citing *Moitoso v FMRLLC*, 451 F.Supp.3d 189, 204 (D. Mass. Mar 27, 2020).

Therefore, Bray concluded, "had Defendants understood the benchmarking reports they were reviewing, relationship pricing, and how to effectively negotiate retirement plan recordkeeping fees, Plan participants would not have lost millions of dollars in their retirement accounts." ¶ 64. Furthermore, "Considering all the proprietary Schwab products and services the Plan has been utilizing during the Class Period**, a reasonable recordkeeping for the Plan is between $12 to $20 per participant which is in line with the rates for the plans I cite in paragraph 28.**" ¶ 64. (emphasis added).

### C. Ms. Bray Opines that recordkeeping fees are excessive "relative to the services rendered" in accordance with the holding of *CommonSpirit*, 37 F.4th 1160.

Although Defendants present this argument in disguise, the heart of Defendants' argument is that, Bray, "failed to conduct any analysis of the services received by the Humana Plan in exchange for the recordkeeping fees paid—directly contradicting Sixth Circuit precedent that requires Plaintiffs to show that fees were 'excessive relative to the services rendered'" Def. Mem. at 2 citing *CommonSpirit*, 37 F.4th 1169. However, this argument does not belong in a motion to exclude expert testimony.

"The Sixth Circuit has identified three requirements for admissibility under Rule 702: (1) 'the witness must be qualified by knowledge, skill, experience, training, or education'; (2) 'the testimony must be relevant, meaning that it will assist the trier of fact to understand the evidence or to determine a fact in issue'; and (3) 'the testimony must be reliable.'" *Eimers v. Lindsay Corp.*, 2021 WL 5647993, at *4 (E.D. Tenn. Dec. 1, 2021), rev'd on other grounds by *Eimers v. Lindsay*

15

*Corp.*, No. 1:19-cv-44, 2022 WL 1721451 (E.D. Tenn. May 27, 2022) (quoting *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 528-29 (6th Cir. 2008)). Whether or not Bray "failed to conduct any analysis of the services received by the Humana Plan in exchange for the recordkeeping fees paid—directly contradicting Sixth Circuit precedent that requires Plaintiffs to show that fees were 'excessive relative to the services rendered'" does not speak to any element of admissibility of an Expert under Rule 702. It is certainly not an argument that "Ms. Bray's opinion is not grounded in any discernible methodology" as argued by Defendants. Def. Mem. 1-2. Instead, if true, (which it is not) it's an argument that belongs in a Motion for Summary Judgment as to why Bray's Report alone does not meet Plaintiff's burden to Prove the elements of their case. Therefore, Defendants' argument should be disregarded.

Nonetheless, Defendants' argument is incorrect for two reasons. First, Ms. Bray does opine that the Plan's recordkeeping fees were "excessive relative to the services rendered" in comparison to the comparator Plans offered by Ms. Bray in accordance with the holding of *Smith v. CommonSpirit Health*,. 37 F.4th 1160 (6th Cir. 2022). Bray Rtp. ¶¶ 22, 23, 29, 57, and Second, this Court already rejected this argument because "Plaintiffs also include another important comparison: the Plan itself. Plaintiffs allege that the Plan's fiduciary later negotiated the recordkeeping fee, decreasing it to $23 per participant with the same plan and the same recordkeeper. Defendants do not argue, nor would it make sense to argue, that the Plan offered dissimilar services compared to itself." *Moore II*, 2022 WL 20766504, at *3.

        **1. Ms. Bray opines that the Plan's recordkeeping fees were "excessive relative to the services rendered" in comparison to the comparator Plans.**

In *Moore II*, this court held that Plaintiffs' Amended Complaint satisfied the holding of *Commonspirit* requiring that Plaintiff show Recordkeeping fees were, "excessive relative to the services rendered" under *CommonSpirit Health*, 37 F.4th at 1169. This court held:

> Plaintiffs here allege the Plan's recordkeeping fee was too high, at $37 per participant, because the Plan failed to negotiate recordkeeping fees. And their comparison is to "similarly situated" plans—plans with a similar number of participants and assets, but lower recordkeeping fees—during the Class period. Plaintiffs allege that the other similarly sized plans offer the same range of services. ("Nearly all recordkeepers in the marketplace offer the same range of services") The Complaint in *CommonSpirit* contained no such comparisons or allegations; that Complaint alleged high recordkeeping fees in comparison to smaller plans and market average and had no comparison chart with similarly sized plans, and no similar allegation of the services offered by any plan.

*Moore v. Humana, Inc.*, 2022 WL 20766504, at *2 (W.D. Ky. Dec. 2, 2022).

Here, Bray's Expert Opinion provides evidence of Plaintiffs' claims that this Court found satisfy the holding of *Commonspirit*. Ms. Bray explains how Recordkeeping services and fees work and how fees are determined. ¶ 21-30. Bray provides a detailed list of "Recordkeeping services are necessary for all defined contribution plans, regardless of asset size and participant size." ¶ 21. Importantly, Bray opines, "The Charles Schwab Explanation of Fees and Services lists out their Standard Services and the service agreements for the Plan outline the services that will be provided by Schwab to the Plan. Upon review, in my experience, and confirmed by the Plan's Senior Vice President of Total Rewards, there are no unique services Schwab is providing to the Plan to warrant an unreasonable recordkeeping fee." ¶ 57 citing Klein Dep. 55:22-24, 56:1-11.

In comparison with the Plan, Bray provides a chart where she identifies, "five mega sized retirement plans with billions of dollars in assets and thousands of participants which maintain reasonable recordkeeping fees." ¶ 29 Significantly, all the mega sized comparator plans had less Plan participants than the Plan, giving the Plan greater bargaining power to negotiate recordkeeping

fees than the comparator plans. Comparing ¶ 66 Table 4 with ¶ 29 Table 2. Bray explained,

"services are the same, regardless of the size of the retirement plan" and fiduciaries "leverage plan

assets and participant size to negotiate the highest level of services and lowest fees" Bray Rpt.

¶¶22-23, 47. Furthermore, identified that, "In 2020, Fidelity quoted a $14 to $21 per participant

recordkeeping fee in a lawsuit." ¶ 29 citing Moitoso v FMRLLC, 451 F.Supp.3d 189, 204 (D.

Mass. Mar 27, 2020). Therefore, Bray concluded, "a reasonable recordkeeping for the Plan is

between $12 to $20 per participant which is in line with the rates for the plans I cite in paragraph

28." ¶ 65. Given that "Recordkeeping services are necessary for all defined contribution plans,

regardless of asset size and participant size," and    ¶ 21. "[T]here are no unique services Schwab is

providing to the Plan to warrant an unreasonable recordkeeping fee." ¶ 57 citing Klein Dep. 55:22-

24, 56:1-11, then all the comparator plans have either the same basic services as the Plan or more

complex services that would make them more expensive than the Plan by comparison. Yet, all of

the comparator mega size plans had less expensive recordkeeping fees even though they had more

plan participants, giving them greater bargaining power to negotiate lower recordkeeping fees.

### 2.   Ms. Bray opines that the Plan's recordkeeping fees were "excessive relative to the services rendered" in comparison to itself.

In *Moore II*, this court held that Plaintiffs Amended Complaint satisfied the holding of

*Commonspirit* requiring that Plaintiff show Recordkeeping fees were, "excessive relative to the

services rendered" under *CommonSpirit Health*, 37 F.4th at 1169 when compared to **itself**. The

court held, "Plaintiffs also include another important comparison: the Plan itself. Plaintiffs allege

that the Plan's fiduciary later negotiated the recordkeeping fee, decreasing it to $23 per participant

with the same plan and the same recordkeeper. Defendants do not argue, nor would it make sense

to argue, that the Plan offered dissimilar services compared to itself." *Moore II*, 2022 WL

20766504, at *3." Discovery is complete and confirms Plaintiffs' allegations. Ms. Bray's findings confirm that over this five-year period when recordkeeping fees were at $37 per participant, the Plan's recordkeeper was making more money while providing the same standard services. Bray Rep. ¶ 55 citing Klein Dep. 79:12-19. In 2019, the Plan's recordkeeping fee was reduced from $37 per participant to $23 per participant while providing the same services, showing that the Plan was able to significantly reduce recordkeeping fees for the entire period while remaining at $37. Bray Rep. ¶ 59. Therefore, Ms. Bray's conclusion that recordkeeping fees were "excessive relative to the services rendered" satisfies the holding of *CommonSpirit* when compared to itself. 37 F.4th 1160 (6th Cir. 2022).

### D. Bray Opines that the Plan Defendants failed to follow a Prudent Process with regard to the Defendants' RFP Process.

Defendants argue Ms. Bray could not, "explain why she ignored the competitive bids that the Plan obtained over the relevant period through its various RFP process-despite conceding that RFPs are 'best practice' that help discern reasonable rates in the market." Def. Mem. at 9-10. Again, this argument does not speak to why "Ms. Bray's opinion is not grounded in any discernible methodology" as argued by Defendants. Def. Mem at 1, but it's such a blatant mischaracterization of Bray's opinions that requires Plaintiffs to respond.

Defendants conveniently leave out that Bray opined the Plan's circumstances necessitated conducting an RFP two years earlier than 2019 (and therefore two years earlier than 2022), and the record did not reflect adequate negotiations in relation to the RFPs. SOF ¶19. Specifically, Bray explained, "[a] plan the size of Defendants', merging assets of retirement plans of acquired organizations into the Plan, adding hundreds of millions of dollars and thousands of participants

each year should perform this task at least every three years, if not more frequently." Bray Rpt. ¶ 46.

Bray also explained that "doing an RFP is constant negotiation from the first issue of the RFP to when they get to the service agreement, whether or not it's a new provider or not or it's their current provider. There's constant negotiations." Bray Dep. 79:15-19. Bray did not find the RFPs included sufficient negotiations. Bray opined that, "the person that facilitated the [2019] RFP did not have multiple fee negotiations with the recordkeeper to try to get a lower recordkeeping fee." Bray Dep. 149:23-25. Bray also testified the record of the 2014 RFP did not reflect whether "there were any negotiations, or it was just, here, give me your bid." *Id*. at 146:22-147:1. *See also* Bray Rpt., 56 citing Klein Dep. 92:16-24, 93:1-3.

### E. Not one case Defendants cite is applicable to the facts of this case in support of Defendants motion to Exclude Bray's Expert Testimony.

In support of their argument, Defendants site several out-of-circuit cases that are simply in applicable to the facts of this case in support of Defendants' argument to exclude Bray's expert testimony. Defendants cite the out-of-circuit case *Huang v. TriNet HR III, Inc,* where the court excluded the opinion of plaintiffs' recordkeeping expert for failing to demonstrate his methodology was reliable, where he only considered "the recordkeeping fees of several plans incomparable in size and structure to the Plan and relied on his experience to determine what a reasonable fee should have been." Def. Mem. at 10 quoting 2023 WL 3092626, at *9–10 (M.D. Fla. Apr. 26, 2023). However, Defendants conveniently leave out that the plan at issue in *TriNet* was a complex multiemployer plan and the expert only compared fees only to basic single employer plans. *Id*. at 10. at *TriNet* The expert even admitted there are, "significant differences in the administrative costs incurred by a recordkeeper and plan administrator in administering a single employer plan, as

opposed to a multiple employer plan" and "[h]e also admitted that a single employer of comparable size to an MEP would have lower recordkeeping fees." *Id.* Here, the Plan is a single employer plan and Bray opines, "The Charles Schwab Explanation of Fees and Services lists out their Standard Services and the service agreements for the Plan outline the services that will be provided by Schwab to the Plan. Upon review, in my experience, and confirmed by the Plan's Senior Vice President of Total Rewards, there are no unique services Schwab is providing to the Plan to warrant an unreasonable recordkeeping fee." ¶ 57 citing Klein Dep. 55:22-24, 56:1-11. Unlike in *Trinet,* where the expert admitted the plan at issue was more complex than any comparator plan, thereby justifying its higher fees compared to the comparator plans, here "there are no unique services Schwab is providing to the Plan to warrant an unreasonable recordkeeping fee." ¶ 57 citing Klein Dep. 55:22-24, 56:1-11, whereas all the comparator plans have either the same basic services as the Plan or more complex services that would make them more expensive than the Plan by comparison.

The out-of-circuit case *Reed v. MedStar Health, Inc.*, 2023 WL 5154507, is inapplicable because there, there expert concluded without any bases that recordkeeping fees should have been "no greater than $28 per participant" without citing to any comparator plans. *Id.*, at *12 (D. Md. Aug. 10, 2023). Where as here, Bray cites  to similarly situated comparator plans and concluded, "a reasonable recordkeeping for the Plan is between $12 to $20 per participant **which is in line with the rates for the plans I cite in paragraph 28**" in Bray's expert report.  ¶ 65. (emphasis added). *Marshall v. Northrop Grumman Corp.*, 2019 WL 4058583, at *7 (C.D. Cal. Aug. 14, 2019) and *Pledger v. Reliance Tr. Co.*, 2019 WL 4439606, at *17–18 (N.D. Ga. Feb. 25, 2019) are inapplicable for the same reason.

In the out-of-circuit case *Cunningham v. Cornell Univ,* the expert "offers no explanation for how he arrived at the tiered pricing structure of $40 for 2010-2014 and $35 for 2015-2018 and

21

makes no attempt to tie these numbers to his exemplary plans' fees. 2019 WL 4735876, at *10 (S.D.N.Y. Sept. 27, 2019), aff'd, 86 F.4th 961 (2d Cir. 2023). Whereas here, Bray tied her number to her exemplary plan fees: "a reasonable recordkeeping for the Plan is between $12 to $20 per participant **which is in line with the rates for the plans I cite in paragraph 28**" in Bray's expert report. ¶ 65. (emphasis added).

## VI.    CONCLUSION

For these reasons, the Court should deny Defendants' motion to exclude the testimony and opinions of Veronica Bray.

Dated:  February 6, 2024                         Respectfully Submitted,

**CAPOZZI ADLER, P.C.**

/s/ *Mark K. Gyandoh*
Mark K. Gyandoh (admitted *pro hac vice*)
James A. Wells (admitted *pro hac vice*)
312 Old Lancaster Road
Merion Station, PA  19066
Phone: (610) 890-0200
Fax: (717) 233-4103 (fax)
Email: Markg@capozziadler.com
           Jayw@capozziadler.com

Donald R. Reavey (admitted *pro hac vice*)
Brandon Williams (admitted *pro hac vice*)
2933 North Front Street
Harrisburg, PA  17110
Phone: (717) 233-4101
Fax: (717) 233-4103 (fax)
Email: Donr@capozziadler.com
           Brandonw@capozziadler.com

## CERTIFICATE OF SERVICE

I hereby certify that on February 6, 2024, a true and correct copy of the foregoing document was filed with the Court utilizing its ECF system, which will send notice of such filing to all counsel of record.

*/s/ Mark K. Gyandoh*
Mark K. Gyandoh, Esq.