UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

KENA MOORE, *et al.*                                         **Plaintiffs**

v.                                          Civil Action No. 3:21-cv-232-RGJ

HUMANA INC., *et al.*                                        **Defendants**

\* \* \* \* \*

## MEMORANDUM OPINION AND ORDER

Plaintiffs Kena Moore, Timothy K. Sweeney, Russel A. Hohman, Susan M. Smith, and Veronica Cargill (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, move to exclude the expert opinion of Pete Swisher ("Swisher") and for summary judgment. [DE 100; DE 101]. Defendants Humana Inc. ("Humana") and Humana Retirement Plans Committee (the "Committee") (collectively, "Defendants") responded, and Plaintiffs replied. [DE 104; DE 105; DE 110; DE 111]. Defendants move to exclude the expert testimony of Veronica Bray ("Bray") and also move for summary judgment. [DE 97; DE 99]. Plaintiffs responded, and Defendants replied. [DE 106; DE 107; DE 108; DE 109]. These motions are ripe. For the reasons below, Plaintiffs' motion to exclude Swisher is **DENIED**; Defendants' motion to exclude Bray is **GRANTED**; Plaintiffs' motion for summary judgment is **DENIED**; and Defendants' motion for summary judgment is **GRANTED**.

## I.       BACKGROUND

This class action arises under the Employee Retirement Income Security Act of 1974 ("ERISA"). [DE 17 at 78–79]. On behalf of the Humana Retirement Savings Plan (the "Plan") and its participants, Plaintiffs bring claims for (1) "Breach of Fiduciary Duty of Prudence" and (2) "Failure to Adequately Monitor Other Fiduciaries." [*Id.* at 78, 95–98]. The Plan exists to help its

participants save for retirement. [*Id.* at 88]. Defendants were fiduciaries of the Plan and hired Charles Schwab ("Schwab") as the recordkeeper for the Plan during the class period. [*Id.* at 90–91]. Plaintiffs allege that Defendants used an "imprudent process" to administer the Plan which led to excessive recordkeeping fees. [*Id.* at 91]. Plaintiffs also contend that, even though Defendants engaged in requests for proposals ("RFP") for the Plan and performed annual benchmarking using reports from third-party consultants, Schwab's recordkeeping fees were unreasonably high. [*Id.* at 92–93].

Throughout the class period, the Plan grew from roughly $3.5 billion with 49,150 participants in 2015 to roughly $6.5 billion with 58,735 participants in 2022. [DE 97-3 at 2053; DE 97-7 at 2213]. The Plan paid $37 per participant per year ("PPPY") in 2014, $23 in 2019, and $28 in 2021 to Schwab for recordkeeping services. [DE 17 at 93]. Roland Criss, a third-party consultant, performed annual benchmarking for the Plan from 2015–2018. [DE 97-7 at 2221]. Defendants conducted two RFPs—via Institutional Investment Consulting ("IIC"), which it hired to conduct the processes—in 2014 and 2019, and an additional RFP outside the class period after 2019. [*Id.* at 2221–22]. After considering more than 125 vendors, Schwab was selected out of 15 candidates in the 2014 RFP, and again out of more than 10 candidates in the 2019 RFP. [*Id.* at 2224, 2227]. Although it was not the only factor considered in Schwab's selection, Schwab offered the lowest recordkeeping cost among finalists in both the 2014 and 2019 RFP. [*Id.* at 2226, 2228].

## II.     MOTIONS TO EXCLUDE

Rule 702 of the Federal Rules of Evidence sets forth the standard of admissibility for expert testimony:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  In *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), "the Supreme Court established a general gatekeeping obligation for trial courts to exclude from trial expert testimony that is unreliable and irrelevant."  *Conwood Co. v. U.S. Tobacco Co.*, 290 F.3d 768, 792 (6th Cir. 2002) (alteration and internal quotation marks omitted).

> Under Rule 702 of the Federal Rules of Evidence, "a proposed expert's opinion is admissible . . . if the opinion satisfies three requirements.  First, the witness must be qualified by 'knowledge, skill, experience, training, or education.'  Second, the testimony must be relevant, meaning that it 'will assist the trier of fact to understand the evidence or to determine a fact in issue.'  Third, the testimony must be reliable."

*Burgett v. Troy-Bilt LLC*, 579 F. App'x 372, 376 (6th Cir. 2014) (quoting *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 528–29 (6th Cir. 2008)).

The Court does "not consider 'the qualifications of a witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question.'"  *Id.* (quoting *Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994)).  The Court must determine whether the witness is qualified to offer an opinion on the specific area of expertise.  *See In re Welding Fume Prods. Liab. Litig.*, No. 1:03-CV-17000, 2005 WL 1868046, at *5 (N.D. Ohio Aug. 8, 2005) ("An expert may be highly qualified to respond to certain questions and to offer certain opinions, but insufficiently qualified to respond to other, related questions, or to opine about other areas of knowledge."); *Mannino v. International Mfg. Co.*, 650 F.2d 846, 851 (6th Cir. 1981) ("[T]he only thing a court should be concerned with . . . is whether the expert's knowledge of the subject matter

is such that his opinion will likely assist the trier of fact in arriving at the truth.  The weight of the expert's testimony must be for the trier of fact.").

Along with expert qualifications, "[t]he Court must determine whether evidence proffered under Rule 702 'both rests on a reliable foundation and is relevant to the task at hand.'"  *Powell v. Tosh*, 942 F. Supp. 2d 678, 686 (W.D. Ky. 2013) (quoting *Daubert*, 509 U.S. at 597).  To assist with this determination, the Supreme Court in *Daubert* laid out several factors[1] for courts to consider.  *Daubert*, 509 U.S. at 592–94.  Courts have "stressed, however, that *Daubert's* list of specific factors neither necessarily nor exclusively applies to all experts or in every case . . . [i]n some cases . . . the factors may be pertinent, while in other cases the relevant reliability concerns may focus upon personal knowledge or experience."  *First Tenn. Bank Nat. Ass'n v. Barreto*, 268 F.3d 319, 335 (6th Cir. 2001) (finding the *Daubert* factors "unhelpful" in a case involving "expert testimony derived largely from [expert's] own practical experiences throughout forty years in the banking industry [because] [o]pinions formed in such a manner do not easily lend themselves to scholarly review or to traditional scientific evaluation") (internal citations omitted).  "[W]hether *Daubert's* specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine."  *Id.* (quoting *Kumho Tire*, 526 U.S. at 153) (internal quotation marks omitted).

### A.  Plaintiffs' Motion to Exclude Pete Swisher

Defendants' expert, Pete Swisher, holds a B.A. in Linguistics from the University of Virginia and is a certified financial planner.  [DE 97-7 at 2198].  He is currently the founder and

---

[1] The *Daubert* factors include "[w]hether a 'theory or technique . . . can be (and has been) tested'; [w]hether it 'has been subjected to peer review and publication'; [w]hether, in respect to a particular technique, there is a high 'known or potential rate of error' and whether there are 'standards controlling the technique's operation'; and [w]hether the theory or technique enjoys 'general acceptance' within a 'relevant scientific community.'"  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149–50 (1999) (quoting *Daubert*, 509 U.S. at 592–94).

president of Waypoint Fiduciary, LLC and co-founder and managing partner of Group Plan Systems, LLC. [*Id.* at 2196]. Per his expert report, he has worked in the retirement plan industry "as a writer, speaker, educator, government affairs leader, professional fiduciary, and industry expert" dealing with "investment, operational, and administrative duties across most plan types, including 401(k), 403(b), 457(b), ESOP, defined benefit, SIMPLE, SEP, multiple employer, and multiemployer plans, [including] both ERISA and non-ERISA plans such as governmental, church, and owner-only plans." [*Id.*]. He has published papers, articles, and a textbook and is involved in the leadership of professional trade organizations in the field. [*Id.* at 2196–97]. In his words, Swisher was retained to "evaluate (a) the process followed by Humana to oversee and monitor the recordkeeping services and fees associated with the [Plan], and (b) the reasonableness of the recordkeeping fees incurred by the Plan during the Class Period." [*Id.* at 2199]. Ultimately, Swisher concluded that Humana's process to monitor recordkeeping services and fees was reasonable and that the Plan's recordkeeping fees were reasonable. [*Id.* at 2218, 2239].

Plaintiffs advance two broad grounds to exclude Swisher's expert opinion as unsupported *ipse dixit*. First, they argue Swisher provides no basis for concluding that Defendants' use of RFPs and benchmarking through Roland Criss amounts to a prudent process, and his conclusion deviates from case law. [DE 100-1 at 3539–41]. Second, they argue Swisher has no basis for concluding the Plan's recordkeeping fees were reasonable.[2] [*Id.* at 3541–43]. According to Plaintiffs, Swisher's report rests on circular reasoning. [*Id.* at 3535 ("Swisher is essentially saying, 'The fiduciary process was prudent because fees were reasonable, and the fees were reasonable because

---

[2] These speak to the two elements Plaintiffs must prove to prevail on their claims: that (1) Defendants used an imprudent process to monitor recordkeeping fees and (2) the fees were "excessive relative to the services rendered." *Smith v. CommonSpirit Health*, 37 F.4th 1160, 1169 (6th Cir. 2022) (quoting *Young v. Gen. Motors Inv. Mgmt. Corp.*, 325 F. App'x 31, 33 (2d Cir. 2009)). Defendants hired Swisher to address these. [DE 97-7 at 2199].

the fiduciaries followed a prudent process.'")].   Defendants respond that Swisher's industry experience and relevant case law support his conclusions.  [DE 105 at 3975–84].  The Court addresses each argument in turn.

### i.  Swisher's Opinion on the Committee's Process

First, in attempting to attack the basis for Swisher's conclusion, Plaintiffs often attack the conclusion itself.  For instance, they argue that Swisher's opinion is contrary to a Ninth Circuit case that explained fiduciaries must continually monitor trust investments.  [DE 100-1 at 3539 (citing *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197 (9th Cir. 2016))].  Later, they assert that Swisher does not believe there was an obligation to continuously negotiate lower fees with Schwab, and that this belief is both inconsistent with recordkeeping fees decreasing across the industry and contrary to *Tibble*.  [DE 100-1 at 3540–41].

These arguments amount to attacks on Swisher's conclusions, not on his foundation or methodology.  Swisher's expert report outlines his extensive professional experience and the industry resources he draws upon to form his opinion,[3] and Plaintiffs challenge none of it.  An argument that Swisher's opinion was "directly contrary to duty of prudence caselaw" or that his opinion contradicts Plaintiffs' theory of the case—that Defendants had a duty to continuously negotiate lower recordkeeping fees with Schwab—does not address the basis for his opinion.  [*Id.* at 3541].  In other words, as Defendants argue in response, these arguments go to the weight of Swisher's opinions, which is an issue for the trier of fact.  [DE 105 at 3970, 3975]; *see Crouch v.*

---

[3] For example, Swisher identifies his role as a founder of two industry organizations, one of which provides consulting services and another which provides fiduciary services; points to publications which have regarded him as a reliable expert in the industry; cites his own publications which include numerous white papers and an 892-page textbook on 401(k) fiduciary governance; and details his long career in this field.  [DE 97-7 at 2196–98].  Having provided this background, he then describes his understanding of how 401(k) plan recordkeeping and administration functions, outlines standard industry practices for monitoring recordkeeping, and applies these principles to form his opinion that Humana's process was prudent, and its recordkeeping fees were reasonable.  [*Id.* at 2202–49].

*John Jewell Aircraft, Inc.*, No. 3:07-CV-638-DJH, 2016 WL 157464, at *20 (W.D. Ky. Jan. 12, 2016) ("Any disagreement with the [expert's] conclusions . . . is proper fodder [for] cross-examination, not a reason to exclude his opinion."); *In re Greyhound Lines Trial Grp.*, No. CV 05-239, 2008 WL 11343421, at *4 (E.D. Ky. Oct. 22, 2008) (recognizing that "disagreement with [expert's] opinions and conclusions is insufficient to exclude him from testifying").

A few of Plaintiffs' arguments approach challenging the basis for Swisher's opinion on whether Defendants used a prudent process, but his expert report itself shows they are meritless. For instance, Plaintiffs point out that Swisher admitted in deposition testimony that he was not aware of whether the Committee attempted to reduce its fees between 2015 and 2019. [DE 100-1 at 3540–41]. But, as Plaintiffs themselves acknowledge, Swisher was explicit that this information was irrelevant to his conclusions, explaining that "typical industry practice is that fees are not negotiated until the term of the contract nears expiration unless there are significant changes to the plan that alter service requirements or [information] indicates that existing fee arrangements are no longer reasonable." [*Id.*; DE 105 at 3977; DE 104-6 at 3934, ¶ 59]. Plaintiffs may counter that the Plan's growth during the class period and decreasing recordkeeping fees across the industry constituted a significant change, but Swisher found that the RFPs and annual benchmarking reports were sufficient to show the fee arrangement was still reasonable.

Plaintiffs also argue that the Roland Criss benchmarking reports were unreliable because they included "smaller plans with smaller participant sizes," and Swisher admitted in deposition testimony that "he had no way of knowing how many plans in the Benchmarking report were smaller or larger." [DE 100-1 at 3539–40]. But again, as Plaintiffs themselves acknowledge, Swisher explains his basis for crediting the Roland Criss reports as reliable benchmarks. [*Id.* at 3540 (quoting Swisher's expert report) ("[I]n my experience, benchmarking peer groups typically

include plans that are both smaller and larger, in terms of assets and participants, than the plan being benchmarked.")].  Even if Swisher did not know exactly how many comparators were larger than the Plan in the reports, he has provided sufficient basis for crediting them based on his industry knowledge, and courts have allowed experience-based testimony about industry practice.[4]

### ii.   Swisher's Opinion on Whether Fees Were Reasonable

Although Plaintiffs' arguments related to Swisher's opinion on the reasonableness of the recordkeeping fees do attack its foundations, they are not grounds for excluding Swisher's opinions.  Plaintiffs assert that the fees were not reasonable because NEPC surveys are not a "meaningful benchmark" for comparison.  [*Id.* at 3542 (citing *Matousek v. MidAmerican Energy Co.*, 51 F.4th 274, 280 (8th Cir. 2022))].  *Matousek* did not hold that NEPC surveys are never meaningful benchmarks, but rather that an NEPC report's usefulness as applied to that case was limited.  51 F.4th at 280 (explaining that because NEPC report only covered "basic recordkeeping services" and said "nothing about the fees for the other services that Merrill Lynch provided," it was not a good comparator for "*anything else*") (emphasis added).  *Matousek* also explained that there is "no one-size-fits-all approach" to benchmarking a particular plan—a similar perspective to Swisher's.  *Id.* at 281.  *Smith v. CommonSpirit Health*, which Plaintiffs also cite, reached a similar conclusion to *Matoushek* on this point.  37 F.4th 1160, 1169 (6th Cir. 2022) (explaining that an industry-average comparator did not account for all aspects of other plans).  Therefore, the

---

[4] Defendants provide multiple examples.  [DE 105 at 3978]; *see Troudt v. Oracle Corp.*, 369 F. Supp. 3d 1134, 1138–41 (D. Colo. 2019); *Acosta v. WPN Corp.*, No. CV 14-1494, 2018 WL 3707418, at *5–6 (W.D. Pa. Aug. 3, 2018).  Additionally, Defendants argue cases which have held experience-based testimony regarding industry practices was admissible are distinguishable from cases which have held experience alone was an insufficient basis for concluding a fee was reasonable.  [*Id.* at 3978–79].  Defendants provided examples of the latter.  *See Troudt*, 369 F. Supp. 3d at 1138–41; *Cunningham v. Cornell Univ.*, No. 16-CV-6525 (PKC), 2019 WL 4735876, at *9–10 (S.D.N.Y. Sept. 27, 2019) (excluding testimony regarding purported losses attributable to recordkeeping fees where experts did not explain methodology underlying asserted "reasonable" fee levels), *aff'd*, 86 F.4th 961 (2d Cir. 2023).  The Court agrees that Swisher's expert opinion falls in the former category, not the latter.

Court does not find that Swisher's consideration of NEPC surveys renders his testimony unreliable, as this was just one piece of the foundation for his opinions.

Finally, the Court disagrees with Plaintiffs' argument that Swisher's opinion rests on circular logic. [DE 100-1 at 3535 ("Mr. Swisher's circular reasoning fallacy provides no basis to conclude whether the Plan's fees were reasonable or whether the fiduciaries followed a prudent process.")]. Put another way, Plaintiffs argue that Swisher's conclusion assumes that the fees were automatically reasonable by virtue of a prudent process alone. But that is the nature of the inquiry—a prudent process involving competitive bidding (the RFPs), coupled with the Roland Criss reports and an independent comparison to NEPC surveys which Swisher used to show median recordkeeping fees, could form a basis for concluding that the fees were reasonable. The 2014 and 2019 RFPs not only could constitute part of a prudent process, but they also provided data that Swisher could consider to determine whether Schwab's recordkeeping fees were reasonable. The same is true for the annual Roland Criss reports, which provided data to support Swisher's opinion that the recordkeeping fees paid by the Plan were reasonable. It was logical for Swisher to rely on this same data to determine that the fee was reasonable, given that he believed the process that produced the RFPs and the Roland Criss reports was a prudent process, and that he also looked to outside data such as NEPC reports. [DE 105 at 3984].

Ultimately, many of Plaintiffs' objections to Swisher's opinion are not to the basis for his conclusion, but to the conclusion itself, which speaks to the weight of Swisher's opinion instead of its admissibility. To the extent that Plaintiffs do challenge Swisher's methodology, his opinion is not "connected to existing data only by the *ipse dixit* of [Swisher]." [DE 100-1 at 3536 (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997))]. Swisher's opinion that Defendants' reliance on RFPs and benchmarking reports resulted in a prudent process was based on his experience and

knowledge of industry practices. That is an acceptable basis for Swisher's expert opinion, especially because that experience explicitly relates to conclusions outlined in his expert report. The same is true for Swisher's conclusion that Defendants decision not to negotiate for lower fees during their initial contract with Schwab was part of a prudent process because it aligned with industry expectations, and that the resulting recordkeeping fees were reasonable. The Court will not exclude Swisher's testimony, and Plaintiffs' motion [DE 100] is **DENIED**.

### B. Defendants' Motion to Exclude Veronica Bray

Plaintiffs' expert, Veronica Bray, holds a B.S. in Business Administration from the University of North Carolina in Greensboro, as well as Financial Industry Regulatory Authority Series 6 and 63 licenses and a North Carolina Life Insurance license, among other "industry related designations." [DE 97-3 at 2049–50]. She has over two decades of experience in the retirement plan industry, including in "401(k) retirement plan third-party recordkeeping and administrative services at Paychex Securities" and providing ERISA "governed retirement plan advisor consulting services for Gate City Advisors[.]" [*Id.* at 2050]. Bray currently serves as the founder and Chief Executive Officer of Retirement Plan Advisor Search, which assists retirement plan fiduciaries and plan sponsors with finding service providers for their retirement plans. [*Id.* at 2051]. She states that she has "consulted with hundreds of retirement plan fiduciaries and retirement plan committees on all the moving parts of their organizations' retirement plans" since 2003 and served as an expert witness and consultant regarding retirement plan litigation since 2018. [*Id.* at 2051–52]. Per her expert report, Bray was retained in this case to "provide expert opinion and analysis of the oversight, process, decisions, and actions taken by [Defendants] during the Class Period" and opine on "whether Defendants' actions were consistent with the standard of care practiced by a prudent fiduciary acting in the best interest of Plan participants, and the losses

10

suffered by participants as a result of Defendants' failure to review and negotiate recordkeeping fees." [*Id.* at 2049]. Ultimately, Bray concluded that "Defendants failed to effectively negotiate reasonable recordkeeping fees, understand total compensation being paid to the Plan's recordkeeper, and employ other strategies to reduce fees being charged to Plan participants," which resulted in unreasonably high fees that "cost Plan participants millions of dollars from their retirement accounts." [*Id.* at 2053].

Defendants argue that Bray's opinion should be excluded because she (1) provides no basis for "how she arrived at the $12 to $20 PPPY range" that Plaintiffs say the Plan could have paid in recordkeeping fees, (2) offers "no evidence to show the [six plans selected] are actually comparable to the Humana Plan," and (3) "ignored more than half of the Class Period" by limiting her analysis to between 2020 and 2022. [DE 99 at 3514, 3521].

Bray's opinion focuses largely on the reasonableness of the recordkeeping fees paid by the Plan as compared to six other plans she chose for evaluation in her report.[5]  [DE 97-3 at 2061, ¶ 29]. Bray concludes that a reasonable fee would have been in the range of $12 to $20 PPPY—the fee range achieved by these six plans. [*Id.* at 2076, ¶ 65]. But she herself admits these plans were not comparable to the Humana Plan, [DE 97-5 at 156:17–18, 185:23–186:13], and Defendants argue that Bray "did not analyze the services provided to the [Plan] or the services provided to her

---

[5] The six plans cited by Bray only span from 2020–2022, omitting much of the class period and excluding the time period when Plaintiffs say the Committee should have renegotiated with Schwab for lower fees. [*See* DE 97-3 at 2061, ¶ 29]. Those plans are as follows: (1) Federal Express Corporation Pilots' Retirement Savings Plan, with $4,747,535,340 in assets, 5,918 participants, and a recordkeeping fee of $20.81; (2) Clifton Larson Allen, LLP 401(K) Retirement Plan with $1,241,954,741 in assets, 9,043 participants, and a $13.71 recordkeeping fee; (3) BlackRock Retirement Savings Plan with $3,828,146,761 in assets, 12,996 participants, and pays its own recordkeeping and trustee fees including an administration fee of $2.50; (4) The Vanguard Retirement and Savings Plan with $8,185,182,391 in assets, 22,485 participants, and a $12.05 recordkeeping fee; and (5) The Cargill Partnership Plan with $7,721,733,222 in assets, 44,511 participants, and a $15.11 recordkeeping fee. [*Id.* at 2061]. For the sixth plan, Bray merely notes that "[i]n 2020, Fidelity quoted a $14 to $21 [PPPY] recordkeeping fee in a lawsuit." [*Id.* (citing *Moitoso v FMRLLC*, 451 F.Supp.3d 189, 204 (D. Mass. Mar 27, 2020))].

six plans to determine if they were comparable[.]" [DE 99 at 3519]. Rather, she chose these plans merely "to kind of give an example of the buying power that these smaller plans had," and could not give an example of a comparable plan that achieved similarly low recordkeeping fees at her deposition. [DE 97-5 at 154:6–8, 175:16–177:11, 179:4–14]. Additionally, Bray relies heavily on her "experience," providing little explanation for how she applies that experience. *See Troudt*, 369 F. Supp. at 1139–41 (explaining that an expert must use a methodology to relate their "experience to the facts at hand in order to reach an expert opinion.") (citation omitted). Instead, she admits that she compared only the fees from the six plans she selected to the Humana Plan— she did not analyze other aspects of those plans, or the recordkeeping services provided to them at all. [DE 97-5 at 163:24–164:4].

Plaintiffs contend that Bray opines at length about her methodology. First, Bray asserts that recordkeeping fees have been trending downward over the past decade. [DE 107 at 4118; DE 97-3 at 2060, ¶ 28]. She points to her experience to assert that fiduciaries "have ongoing conversations with their plan's service providers, negotiate services and fees, and document these interactions," concluding that Defendants should have at least attempted to use their "leverage" to negotiate lower recordkeeping fees. [DE 107 at 4118; DE 97-3 at ¶¶ 28, 46, 47]. She states her belief that, because the Plan's members and assets increased substantially during 2015–2019, the Plan should have reduced its recordkeeping fee prior to the 2019 RFP process. [DE 107 at 4118]. Beyond her general experience and observation that recordkeeping fees were decreasing industry-wide during the class period (which Defendants do not dispute), Bray only relies on the five comparator plans she identifies and one case where "Fidelity quoted a $14 to $21 [PPPY] fee in a lawsuit." [*Id.* at 4112–19; DE 97-3 at 2061, ¶ 29].

While Bray may have admitted in her deposition that the six plans analyzed in her report—which she relied on to reach the $12–$20 figure that she says would have been reasonable for the Humana Plan to pay—were not comparable plans, the implicit logic of her opinion is that because "the Plan [had] greater bargaining power to negotiate lower recordkeeping fees than the comparator plans," it should have had fees *at least* "in line" with the plans cited by Bray.  [DE 107 at 4121–22].  At best, this connects Bray's experience to her analysis and conclusion, but it does not address the "specific question" she is charged with answering: whether the fee was "excessive relative to the services rendered."[6]  [DE 107 at 4123 (quoting *CommonSpirit*, 37 F.4th at 1169)]; *Berry*, 25 F.3d at 1351.

*Daubert's* factors are flexible and do not apply equally to every expert's testimony.  *See Barreto*, 268 F.3d at 335.  In this case, best practices for fiduciaries of retirement plans are not an exact science and rely heavily on industry knowledge and experience, therefore *Daubert's* factors are less helpful than in other contexts.  *See id.*  It is true that Bray is generally qualified by knowledge and experience in this field, with over two decades of professional involvement within the industry in various roles.  [DE 97-3 at 2050].  Bray's testimony also may even help the trier of fact understand how the Plan's fees generally compare to smaller plans, such as the ones she cites in her report.  Still, Bray is charged with answering a "specific question," and Defendants principally challenge the *reliability* of Bray's opinion to address the dispositive issues in this case.

---

[6] Plaintiffs argue that "this court held that Plaintiffs' Amended Complaint satisfied the holding of [*CommonSpirit*] requiring that Plaintiff[s] show Recordkeeping fees were, 'excessive relative to services rendered.'"  [DE 107 at 4124].  That is a flagrant mischaracterization of what this Court said and the standard it was applying.  When considering earlier motions to dismiss and to reconsider in this litigation, the Court held that Plaintiffs had *alleged*, on the face of their complaint, that they were comparing "similarly situated" plans.  *Moore v. Humana, Inc.*, No. 3:21-CV-232, 2022 WL 20766504, at *2 (W.D. Ky. Dec. 2, 2022).  Conveniently, Plaintiffs leave out the fact that the Court was comparing their complaint to the *complaint* in *CommonSpirit*, not its holding or its ruling on summary judgment.  *Id.*  Nothing in this Court's previous ruling at the motion to dismiss stage, including its ruling on the motion to reconsider, considered the reliability of Bray's expert opinion or the merits of Plaintiffs' allegations.

The Court finds that Bray's opinion applies no reliable methodology to the pertinent questions in this litigation: whether Defendants' process was prudent and whether recordkeeping fees were ultimately "excessive relative to the services rendered." *CommonSpirit*, 37 F.4th at 1169.  Bray's method—essentially, reasoning by inference that, because the six smaller plans were able to achieve a fee in the $12–$20 range, it follows that Humana should have also been able to negotiate for fees in that range—is not a reliable basis for concluding the fees were unreasonably high. *See United States v. Frazier*, 387 F.3d 1244, 1261 (11th Cir. 2004) (quoting the "Committee Note to the 2000 Amendments of Rule 702") ("[I]f the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.").  Defendants cite several cases where courts have excluded expert testimony for exactly this reason in ERISA litigation. *Huang v. TriNet HR III, Inc.*, No. 8:20-CV-2293-VMC-TGW, 2023 WL 3092626, at *9–10 (M.D. Fla. Apr. 26, 2023) (explaining that "[the expert] does not indicate a single plan in his experience with $30 per participant fees for similar services" and "offers no rationale in his report for why or how the comparator plans were selected," then concluding that because "[the expert] purports to have 'considered' the recordkeeping fees for several plans incomparable in size and structure to the Plan and relied on his experience to determine what a reasonable fee should have been," the expert's methodology was "insufficient to support his opinion"); *Cunningham*, 2019 WL 4735876, at *9 (excluding expert testimony where "[h]e does not detail how his knowledge and experience led him to calculate the fees for the time periods listed, or why those numbers are reasonable in light of any features of the Plans"); *Pledger v. Reliance Tr. Co.*, No. 1:15-CV-4444-MHC, 2019 WL 4439606, at *17 (N.D. Ga. Feb. 25, 2019) (excluding expert testimony where expert "did not use any pricing models from any recordkeeper

when performing his analysis" or "any objective source of pricing information from a third party[.]") (emphasis omitted); *Reed v. MedStar Health, Inc.*, No. CV JKB-20-1984, 2023 WL 5154507, at *12 (D. Md. Aug. 10, 2023).

This case law is consistent with recently decided cases identified by Defendants in two notices of supplemental authority. [DE 119; DE 121]. First, in *Rodriguez et al. v. Hy-Vee, Inc. et al.*, No. 4:22-cv-00072-SHL-WPK (S.D. Iowa), the United States District Court for the Southern District of Iowa explained the plaintiffs did not provide a "sound basis for comparison—a meaningful benchmark—not just alleging that costs are too high, or returns are too low." [DE 119-1 at 4234 (quoting *Matousek*, 51 F.4th at 278) (cleaned up)]. Although the *Rodriguez* court denied the defendants' motion to exclude Bray (the same expert in this case) as moot,[7] it held that Bray's comparator plans were not an "apples-to-apples comparison." [*Id.* at 4236]. *Rodriguez* also found that Bray's selection of comparator plans from a limited time to be an unreliable method. [*Id.* ("Bray measured the recordkeeping fees charged by those four comparators for only one year out of the seven-year class period.")]. Second, in *Garcia et al. v. Alticor, Inc. et al.*, No. 1:20-cv-01078-PLM-PJG (W.D. Mich.), the United States District Court for the Western District of Michigan excluded an expert opinion, holding that the $14–$21 benchmark in *Moitoso* was unreliable—a data point that Bray also relies on in this case. [DE 121-1 at 4267–68].

The Court finds the approach in *TriNet*, *Cunningham*, and *Pledger* persuasive, as well as the recent analyses in *Rodriguez* and *Alticor*. Because Bray provides no reasonable explanation for her selection of the six plans and herself acknowledges they are not comparable to the Humana

---

[7] The court in *Rodriguez* granted summary judgment for the defendants, holding that even if Bray's testimony was admissible, it still did not create a genuine dispute of fact. For that reason, it found that it was unnecessary to rule on the motion to exclude Bray, denying it as moot. Regardless, the Court finds *Rodriguez's* analysis of Bray's expert testimony applicable and persuasive.

Plan, the Court will exclude her testimony under *Daubert* and Rule 702.  Defendants' motion to exclude Bray's testimony [DE 99] is **GRANTED**.

### III.     MOTIONS FOR SUMMARY JUDGMENT

Under Federal Rule of Civil Procedure 56, summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The essential inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52.  The movant has the initial burden to demonstrate the lack of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmovant, who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256 (discussing Fed. R. Civ. P. 56(e)).  "[T]he court must view the evidence in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." *Sagan v. United States*, 342 F.3d 493, 497 (6th Cir. 2003) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

Both parties must support their assertions "that a fact cannot be or is genuinely disputed" by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c)(1)(A).  Alternatively, either party may carry its burden by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1)(B).

It is not enough for the nonmovant to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. Rather, the nonmovant must sufficiently allege a fact that, if proven, "would have [the] effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties." *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984) (citation omitted). If the nonmoving party does not respond with specific facts showing a genuine issue for trial, summary judgment is appropriate. *Emmons v. McLaughlin*, 874 F.2d 351, 353 (6th Cir. 1989).

## A. ERISA Standard

To prevail on their claims, Plaintiffs must show both that Defendants breached their fiduciary duty of prudence and that recordkeeping fees were ultimately unreasonable. Under ERISA, a fiduciary must act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent [person] acting in a like capacity and familiar with such matters would use[.]" 29 U.S.C. § 1104(a)(1)(B). This first "duty of prudence" part of the test considers "whether the individual trustees, at the time they engaged in the challenged transactions, employed the appropriate methods to investigate the merits of the investment and to structure the investment." *Hunter v. Caliber Sys., Inc.*, 220 F.3d 702, 723 (6th Cir. 2000) (citation and quotation marks omitted). This requires the Court to focus "on whether the fiduciary engaged in a reasoned decision[-]making process, consistent with that of a prudent man acting in [a] like capacity." *Pfeil v. State St. Bank & Tr. Co.*, 806 F.3d 377, 384–85 (6th Cir. 2015) (quoting *Tatum v. RJR Pension Inv. Comm.*, 761 F.3d 346, 356 (4th Cir. 2014)) (emphasis omitted) (alteration in original). When a fiduciary "appropriately investigate[s] the merits of an investment decision prior to acting," it "easily clear[s] this bar." *Id.* at 385 (quoting *Tatum*, 761 F.3d at 358) (emphasis omitted) (alteration added).

"In addition, 'under trust law, a fiduciary normally has a continuing duty of some kind to monitor investments and remove imprudent ones.'" *Id.* at 383 (quoting *Tibble v. Edison Int'l*, 135 S.Ct. 1823, 1828–29 (2015)).  But "[b]ecause the content of the duty of prudence turns on 'the circumstances . . . prevailing' at the time the fiduciary acts, the appropriate inquiry will necessarily be context specific." *CommonSpirit*, 37 F.4th at 1164–65 (quoting *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014)).  "[T]he circumstances facing an ERISA fiduciary will implicate difficult tradeoffs, and courts must give due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise." *Id.* at 1165 (quoting *Hughes v. Nw. Univ.*, 595 U.S. 170, 177 (2022)).

For the second part of the test, because fiduciaries are liable for "any losses to the plan," *Tullis v. UMB Bank, N.A.*, 515 F.3d 673, 677 (6th Cir. 2008), the recordkeeping fees paid by the Plan must cause a loss because they were "excessive relative to the services rendered." *CommonSpirit*, 37 F.4th at1169; *see also Miller v. Yazaki N. Am., Inc.*, No. 06-10841, 2006 WL 3446246, at *4 (E.D. Mich. Nov. 27, 2006).

The parties each filed competing motions for summary judgment.  Because the arguments in each motion for summary judgment overlap, the Court considers them together to analyze whether there is any genuine dispute of fact as to (1) whether the Committee used a prudent process and (2) whether the recordkeeping fees were excessive relative to the services rendered.

### B.  Whether the Plan Utilized a Prudent Process

Plaintiffs argue that "the undisputed evidence shows that the Defendant-fiduciaries breached their fiduciary duty of prudence regarding the Plan's recordkeeping fees from 2015 to 2019."  [DE 101-1 at 3679].  Their primary argument is that "[a] prudent fiduciary . . . would have recognized the recordkeeping fees were excessive and would have negotiated reasonable

recordkeeping fees," given the Plan's growth from 2015 to 2019 when Plaintiffs say Defendants failed to utilize a prudent review process.  [*Id.* at 3680].  Defendants argue that "Plaintiffs' claim fails . . . because discovery has not revealed a single defect or shortcoming in the Committee's process for monitoring the Plan's recordkeeping fees."  [DE 97 at 2009].  At bottom, Plaintiffs and Defendants offer competing theories of what constitutes a prudent process.  Plaintiffs do not dispute that Defendants engaged in RFPs and annual benchmarking; they simply contend that these do not amount to a prudent process.  And Defendants do not dispute that the Committee did not seek to continually negotiate the lowest possible recordkeeping fee with Schwab; they merely assert that this was unnecessary, and they had no duty to do so.  In other words, the material facts related to the Committee's process are *not* in dispute—the parties only dispute whether they amounted to a prudent process.

First, Plaintiffs' argument that the Plan's failure to have a fee policy statement amounted to an imprudent process is unpersuasive.  From the start, Plaintiffs admit "ERISA does not require plan fiduciaries to have [a fee policy statement]."  [DE 101-1 at 3681].  Quite simply, while perhaps a fee policy statement may help ensure that a fiduciary's process is prudent, it is not required by ERISA.  As Defendants argue, Plaintiffs point to no case law even suggesting that a fee policy statement is a required part of a prudent process, or that its absence is evidence of an imprudent process.  [DE 104 at 3842–43].  The Court also agrees that Plaintiffs do not "show that the absence of [a fee policy statement] in this case had any effect on the Plan's recordkeeping fees[.]"  [*Id.* at 3843].  As a result, nothing in the record suggests that a fiduciary's process cannot be prudent without the aid of a fee policy statement.

Second, ERISA imposed no explicit duty on Defendants to "attempt to negotiate a lower fee between 2015 and 2019."  [DE 101-1 at 3682].  It is true that the Plan grew between 2015 and

2019, both in total assets and individual members.  [*Id.*].  And Defendants do not dispute that the Committee did not attempt to negotiate with Schwab for lower fees during this period.  Therefore, it is undisputed that Defendants also did not "leverage plan assets and participant size to negotiate the highest level of services and lowest fees from their recordkeeper" on an ongoing basis throughout the contract with Schwab, as Plaintiffs say they should have.  [DE 101-1 at 3684].  Plaintiffs rely on *Tibble* to argue that the Committee should have continually negotiated with Schwab for lower prices throughout 2014–2019, but *Tibble* does not require that.  Instead, *Tibble* stands for the proposition that fiduciaries should continue to ensure that recordkeeping fees are reasonable, but it does not prescribe any particular method for doing so.[8]  *See Tibble*, 843 F.3d at 1197–98.  Swisher opined that the Committee's method for ensuring the fee remained reasonable—i.e., using RFPs and annual benchmarking—was a responsible method and consistent with industry practices.  Defendants point out that the RFP process even accounted for a broad set of factors beyond price alone, including the Plan's size, relationship with Schwab, Schwab's compensation, and Schwab's services and offerings.  [DE 104 at 3845].  As they argue, courts have held that competitive bidding, such as the RFPs, is "'compelling evidence' of a prudent process."  [*Id.* (quoting *TriNet*, 2023 WL 3092626, at *11)].

The Court finds there is no genuine dispute of fact that the Committee's process was prudent.  Swisher opined that the RFPs were conducted in a prudent manner consistent with industry practice.  [DE 97 at 2020; DE 97-7 at ¶¶ 85, 92–94].  He also explained that the Roland

---

[8] Plaintiffs' argument that Defendants had a duty to continuously renegotiate is analogous to arguing that a fiduciary must continuously engage in competitive bidding, which courts have repeatedly rejected. Defendants provide numerous examples of this.  [DE 104 at 3845–46]; *see, e.g.*, *Marshall v. Northrop Grumman Corp.*, No. 2:16-cv-06794-AB (JCX), 2019 WL 4058583, at *10 (C.D. Cal. Aug. 14, 2019) ("The allegation that the Plan fiduciaries were required to solicit competitive bids on a regular basis has no legal foundation.") (citation omitted); *White v. Chevron Corp.*, No. 16-CV-0793-PJH, 2016 WL 4502808, at *14 (N.D. Cal. Aug. 29, 2016) (acknowledging "nothing in ERISA compels periodic competitive bidding"); *Albert v. Oshkosh Corp.*, 47 F.4th 570, 579 (7th Cir. 2022).

Criss benchmarking reports were reliable and employed "commonly used thresholds" for peer grouping. [DE 104 at 3847]. And as Defendants point out, the Committee's use of RFPs and annual benchmarking reports was consistent with other cases where courts found a fiduciary's process to be prudent. [DE 97 at 2020]; *see*, *e.g.*, *TriNet*, 2023 WL 3092626, at *11–12; *Marshall*, 2019 WL 4058583, at *11. Plaintiffs have no factual support for their position that a $12–$20 recordkeeping fee would have been reasonable for the Plan to pay. Plaintiffs also point to no case law suggesting that a prudent process must involve continuous negotiations with a recordkeeper for lower fees throughout a contract period. *C.f. Hughes v. Nw. Univ.*, 63 F.4th 615, 625 (7th Cir. 2023) (quoting *Hecker v. Deere & Co.*, 556 F.3d 575, 586 (7th Cir. 2009)) ("[N]othing in ERISA requires every fiduciary to scour the market to find and offer the cheapest possible fund."); *see also CommonSpirit*, 37 F.4th at 1169 (citing *Hecker*, 556 F.3d at 586) ("Other appellate courts have also rejected challenges to ERISA plan management fees where it is clear those fees are set by market forces.").

### C. Whether the Recordkeeping Fees Were Reasonable

Even if there were a genuine dispute of fact on the Committee's process, there can be no doubt that Plaintiffs have failed to demonstrate any dispute of fact on whether the recordkeeping fees were excessive relative to the services provided. Plaintiffs' only evidence in support of their argument that the recordkeeping fees were too high was Bray's testimony. [*See* DE 101-1 at 3688–89; DE 121-1 at 4274 (holding that "[w]ithout evidence of loss, Plaintiffs' claims fail" after excluding the plaintiffs' expert)]. But as the Court has already explained, Bray's testimony rested on an unreliable foundation to answer this question, and so the Court has excluded it and will not consider it here. *See CommonSpirit*, 37 F.4th at 1169 (quoting *Young*, 325 F. App'x at 33) ("[Plaintiff] has failed 'to allege that the fees were excessive relative to the services rendered.

[Plaintiff] also allege[s] no facts concerning other factors relevant to determining whether a fee is excessive under the circumstances.").   On the other hand, Defendants have shown that Schwab's recordkeeping fees produced the lowest cost to the Plan of any candidates solicited via the RFPs competitive bidding, and that annual benchmarking revealed the Plan's fees were still reasonable. As a result, Defendants are also entitled to summary judgment on this element.

### D.  Plaintiffs' Failure to Monitor Claim

Defendants are correct to argue that failure to monitor claims are "'essentially derivative of the breach of fiduciary duty claim' and cannot survive without a viable claim regarding an underlying fiduciary breach." [DE 97 at 2024 (quoting *Dorman v. Charles Schwab Corp.*, No. 17-CV-00285-CW, 2018 WL 6803738, at *7 (N.D. Cal. Sept. 20, 2018))].   Because Defendants are entitled to summary judgment on their breach of fiduciary duty claim, Plaintiffs' failure to monitor claim necessarily also fails.   Accordingly, Plaintiffs' motion for summary judgment [DE 101] is **DENIED** and Defendants' motion for summary judgment [DE 97] is **GRANTED**.

### IV.    CONCLUSION

For the reasons explained, and the Court being otherwise sufficiently advised, it is

**ORDERED**:

1.  Plaintiffs' motion to exclude Pete Swisher [DE 100] is **DENIED**.

2.  Defendants' motion to exclude Veronica Bray [DE 99] is **GRANTED**.

3.  Plaintiffs' motion for summary judgment [DE 101] is **DENIED**.

4.  Defendants' motion for summary judgment [DE 97] is **GRANTED**.

5.  The Court will enter a final judgment in favor of Defendants by separate order, pursuant
    to Federal Rule of Civil Procedure 58.

Rebecca Grady Jennings, District Judge
United States District Court

cc: counsel of record                                    May 22, 2024

23